IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


BRET A. BIELEMA                                                                PLAINTIFF

v.                                          Case No. 5:20-cv-05104-PKH

THE RAZORBACK FOUNDATION, INC.                                    DEFENDANT


**BRIEF IN SUPPORT OF RESPONSE OPPOSING
RAZORBACK FOUNDATION'S MOTION
TO DISMISS AMENDED COMPLAINT**


Through the undersigned counsel, the plaintiff, Bret A. Bielema ("Coach Bielema"), states the

following in opposition to The Razorback Foundation, Inc.'s ("Foundation") Motion to Dismiss

Amended Complaint ("Motion")[1]:


**INTRODUCTION**

Eighteen months after declaring that Coach Bielema breached the terms of the Final Buyout

Agreement ("Agreement"), the Foundation has yet to decide what the terms of the Agreement

mean.  Beginning with its January 31, 2019 Demand Letter and through its recent court filings, the

Foundation's characterization of the Agreement continues to evolve to a degree that the

Foundation's position has become indefensibly absurd. For example, in seeking to dismiss the

Complaint, the Foundation asserted for the first time that "[Coach Bielema's] obligations would

be satisfied only by obtaining a job that paid more than $150,000." The most careful, microscopic

review of the Agreement would not reveal a single word, phrase, or sentence that imposed an

---

[1] To the extent the Foundation incorporated its Motion in the conditional waiver, *№ 23*, Coach Bielema
likewise asserts these arguments with respect to that waiver.

obligation on Coach Bielema to seek the highest-paying position he could obtain – much less to seek a position that paid more than $150,000 per year. Perhaps the Foundation thought that was the deal, but anyone who's actually read the Agreement would know better. This recent example of the Foundation straining credulity has become a pattern that repeats itself as the Foundation struggles to avoid federal court in its most recent motion to dismiss.

The Foundation devoted nearly six pages of its supporting brief to disparaging Coach Bielema and offering what it calls "facts" that have little, if anything to do with the issues in the Motion. On its face, the Foundation's lengthy statement of "facts" and contradictions of averments in the Amended Complaint looks like a request to resolve fact issues against the pleader on the strength of counsel's statements in a brief. As Judge H. Franklin Waters once observed in a 1991 defamation case, we assume that section "was written for a broader audience."

As explained below, the only real issue before the Court is whether the forum-selection clause of the Agreement means what it says or whether "Washington County" should be given a previously unheard of meaning. Though we believe the Court should give short shrift to the Foundation's jurisdictional "red herring" argument, that issue too is fully briefed below.

## CONTRACT ANALYSIS

The Amended Complaint reflects that Coach Bielema went above and beyond what the Agreement required. To avoid paying him as agreed, the Foundation has simply invented a new one. As noted above, the Foundation relies on words and phrases that don't exist for every argument in its Motion. Further, if the Foundation truly intended to seek dismissal "with prejudice" on the merits of Coach Bielema's contract claim,[2] it has profoundly misread that contract.

---

[2] Because the Foundation calls Coach Bielema's imagined acts of breach "the case that a court will eventually decide[,]" *№ 22* at 2 n.1, we assume the request for dismissal "with prejudice" under Rule 12(b)(6)

2

According to the Foundation's recent motions, the Agreement contained an invisible-ink requirement that Coach Bielema immediately "obtain other employment" at more than $150,000 in 2018. That is not required by the Agreement or by any provision of law, and the Foundation saying it's a requirement doesn't make it so. The reference to $150,000 in the Agreement does not have any connection to the sentence that required Coach Bielema to "seek and to obtain other employment." It appears in the schedule of exempt income ("Schedule"):

| | |
|---|---|
| Nov. 25, 2017 to Dec. 31, 2017 | $150,000.00 |
| Jan. 1, 2018 to Dec. 31, 2018 | $150,000.00 |
| Jan. 1, 2019 to Dec. 31, 2019 | $125,000.00 |
| Jan. 1, 2020 to Dec. 31, 2020 | $100,000.00 |

№ 19-5 at 4–5 ¶ 5(B)(v). The Foundation's interpretation of the Agreement would be bizarre if 2018 were the only year in the Schedule. On the full schedule, however, the Foundation's interpretation of the Agreement becomes preposterous.

After all, if the Foundation really believes the 2018 exemption defined a $150,000 salary Coach Bielema must obtain in the "first full year of the Release Agreement" to avoid an incurable breach,[3] what consequence does the Foundation attach to the smaller exemptions in 2019 and 2020? Does it contend that Coach Bielema was permitted (or even required?) to negotiate a salary that declined with time? Probably not, but that would be the result if the Court were to embrace

---

means a dismissal with prejudice to refiling outside the Circuit Court of Washington County, Arkansas. *See Northport Health Services, Inc. v. Ellis* ("*Northport*"), No. 2:20-CV-02021-PKH, 2020 U.S. Dist. LEXIS 62901, at *14 (W.D. Ark. Apr. 10, 2020) (dismissing under *forum non conveniens* "without prejudice to its refiling in the forum agreed to by the parties."). The contract analysis is offered in an abundance of caution. Similarly, to the extent the Foundation complains under Rule 8 about the length of the Amended Complaint, that length was needed to describe the unique job market for elite football coaches and unique considerations that come into play in head coach buyout agreements, though Coach Bielema could, Fed. R. Civ. P. 9(c), and did, *№ 19* ¶ 141, plead generally that he had performed all conditions precedent to the Foundation's obligation to pay him.

[3] *Compare № 13* at 1 & n.1 ("Specifically, his obligations would be satisfied only by obtaining a job that paid more than $150,000.") *with № 22* at 1–2 & n.1. The Foundation cannot crawfish away from the theory of breach it stated in January 2019, *№ 19* ¶ 98, with two years left in the contract term. *See Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 363 (7th Cir. 1990) (Posner, J.)("mend the hold" prevents a contracting party from "hok[ing] up a phony defense to the performance of [its] contractual duties" and then changing its position in litigation); *accord Harriman v. Meyer*, 45 Ark. 37, 40 (Ark. 1885).

the Foundation's attempt to devise a brand-new breach of contract theory by pointing to contract language that doesn't exist.

The absurdity of the premise described in the Foundation's recent motions does not end there. Though 2018 was the first "full year" of performance, as the Foundation notes, the Schedule includes the same $150,000 exemption for the end of 2017. But 2017 had already passed when the Agreement was signed in January 2018. *№ 19* ¶ 5. The Foundation was well aware that Coach Bielema had not earned more than $150,000 from other employment in the last five weeks of 2017. The notion that Coach Bielema's failure to earn more than $150,000 in 2018 was *per se* a breach of contract would imply he was in breach of his obligations the minute he signed the Agreement.

The Foundation's notion that the Schedule imposed a duty to earn more than a specific amount is not its only misconstruction of Coach Bielema's mitigation duty. The central provision, Paragraph 5(B), is this:

> (i)   Bielema shall have an affirmative duty of mitigation to diligently seek and to obtain other employment. Every six (6) months during the life of this Agreement, Bielema shall provide a written summary to the Foundation of his efforts to find other employment.
>
> (ii)  The Parties understand and agree that if Bielema is successful in gaining such re-employment, or alternative employment of any kind . . . ("Other Employment"), Bielema shall notify the Foundation in writing of his Other Employment and his total Other Income (as herein defined). Upon the Foundation's written request, Bielema shall cooperate and provide records verifying such Other Income (as defined herein).

*№ 19-5* at 4 ¶ 5(B). There are just two sentences in the "mitigation clause" in Paragraph 5(B)(i). The first sentence required Coach Bielema to "diligently seek and to obtain other employment." *Id.* ¶ 5(B)(i). The second sentence required him to report on his job search until he found one. *Id.* After he found a new job, nothing required him to keep looking for others. Indeed, Paragraph 5(B)(ii) contemplates that he might fail to obtain any employment at all. The parties agreed that "*if Bielema [was] successful* in gaining such re-employment, or alternative employment of any kind", his

duties would change to reporting income on request and offsetting any nonexempt part. *Id.* ¶ 5(B)(ii).

The Foundation's ever-changing characterization of Coach Bielema's obligations is not the only moving target in this litigation. Having found no evidence to support the allegations it made to assert a breach by Coach Bielema, the Foundation uses its latest mischaracterization of the Agreement to invent new grounds for an alleged breach. Despite the absence of any contractual obligation to seek the highest paying available job, the Foundation's motion includes an irrelevant rant about how much money Coach Morris and Coach Bielema's former assistants are earning. If the Foundation could point to anything in the Agreement that supported its recently invented theory, those comparisons might call for an explanation. And, for what it's worth, an explanation is readily available. But under the terms of the Agreement the Foundation drafted and signed, Coach Bielema had every right to accept a position that, in his judgment, would put him in the best position to become a top-tier candidate for a DI head coach position. The Foundation could have imposed a condition on Coach Bielema that deprived him of that right, but no such restraints can be found anywhere in the Agreement – either expressed or implied.

As explained in the section that follows, as with its interpretation of the "mitigation clause," the Foundation's attempt to rewrite the forum-selection clause is based on invented nuances in language that could not be clearer. "Washington County" means just that – a location, not a forum – and no amount of torture will make those words say "Washington County Circuit Court."

## FORUM SELECTION

Outside the Tenth Circuit, courts overwhelmingly hold that a forum-selection clause that designates a county where both a state and a federal court sit "permit[s] the case to be filed with any court, whether state or federal, that is located *within the contractually described geographical*

*boundary.*" *Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 676 (4th Cir. 2018) (emphasis added); *see also, e.g.*, *Blanca Peak Res., LLC v. Big Star Energy Ltd.*, 2020 U.S. Dist. LEXIS 50424, at *1 (N.D. Tex. Mar. 24, 2020) (clause "the forum for the litigation of any such dispute is Dallas County, Texas" did not "imply state rather than federal jurisdiction"); *Weener Plastics, Inc. v. HNH Packaging, LLC*, 2009 U.S. Dist. LEXIS 130499, at *22 (E.D.N.C. Apr. 9, 2009) (dismissing in part because parties chose "[v]enue shall be Wilson County, North Carolina" and "there is no federal district court in Wilson County."); *Nahigian v. Juno-Louduon, LLC*, 661 F. Supp. 2d 563, 567-568 (E.D. Va. 2009) (agreement that "[t]he sole venue for any litigation shall be Loudoun County, Virginia" held unambiguous and "'plainly geographic,' as it contains only a reference to a location, with no reference to a specific court, court system, or sovereign."); *Hope Cancer Treatment Found., Inc. v. Mountaineer Park, Inc.*, 2007 U.S. Dist. LEXIS 3979, at *2 (W.D. Pa. Jan. 19, 2007) (dismissing where "[v]enue shall be Hancock County, West Virginia" because no federal court sits there). The presence or absence of a federal courthouse in the chosen county usually ends the inquiry.[4]

Thus, the Ninth Circuit briskly held that "[a]n agreement limiting venue to a particular county unambiguously prohibits litigation in federal court when there is no federal courthouse located in the designated county." *City of Albany v. CH2M Hill, Inc.*, 924 F.3d 1306, 1308 (9th Cir. 2019). The "clear import" of that clause was to "ensure that any litigation would take place within the geographic boundaries of [the chosen county]." *Id.*

Likewise, in *Yakin v. Tyler Hill Corp.*, the Second Circuit held that when a forum-selection clause "merely contains obligatory venue language, it conveys nothing about the parties' intent as

---

[4] Some courts have held that a geographic designation permits litigation in a federal venue that encompasses the specified place. *E.g.*, *Links Design, Inc. v. Lahr*, 731 F. Supp. 1535, 1536 (M.D. Fla. 1990) (agreement that venue "shall be Polk County, Florida" included federal district court for the district that included that county).

to jurisdiction." 566 F.3d 72, 76 (2d Cir. 2009). Otherwise, that agreement might have implied intent to allow a federal forum, because a federal court sat in Nassau County, the "venue and place of trial of any dispute", when it was entered. But that courthouse had closed, so a federal trial there was impossible. Otherwise, "remand would have been improper." *Id.* at 76.

The Fifth Circuit held the same when parties reached federal court too soon. By statute, court for the Sherman Division of the Eastern District of Texas "shall be held in Plano", a city mostly encompassed in the county the parties chose. *Collin County v. Siemens Bus. Servs.*, 250 F. App'x 45, 52-53 (5th Cir. 2007) (unpublished). A future federal courthouse was planned. However, "no federal district court was then sitting or had ever sat, in Collin County" when the parties removed the action, and no one argued the planned courthouse would be completed before trial. *Id.* at 54.

None of these authorities addresses the Foundation's additional hardship here: The need to persuade the Court that the parties' last contract chose the *exact same* state forum they had unambiguously chosen twice, but used entirely different language to choose it. Worse, having used entirely different language to describe where an action must be filed and having argued that the new language chose the same forum, the Foundation has given no explanation for the drafting change. Why change out contract language that isn't broken if you didn't intend for it to have a different meaning? Having passed on the opportunity to provide an explanation, the Foundation's assertion that it intended no change from the previous agreement does not ring true.

Further, the Foundation neglects that Washington County, Arkansas is the only place in this Division a federal case could be tried, and that after *Atlantic Marine*, either party could invoke their agreement that "Washington County, Arkansas shall be the exclusive venue" to require transfer to this Division from another federal forum or oppose transfer elsewhere.

*The parties chose to allow any action arising from the Final Buyout Agreement to be filed in or removed to this federal forum.*

We find nothing ambiguous in a clause making "Washington County, Arkansas" the place where an action must be brought and tried. If the Court disagrees, however, it should resolve the ambiguity to allow suit in this federal forum. This Court acknowledged in *Northport* that interpreting an ambiguous clause is an earnest inquiry in which a court should "place itself in the same situation as the parties who made the contract" to view the circumstances as the parties would have. 2020 U.S. Dist. LEXIS 62901, at *9 (citation omitted). There, the clause in a repeat litigant's form contract allowed any Arkansas county to be inscribed as the chosen forum, whether a federal court sat there or not. *Id.* at *9–13. That prevented any inference that writing "Sebastian County" meant the parties to that particular contract deliberately allowed a federal forum. *Id.* at *12–13.

Here, new language in the Final Buyout Agreement repeatedly shows the parties were mindful of diversity jurisdiction and intended to permit suit in this forum. And so do the surrounding circumstances. The 2012 Buyout Agreement was signed as Coach Bielema committed to become a long-term co-citizen with the Foundation. With the 2015 Buyout Agreement, as the University raised Coach Bielema's salary and extended his contract term, they were even more hopeful.

By January 2018, however, Coach Bielema's employment with the University was done. And though the parties to the Agreement could not know the amount in controversy for a future action, they knew it would be between "citizens of different States[.]" 28 U.S.C. § 1332(a)(1). Coach Bielema did not intend to remain in Arkansas. Indeed, the duty to "diligently seek and to obtain" other employment all but compelled him to leave.

Comparing the forum-selection clauses in the three Buyout Agreements reveals at least three indications the parties intended the last Agreement to permit suit in this forum. The past agreements used this language:

> This Agreement is governed by and shall be construed and enforced under the laws of the State of Arkansas, and venue for this Agreement shall lie solely with the Circuit Court of Washington County, Arkansas.

*№ 19-3 & 19-4* at 5 ¶ 15. The Final Buyout Agreement replaced almost every word:

> Governing Law. This Agreement shall be governed by the laws of the State of Arkansas without regard to its choice of law principles. Washington County, Arkansas, shall be the exclusive venue for any action arising under or relating to this Agreement.

*№ 19-5* at 6 ¶ 6.

First, the parties had twice agreed venue "shall lie solely with" a specific state forum, the Circuit Court of Washington County. Now they agreed that a specific place, Washington County, "shall be the exclusive venue."  And several courts, including this one, sit there.

Second, all three contracts choose Arkansas's substantive law. But only the last one specifies, in contemplation of an interstate controversy, that Arkansas's law will apply "without regard to its choice of law principles." *№ 19-5* at 6 ¶ 6. Under those choice-of-law principles, "the law of the state with the most significant relationship to the issue at hand should apply." *Ducharme v. Ducharme*, 872 S.W.2d 392, 394 (Ark. 1994); *see also Yarbrough v. Prentice Lee Tractor Co.*, 479 S.W.2d 549, 552-553 (Ark. 1972). Previously, the prospect that another state would have a "significant relationship" to any dispute was too remote to mention. In the Final Buyout Agreement, the parties contemplated that possibility and chose how to resolve it.

Third, the narrowing word "exclusive" in the Final Buyout Agreement is broader than the narrowing word used in past contracts – and the narrowing phrase in *Northport*. Contrary to the Foundation's suggestion, *№ 22* at 17, that clause named Sebastian County the "sole and exclusive" venue, not just the "exclusive" venue. *Northport*, 2020 U.S. Dist. LEXIS 62901, at *5. As we read *Northport*, the pair of words, not the word "exclusive," drove the result: Interpreting them to impose both a geographical and jurisdictional limit "allows *each* of the words 'sole' and

'exclusive' . . . to take their plain and ordinary meaning as words that decrease, rather than increase, the different fora available for dispute resolution." *Id.* at \*13 (emphasis added).

The narrowing word "exclusive" is also broader than the narrowing language in the 2012 and 2015 Buyout Agreements. Although the parties spoke of "venue," they "solely" chose one judicial forum: "Circuit Court of Washington County, Arkansas." *№ 19-3* at 5 & *19-4* at 5–6 ¶ 15. "Sole" means "only" or "single." Anyway, only one circuit court sits in Washington County. The Final Buyout Agreement identified a venue, or "place of suit,"[6] not a forum – Washington County, Arkansas. The word "exclusive" requires suit in an included forum, but it does not imply there is only one forum. As the Ninth Circuit held in *Simonoff v. Expedia, Inc.*, "'exclusive' means to the exclusion of courts not located in [the specified county]; it does not denote a 'singular' court." 643 F.3d 1202, 1206 n.3 (9th Cir. 2011).

So the forum-selection clause in the Final Buyout Agreement was simply broader than the past ones. If it does not unambiguously permit suit here, the Court can consult those past agreements to resolve any ambiguity. In *Terra International v. Mississippi Chemical Corp.*, the Court of Appeals reviewed forum-selection clauses in license agreements drafted years earlier to conclude a company "knew how to draft an explicitly broad clause when it wanted to but did not do so" there. 119 F.3d 688, 693 (8th Cir. 1997). Here, the past contracts are not just similar contracts with other parties, but contracts between these same parties that were referenced in and superseded by the Agreement. *E.g.*, *№ 19-5* at 1 & ¶¶ 1& 8. They used an explicitly *narrow* clause, proving the Foundation knew how to *explicitly* choose *the same court* it labors to suggest the Agreement *implicitly* chooses if Tenth Circuit caselaw is applied to its wholly different language.

---

[6] *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939).

*Either party could invoke this forum-selection clause to require transfer to this Division, where trial is held only in Washington County.*

The Foundation suggests parties who wanted either a state or federal forum in Washington County would have agreed that "actions may be brought in the Western District of Arkansas or Washington County Circuit Court[.]" *№ 22* at 14-15. But in fact, the clause in the Agreement guarantees trial in Washington County – and the Foundation's alternative would not. Because there is no mandatory divisional venue for original actions, that clause would allow a party to file in any division. Because it neither chooses nor necessarily implies a choice of this Division, the presumptively "controlling weight" of a choice of forum would not govern any motion to transfer it here. *See Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 60 (2013).

Instead, under *Atlantic Marine* the parties could simply agree that "Washington County, Arkansas shall be the exclusive venue", and let divisional venue and section 1404 do the rest. This Division "comprises the counties of Benton, Madison, and Washington." 28 U.S.C. § 83(b)(5). A case pending here must be tried in "Fayetteville," thus in Washington County. *Id.* Though the Court may order trial "*at any place within the division in which it is pending*[,]" 28 U.S.C. § 1404(c), there is no other place in this Division. A district court "sits" where it regularly holds court. *Argyll Equities LLC v. Paolino*, 211 F. App'x 317, 319 (5th Cir. 2006) (unpublished).

Transfer among divisions, like districts, is permitted by statute. 28 U.S.C. § 1404(a). But after *Atlantic Marine*, the statutory transfer considerations defer to a chosen forum. Section 1404(a) itself is a tool to enforce a choice of federal forum. *Atl. Marine Constr. Co.*, 571 U.S. at 59. By agreeing that Washington County would be the "exclusive venue", the parties made this an available forum. Coach Bielema could have removed here if the Foundation had filed in circuit court. And either party could have invoked the "controlling weight" of that choice to require transfer here from another federal forum – or *to oppose a motion to transfer elsewhere*. *Sirius*

*Computer Solutions, Inc. v. Sparks*, 138 F. Supp. 3d 821, 834 (W.D. Tex. 2015) ("holding [a party] to [his] bargain" by denying transfer from selected federal forum).

Indeed, divisional venue is a seldom-discussed but sometimes controlling influence in this area. Even the result in *Excell, Inc. v. Sterling Boiler & Mechanical, Inc.*, 106 F.3d 318 (10th Cir. 1997), may have been different if Colorado were a divided district. The Court's analysis amounted to the observation that in the federal statutes, "venue is not stated in terms of 'counties.' Rather, it is stated in terms of 'judicial districts.'" *Id.* at 321. That two-sentence analysis was flawed: Those statutes also speak in terms of "divisions." 28 U.S.C. §§ 1404 & 1406.

And as the Fifth Circuit explained in *Alliance Health Group LLC v. Bridging Health Options LLC*, that assumption that "county" implied a state forum "would be more persuasive were the federal courts organized in total disregard of state counties[,]" such as by metes and bounds. 553 F.3d 397, 400-01 (5th Cir. 2008). That Court had already noted the error in *Excell, Inc.*, holding that an agreement that venue "shall lie exclusively in Collin County, Texas" did not waive the right to remove. *Collin County*, 250 F. App'x at 51–52. Further, it gave the same limited force to the terms used in federal venue statutes: When section 1441 speaks of "districts" and "divisions," "it does so only in relation to *location*" of the federal court that hears the removed case. *Id.* at 52 (emphasis original). And "when a federal court sits in a particular county, the district court is undoubtedly 'in' that county." *Simonoff*, 643 F.3d at 1206.

Further, neither the jurisdiction nor venue of Arkansas circuit courts conforms neatly to county lines, preventing a "county" venue from implying a state forum. Although every county is the seat of an Arkansas state court, as the Court observed in *Northport*, Arkansas does not "designate circuit courts by county" as the Foundation suggests. № 22 at 16. Arkansas designates circuit courts by "Judicial Circuit." Ark. Code Ann. §§ 16-13-901–3201. Washington County is in the

Fourth Judicial Circuit, which includes Madison County as well. Ark. Code Ann. § 16-13-1201. The judges of that Circuit could be elected from either county.7 And they sometimes "sit" in Washington County to hear cases, as this Court does, but they also sit in Madison County.

Further, ten counties are split into judicial districts. For venue, "[t]he separate districts of a county must be treated as separate counties." *Prairie Implement Co. v. Circuit Court of Prairie County*, 844 S.W.2d 299, 299 (Ark. 1992). And many district courts have countywide jurisdiction. *E.g.*, Ark. Code Ann. § 16-17-902(a) & -(c). So not only might an "exclusive" county venue leave open a federal forum; it might open a number of state courts as well. In light of similar divisions within Mississippi counties, "it [could] hardly be said that a reference to 'county' clearly suggests the Harrison County Circuit Court rather than the [district court] when it has a courthouse in, and jurisdiction over," that county. *Alliance Health Group LLC*, 553 F.3d at 401.

Though *Excell, Inc.* was a removed case, that Court cited the venue statute for original jurisdiction for the idea that federal venue is discussed in terms of "judicial districts". *Id.* at 401. The removal statute it should have discussed puts venue in "the district *and division* embracing the place where such action is pending." 28 U.S.C. § 1441 (emphasis added). And not only are divisions described by county, there are at least two *single-county* divisions. The Southern Division of the Central District of California "comprises Orange County[,]" and the El Paso Division of the Western District of Texas "comprises the county of El Paso." 28 U.S.C. §§ 84(c)(3) & 124(d)(3).

The parties in *Excell, Inc.* could not have chosen a narrower federal forum because Colorado is an undivided district with a typical enabling statute providing simply that court "shall be held at

---

7 Ark. Const. Amend. 80 § 17; Ark. Code Ann. § 16-13-1203(a). The place of trial, not where a judge might live or keep chambers, is relevant to forum selection. The Foundation seems to draw the opposite conclusion from *Hot Shot Services, Inc. v. Nanney*, 2010 U.S. Dist. LEXIS 151339 (D.N.M. Apr. 23, 2010). That court's reference to whether a case "will be assigned to a judge" outside Albuquerque was referring to the absence of any restriction on case assignment for trial in that undivided district. 28 U.S.C. § 111. Here, neither forum would guarantee assignment to a judge who lives or works in Washington County.

Boulder, Colorado Springs, Denver, Durango, Grand Junction, Montrose, Pueblo, and Sterling."[8] Although there was a federal courthouse in Colorado Springs – El Paso County – without divisional venue, removing there would not have guaranteed trial in that county.

New Mexico too is an undivided judicial district, 28 U.S.C. § 111, a fact that controlled in *Nanney*, 2010 U.S. Dist. LEXIS 151339. The court acknowledged that the place the parties chose, Bernalillo County, included the federal courthouse at Albuquerque. *Id.* at *11. But by choosing *one* county, the parties had necessarily chosen a state forum: That district includes Bernalillo County, but also "every other county in the state" because it is a statewide district. *Id.* at *10-11. And a case filed in Albuquerque might be heard in one of the places outside Bernalillo County where Congress had also decreed court should be held. *See id.* at *11, 28 U.S.C. § 111.

In *L.G. Marcus & Sons, Inc. v. Faherty*, another district court in the Tenth Circuit made want of divisional venue an explicit part of its decision to remand. The clause read "the proper venue shall be Wyandotte County, Kansas." 2004 U.S. Dist. LEXIS 27922, at *7 (D. Kan. May 17, 2004). That county includes Kansas City, where a federal court sits. However, as the plaintiff "persuasively argue[d]," filing there would not guarantee it would be the venue for trial. *Id.* at *10. Kansas is a one-district, one-division state. 28 U.S.C. § 96. By local rule, a case filed in Kansas City could be heard in Wichita or Topeka, both of which were outside Wyandotte County. *Id.*

We have found no case addressing the post-*Atlantic Marine* effect of choosing the *only* county where a federal court hears cases pending in its division. But Washington County is one. And the resulting hindrances to trying this action elsewhere makes the parties' choice to allow suit in this federal forum in that "exclusive" venue as specific as any they could have drafted.

---

[8] 28 U.S.C. § 85. It might be noteworthy that the Tenth Circuit includes only one statutorily divided district, Utah.

*There is no real difference between agreeing "venue will be" a county and "venue will be in" that county.*

The Foundation argues that a "weight of cases" hold that "forum selection clauses that designate a particular county without using the words 'in' or 'of' require that state courts resolve the disputes." *№ 22* at 12. That notion is unsound and unsupported by the cases it cites. In *Switch, Ltd. v. Gei Consultants, Inc.*, the district court acknowledged that it could keep a removed action where "Clark County, Nevada" was the exclusive venue, because it sat in that county. 2019 U.S. Dist. LEXIS 171340, *4 (D. Nev. Oct. 1, 2019). It remanded anyway, chiefly because that contract specified the county would be the "exclusive venue *and jurisdiction* for any dispute. *Id.* at * 6–7. "Jurisdiction" goes to a court's power, not its location, and that court did not "derive its power from Clark County[.]" *Id.* at *7.

In *Docksider Ltd. v. Sea Tech., Ltd.*, the forum-selection clause put venue in "Gloucester County, Virginia[,]" a continent away from the Central District of California where the case was filed. 875 F.2d 762, 763 (9th Cir. 1989). There is and was no federal court in that Virginia county. 28 U.S.C. § 127(a). As a later panel noted, the question was whether the clause was mandatory or permissive, not whether it required a state forum. *City of Albany.*, 924 F.3d at 1308.

In *Robrizine v. Big Lots Stores, Inc.*, the parties had agreed to "submit to the exclusive jurisdiction of" a "court of competent jurisdiction in the State of Ohio" before agreeing that one Ohio county would be "the venue." 2016 U.S. Dist. LEXIS 82302, at *17 (N.D. Ill. June 24, 2016). An exclusive venue can include more than one forum. But if parties agree to an exclusive jurisdiction *and* an exclusive venue, a single forum is implied.

*Tri-Lakes Petroleum Co., LLC v. Brooks*, 2014 U.S. Dist. LEXIS 61775 (N.D. Okla. May 5, 2014), involved whether the forum-selection clause was mandatory, not whether "the proper venue shall be Taney County, Missouri" required a state forum. That plaintiff simply ignored the contract

and filed in the Northern District of Oklahoma. Anyway there is no federal forum in Taney County; in the division that encompasses it, court is held in Greene County. 28 U.S.C. § 105(b)(5).

So the relevant "weight" of those cases is zero. We respectfully submit, after an exhaustive review of this area, that there is no sensible distinction between agreeing venue will *be* a county and agreeing venue will be *in* a county, only imagined nuances that insert a costly threshold issue and delay resolution on the merits.

---

*Contracting parties cannot require a court to strain to interpret an ambiguous forum-selection clause instead of construing it against the drafter.*

The Foundation must admit that it drafted the Final Buyout Agreement. It implicitly concedes that if the forum-selection clause is ambiguous, the ambiguity would be construed against it unless Paragraph 14 applies. *№ 22* at 16. The case for applying *contra proferentem* is strongest for forum-selection clauses, which implicate judicial economy, not just private rights. The doctrine applies "only as a last resort when the meaning of a provision remains ambiguous after exhausting the ordinary methods of interpretation[,]" and "provides a default rule based on public policy considerations" when the parties' intent as to an ambiguous term cannot be resolved. *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417 (2019) (cleaned up).

Enforcing Paragraph 14 would not lessen any ambiguity, just eliminate a tool for resolving it.[9] Both the Fifth and Eleventh Circuits have reviewed forum-selection clauses *contra proferentem* as a matter of federal law. *Alliance Health Group LLC v. Bridging Health Options LLC*, 553 F.3d at 402. The Eleventh Circuit and other courts have noted a deterrent quality:

> The phrase ["submit to the jurisdiction of Broward County, Florida"] is simply ambiguous, . . . and rather than strain to find that one [interpretation] should prevail . . . we must simply construe it against Global Satellite, the drafter.

---

[9] If the Court found the forum-selection clause in Paragraph 6 of the Agreement insolubly ambiguous and found that Paragraph 14 prevented resolving that ambiguity against the Foundation, it could simply sever one of those provisions to preserve the enforceability of the rest. *№ 19-5* at 7 ¶ 9.

*Global Satellite Commun. Co. v. Starmill U.K. LTD*, 378 F.3d 1269, 1274 (11th Cir. 2004) (citation omitted); *see also Carolina Care Plan Inc. v. McKenzie*, 467 F.3d 383, 389 (4th Cir. 2006); *Bodine Elec. Co. v. Viking Access Sys., LLC*, 2009 U.S. Dist. LEXIS 87861, at *7 (N.D. Ill. Sept. 22, 2009) (noting these disputes "consume valuable court resources[,]" and construing against the drafter so as not to "invite future litigants to continue drafting ambiguous forum selection clauses"). If the Foundation had wished to require suit in the Circuit Court of Washington County, it could simply have used the words the parties had used twice before to do that.

## ELEVENTH AMENDMENT

The Foundation asks the Court to give it the status of a sovereign state by alchemizing Coach Bielema's withdrawn statement that it "functions as an arm of the Athletic Department" *for athletics purposes* into an admission that it "is an 'arm of the state'" for jurisdictional purposes. The barriers to that attempt fall in four categories.

---

*Withdrawn averments have no role in the Court's jurisdictional analysis.*

Because the Amended Complaint removed the averments the Foundation relies on, its point is moot.  It is "is well-established that an amended complaint super[s]edes an original complaint and renders the original complaint without legal effect." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 928 (8th Cir. 2005) ("*Wireless Fee Litig.*").  The superseded pleading "no longer serves any function in the case," except as an evidentiary party admission. *Sunkyong International, Inc. v. Anderson Land & Livestock Co.*, 828 F.2d 1245, 1249 n.3 (8th Cir. 1987) (citation omitted). Statements that are altered or removed by amendment go out with the bathwater and play no role in Rule 12 analysis. *See, e.g.*, *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171–172 (3d Cir. 2013) (collecting cases). Even when the amendment

implicates subject-matter jurisdiction, when a party amends voluntarily, subject-matter jurisdiction must be assessed "by examining the face of the amended complaint[,]" not the superseded one. *Wireless Fee Litig*, 396 F.3d at 928–929. And this amendment was voluntary.[10]

On the strength of an opinion from the Federal Circuit and one unpublished district court opinion, the Foundation urges the Court to ignore averments that were changed in the Amended Complaint. *№ 22* at 7. That would not be lawful. *Burks v. Abbott Labs.*, 2010 U.S. Dist. LEXIS 38616, at *21-23  (D. Minn. Apr. 20, 2010) (noting inconsistency between *Bradley v. Chiron Corp.,* 136 F.3d 1317 (Fed. Cir. 1998), and *Wireless Fee Litig*, 396 F.3d 922 (8th Cir. 2005)). Moreover, those authorities are distinguishable on the facts – it is not a "false or sham" amendment to conform deliberately misconstrued statements to match what both parties agree is the truth.

---

*Even if Coach Bielema had not withdrawn those averments, they would be amendable even after judgment.*

The analysis of the Foundation's citizenship and Eleventh Amendment status should be simple. The Amended Complaint removed the statements the Foundation misconstrued in its original motion. Indeed, it pleads the Foundation is operationally independent of the University, that a money judgment will not affect the state treasury, and that the University is not the real party in interest. *№ 19 ¶* 11. The Foundation "denies that it is an arm of the State." *№ 22* at 8 n.5. Again. *№ 13* at 3 n.3. Coach Bielema agrees. That should have been the end.

Instead, the Foundation seems to accuse Coach Bielema of misconduct for conforming his Amended Complaint to the Foundation's own stated position. And it argues he "cannot remedy the jurisdictional flaws in his original complaint[,]" *№ 22* at 8, forgetting that defective *jurisdictional* allegations can *always* be cured by amendment. 28 U.S.C. § 1653; *see also, e.g.*,

---

[10] Coach Bielema was not trying to avoid dismissal. He was trying to avoid needlessly litigating an issue on which both parties agree in substance while Rule 15 gave him an open goal. (Obviously, that didn't work.)

18

*Neely v. Bankers Trust Co.*, 757 F.2d 621, 634 n.18 (5th Cir. 1987). Federal jurisdiction depends on the jurisdictional facts, not what the parties have said. Section 1653 permits amendment of "incorrect statements of jurisdiction that actually exists," *Newman-Green. Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 831 (1989), and the Foundation twice concedes it does.[11]

Counsel could find just one authority discussing amendment where an asserted jurisdictional defect arose from the wording of an averment instead of the citizenship or a party or existence of a claim. Fortunately, it was a decision by the Court of Appeals.  In *United Steelworkers of America v. Mesker Bros. Industries, Inc.*, a labor union filed an original action under 29 U.S.C. § 185(a), which provides federal jurisdiction for suits alleging violations of collective bargaining agreements ("CBOs"). 457 F.2d 91 (8th Cir. 1972). The defendants were (1) an insurance company alleged to have wrongly denied a union member's claim for hand injury, and (2) the employer whose CBO required it to obtain a policy that covered that claim. *Id.* at 92.

The jurisdictional need for an alleged violation of a CBO created tension: If the insurer had broken a duty under a policy that conformed to the coverage required by the CBO, the plaintiff's claim was for breach of the policy, but not the CBO.  And the union stumbled.  It pleaded:

> That in carrying out its collective bargaining obligations pursuant to the terms of the written collective bargaining agreement . . .  *defendant employer obtained insurance coverage for such plan from the defendant insurance company, which has regularly attempted to provide insurance coverage for the Schedule of Benefits agreed upon in and incorporated by reference in the collective bargaining agreement.*

*Id.* at 92 n.1 (emphasis added). The district court dismissed because "[t]he complaint itself indicate[d]" the employer had complied with the CBO. *Id.* at 92.

---

[11] Though a voluntary amendment supersedes the original complaint including jurisdictional allegations, to the extent the Court interprets 28 U.S.C. § 1653 to require seeking leave to amend, we hereby seek it.

The union moved to amend its complaint to allege the employer had broken its promise to procure the coverage set out in the CBO, and that the insurer had refused to provide the coverage and benefits required in it. *Id.* at 92 n.2. Leave should have been granted, the Court held. The post-dismissal amendment caused no prejudice to the defendant. *Id.* at 93. And the revised allegation that the employer "had breached the collective bargaining agreement by failing to obtain the required insurance benefits for those in the bargaining unit" made out a federal claim. *Id.* at 94; *see also Foman v. Davis*, 371 U.S. 178, 181 (1962); *accord McIndoo v. Burnett*, 494 F.2d 1311, 1313 (8th Cir. 1974).

---

*Coach Bielema never said the Foundation was an "arm of the state" anyway.*

Even if the withdrawn statements remained in force, they would not turn the Foundation into the state. In this posture the Court is to disregard legal conclusions, take the well-pleaded *facts* as true, and construe them in favor of the nonmovant.[12] As always, pleadings "must be construed so as to do justice." Fed. R. Civ. P. 8(e).

---

[12] The Foundation first specified this was a "facial attack" under which the "non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." № *13* at 14 (quoting *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016)). Because the Foundation continues to deny it is an "arm of the state", № *22* at 8 n.5, and urges the Court to ignore allegations that "directly contradict" the Complaint, *id.* at 7, we assume the Foundation attacks the "face" of that judicially edited Amended Complaint.

However, it attaches a redacted letter from counsel, № *22-1*, presumably to suggest that changes in the Amended Complaint were made in bad faith. The letter should be struck and disregarded. First, it's inadmissible. Though the Foundation purportedly redacted the letter to honor Rule 408, it appears to offer the unredacted part for a purpose the Rule also prohibits: To impeach statements in the Amended Complaint "by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(a)(2). Second, it's immaterial. Arkansas's Freedom of Information Act reaches many entities that would never be considered Eleventh Amendment "arms of the state", and uses a different standard. Third, Coach Bielema's "position" is set out in the Amended Complaint. If it supersedes the Complaint, it would supersede the letter even if counsel had taken a position in that letter on the Foundation's Eleventh Amendment status.

Without waiving those objections, for transparency the full letter is attached to the Response. № *27–1*.

The Foundation's argument starts (and mostly ends) with a withdrawn statement that it "is so intertwined with every aspect of the University's Athletics Department that it functions as an ***arm of the Athletics Department***." № 13 at 14 (emphasis original). But twisting that phrase to mean what Coach Bielema manifestly did not intend would be construing the pleadings *against* the nonmovant. Further, instead of "disregarding" legal conclusions, the Foundation asks the Court to create one: Whether an agency is an "arm of the state" is a legal conclusion reviewed *de novo*.

And to the extent Eleventh Amendment immunity is treated like an affirmative defense, it can be addressed in a Rule 12(b) motion only if it is "apparent on the face of the complaint . . . ." *ABF Freight Sys., Inc. v. Int'l Broth. of Teamsters*, 728 F.3d 853, 861 (8th Cir. 2013) (quotation omitted). That requires that "all facts necessary to the affirmative defense clearly appear on the face of the complaint[,]" *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (cleaned up), such that those facts "the are definitively ascertainable" and "establish the affirmative defense with certitude." *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006) (quotation omitted). Here, not only is there no "certitude" the Foundation *is* an "arm of the state," the parties agree it is not. *Cf. N. Ins. Co. v. Chatham County*, 547 U.S. 189, 194 (2006) (relying on concessions party was not an "arm of the state" and forfeiture in certiorari proceedings).

Second, "[b]y its terms, the protection afforded by [the Eleventh] Amendment is only available to 'one of the United States.'" *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 400 (1979) (agency created interstate compact). That showing must give the Court "good reason" to believe the State "structured the new agency to enable it to enjoy the special constitutional protection" of the State itself. *See id.* at 401. Thus an entity that asserts Eleventh Amendment immunity "bears the burden of showing that it is an arm of the state." *United States ex rel. Fields v. Bi-State Dev. Agency*, 872 F.3d 872, 876 (8th Cir. 2017) (collecting cases).

21

Not only has the Foundation failed to *show* it is an "arm of the state," it has not even *said so*. But a party must "affirmatively state" any avoidance or affirmative defense, Fed. R. Civ. P. 8(c), the "basic concept" of which is an "*admission* of the facts alleged in the complaint, coupled with the assertion of some other reason defendant is not liable." *Indeca v. Cont'l Ill. Nat'l Bank & Trust Co.*, 576 F. Supp. 985, 988 (N.D. Ill. 1983) (Shadur, J.). The Foundation denies it is an "arm of the state," in the same papers where it asserts a defense that depends on affirming that proposition. In these circumstances, that is a waiver of the defense.[13]

Third, whether an entity is an "arm of the state" depends chiefly on whether a state is the real party who would pay a judgment. And "the most important factor" in that analysis, *United States ex rel. Fields*, 872 F.3d at 883, is not a "mechanical analysis" of whether a State might ultimately pay, but whether the state "would be legally obligated to pay a judgment." *Id.* at 881 (quoting *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 86 (3d Cir. 2016)) (emphasis added). In *Maliandi*, the Third Circuit noted that it had "consistently rejected" arguments that a state-affiliated university could be an arm of the state without "identify[ing] a legally enforceable obligation on the part of the State to pay money judgments entered against it," merely because the state might voluntarily keep it afloat. 845 F.3d at 87–88.

In other words, under a standard the Court of Appeals has approved, the Foundation is steps removed from a connection that would *fail* to make it an "arm of the state." It is the operationally independent, *№ 19* ¶ 11, donor-financed adjunct of the Athletic Department. And the parties' contracts, as well as Arkansas statutes, prevent any conclusion that Arkansas is the real party in interest. Coach Bielema's employment contracts observe that the Athletic Department is one of few nationally "that is self-supporting *and does not rely upon appropriated tax dollars or student*

---

13 In the alternative, Judge Shadur recommends that it be struck.

*fees to operate*[,]" and would meet its obligations "*with the Athletic Department's self-generated revenues and private funds* donated in support of the Athletic Department[.]" *№ 19-1 & 19-2* at 1 (emphasis added). The Athletics Department has no other choice: State appropriations for intercollegiate athletics are limited to a fixed percentage of the school's general revenue. Ark. Code Ann. § 6-62-803(a). Any deficit must be "funded by a student athletic fee" identified as "being for the support of intercollegiate athletics, separate and distinct from other tuition or student activity fees[,]" Ark. Code Ann. § 6-62-804(a)–(b), not the state treasury.

In fact, even the Complaint established that the Foundation, not the University, is the real party in interest. All three Buyout Agreements were attached. Instead of putting the University at risk to pay a judgment against the Foundation, the Foundation twice guaranteed, then wholly assumed, its obligations. *№ 19-3 & 19-4* ¶¶ 8 & 9; *19-5* at 1 & ¶¶ 1, 2, 5(A) & 8.

---

*The Foundation is a private corporation that couldn't be an "arm of the state."*

Although not every political subdivision is an "arm of the state," corporation as a state agency seems to be a minimum condition. *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997) ("The question whether a *particular state agency* . . . is . . . an arm of the State, and therefore 'one of the United States'" requires "considering the provisions of state law that define the agency's character.") (emphasis added). Indeed, the "original source" of the "alter ego" or "arm of the state" analysis of political subdivisions "was the rule that corporations are citizens of the State in which they are formed, and are subject as such to the diversity jurisdiction of the federal courts." *Moor v. County of Alameda*, 411 U.S. 693, 718 (1973) (emphasis omitted). In Arkansas, a "state agency" must be part of the state itself. *E.g.*, Ark. Code Ann. § 25-1-206 (defining "state agency" as a subdivision or officer "of the state"); Ark. Code Ann. § 19-4-801(2)(B) (defining

23

"state agency" as an "*office or unit of government of the State of Arkansas* created or established pursuant to law . . . .").

The only veneer of legal support for the idea that the Foundation could be a state agency is *Souto v. Florida Int'l University Foundation, Inc.*, which involved another university foundation. 2020 U.S. Dist. LEXIS 37524 (S.D. Fla. Mar. 3, 2020).  But on examination, the contrast with *Souto* is devastating. The Foundation has no special status under state statute. It was chartered for one of many "lawful purposes" permitted in the Arkansas Nonprofit Corporation Act. *See* Ark. Code Ann. § 4-28-205. The foundation in *Souto* was chartered as a public body – a "Direct-Support Organization" ("DSO") created by statute "exclusively to receive, hold, invest, and administer property and to make expenditures to or for the benefit of a state university in Florida" and which "a state university board of trustees . . . has certified to be operating in a manner consistent with the goals of the university and in the best interest of the state." Fla. Stat. § 1004.28(1)(a)(2) & -(3). A Florida state university is authorized to "permit the use of property, facilities, and personal services" by a DSO, and a DSO can "establish [investment] accounts with the State Board of Administration . . . ." *Id.* § 1004.28(2)(a).

Unlike the Foundation, *№ 19 ¶ 11,* a Florida DSO is tied to the supported university by a statute directing the university board to appoint "at least one representative" to the DSO's board. *Id.* § 1004.28(3). The university president must also serve on the DSO's board. *Id.* The DSO's other board appointments are subject to approval by the university. *Id.* Though a DSO is exempt from freedom-of-information laws, its records are subject to confidential review by the university board and the State Auditor. *Id.* § 1004.28(5)(a) & -(b).

The Public School Retirement System of Missouri ("PSRS") too was a state agency. It was created by Missouri statute "[f]or the purpose of providing retirement allowances and other

24

benefits" to public-school employees. *Pub. School Ret. Sys. Mo. v. State Bank & Trust Co.*, 640 F.3d 821, 823 (8th Cir. 2011). Although PSRS can sue and be sued, usually a mark of independence, those powers were conferred by statute. *Id.* at 827–828. Like the DSO in *Souto*, PSRS was operationally linked to the state: The governor appoints three of its board members, and its operations are extensively regulated by statute. *Id.* at 828.  Indeed, Missouri statutes characterize state retirement systems as "state agenc[ies,]" not "political subdivisions[,]" *id.* at 829, much less private actors.  The Court was moved, ultimately, by statutes that provided for paying a judgment against a "state agency" from the State Legal Expense Fund, *id.* at 832, and the possibility that employees who contributed to PSRS could be in contract with the state.

## CONCLUSION

For the foregoing reasons, the Foundation's motion fails to discredit Coach Bielema's breach of contract claim, this Court has subject-matter jurisdiction to adjudicate this dispute, and it is properly heard in the Western District of Arkansas, Fayetteville Division.

WHEREFORE, the Court should deny the Motion to Dismiss, and grant all other just and proper relief.

Respectfully submitted,

By:/s/ Thomas A. Mars
    Thomas A. Mars, #86115
    MARS LAW FIRM
    5500 Pinnacle Point Dr., Suite 202
    Rogers, Ark. 72758
    Phone: (479) 381-5535
    tom@mars-law.com

    R. Craig Wood
    Benjamin P. Abel
      (admitted *pro hac vice*)

    McGUIRE WOODS LLP
    Court Square Building
    652 Peter Jefferson Parkway, Suite 350

Charlottesville, Va. 22911
Phone: (434) 977-2558
cwood@mcguirewoods.com
babel@mcguirewoods.com

John C. Everett, #70022
EVERETT LAW FIRM
P.O. Box 1460 12217 W. Hwy. 62
Farmington, Ark. 72730-1460
Phone: (479) 267-0292
john@everettfirm.com

John E. Tull III, #84150
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center St., Suite 1900
Little Rock, Ark. 72201
Phone: (501) 379-1705
jtull@qgtlaw.com

Ryan K. Culpepper, #2012093
CULPEPPER LAW FIRM, PLLC
P.O. Box 70
Hot Springs, Ark. 71902
Phone: (501) 760-0500
ryan@theculpepperfirm.com

ATTORNEYS FOR BRET BIELEMA, *Plaintiff.*