# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

**BRET A. BIELEMA**                                                                 **PLAINTIFF**

**v.**                                      **5:20-cv-05104-PKH**

**THE RAZORBACK FOUNDATION, INC.**                                  **DEFENDANT**

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS

Defendant, The Razorback Foundation, Inc. (the "Foundation"), through its attorneys, for its Reply in Support of its Motion to Dismiss Plaintiff's Amended Complaint, states as follows:

Bielema concedes that the real issue before the Court is the forum selection clause. The Foundation agrees. Nevertheless, Bielema cannot resist continuing to distort the record. Although the Foundation strongly disagrees with Bielema's distorted characterizations of the contractual language and his attempt to rewrite history, it will leave those matters for another day.

Crystal clear from Bielema's brief is that he will say anything to win.

- In his original complaint, he alleged that the Foundation is an arm of the state. When he realized those assertions may result in dismissal, he alleged the exact opposite in his amended complaint. He now doubles down in his brief, asserting that the Foundation could not possibly be an arm of the state.

- In his brief, he first argues that the Foundation drafted the venue provision, but then argues a few pages later that Bielema supposedly insisted on including the new venue provision.

- He cited the *Northport* decision in his original complaint in support of federal venue but now largely ignores this Court's precedent that is the most salient authority on the issue.

- He first argues that a court sits where it regularly conducts court proceedings, but later reverses course to suit his argument and argues that a court sits where a case is to be tried.

Bielema's change of position at every turn undermines his arguments and demonstrates an unfortunate truth – Bielema filed suit in this Court, not because he actually believed it was the proper forum under the contract, but because he perceives some tactical advantage to litigating his claims in a different forum.

EXHIBIT A

1

## I.     The Forum Selection Clause Requires Dismissal in Favor of State Court

Bielema concedes that the forum selection clause is mandatory and enforceable. He instead argues that because the forum selection clause designates a county where a state and federal court both sit, the clause permits the case to be heard in either court. But there are few cases that address this specific point, and the most analogous of those cases hold that the state court must hear the dispute. *See Robrinzine v. Big Lots Stores, Inc.*, 2016 WL 3459733, at *3 (N.D. Ill. June 24, 2016) (provision stating "Franklin County Ohio shall be designated as the venue" required state court to hear dispute even though federal court sat in chosen county); *Switch, Ltd v. GEI Consultants, Inc*., 2019 WL 4803222, at *1 (D. Nev. Oct. 1, 2019) (provision stating "Clark County, Nevada, shall be the exclusive venue and jurisdiction for any dispute arising out of or related to this Agreement" required state court to hear dispute even though federal court sat in chosen county).

Notably, Bielema cites no relevant Eighth Circuit precedent. Bielema cites a dozen or more out-of-circuit cases interpreting materially different contractual language but largely ignores the elephant in the room – that the only binding precedent from this Court held that a virtually identical forum selection clause required that the dispute be heard in state court. *See Northport Health Servs. of Arkansas, LLC v. Ellis*, 2020 WL 1846531, at *1 (W.D. Ark. Apr. 10, 2020).

The Foundation has not found a case that lines up more squarely than the *Northport* case (*i.e.*, involves a forum selection clause that (i) uses the phrase "shall be" as opposed to "in" or "of," (ii) employs mandatory venue language, and (iii) designates a county where both a state a federal court sit). Bielema fails to show that the Court's holding there does not dictate dismissal in this case. Bielema's only argument distinguishing the *Northport* case as a legal matter is spurious. He contends that this Court's holding relied on the *pair* of words "sole and exclusive" – suggesting that the Court's holding would have been different if only the word "sole" or "exclusive" were present in the contract at issue. That is not how the Foundation reads that decision, nor is it how

2

other courts in this circuit have interpreted those terms. *See Wahrmund v. Buschman*, 2017 WL 5661340, at *4 (E.D. Ark. Mar. 28, 2017) (explaining that "words such as shall, must, sole, only, *or* exclusive" are all words of exclusivity (emphasis added)). Neither is there anything in the cases to suggest that the word exclusive is broader than the word sole, as Bielema later argues.

In an apparent attempt to avoid this Court's previous decision, Bielema's brief is heavy with case citations, but no amount of inapposite authority will tip the scales in his favor. Many of the cases upon which Bielema relies involved situations where there was no federal courthouse in the designated county.[1] These cases stand for the unremarkable proposition that where there is not a federal court in the chosen county, state courts must hear the dispute. These cases do not, however, stand for the inverse. In fact, numerous cases come out the other way on this issue. *Northport*, 2020 WL 1846531, at *4 (dismissing in favor of state court where a federal court sat in chosen county); *Robrinzine*, 2016 WL 3459733, at *9 (same); *Hot Shot Servs., Inc. v. Nanney*, 2010 WL 11493293, at *5 (D.N.M. Apr. 23, 2010) (same). Cases where there is no federal court in the chosen county are wholly irrelevant, and Bielema's assertion that the presence of a federal courthouse in the county ends the inquiry is flatly false. Additionally, many of Bielema's cases had been removed to federal court and often involved one party having arguably waived the right to remove by agreeing to language in a forum selection clause.[2] Removal is a different procedure

---

[1]  *City of Albany v. CH2M Hill, Inc.*, 924 F.3d 1306, 1308-09 (9th Cir. 2019); *Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 676-77 (4th Cir. 2018); *Yakin v. Tyler Hill Corp.*, 566 F.3d 72, 76 (2d Cir. 2009); *Collin Cty. v. Siemens Bus. Servs., Inc.*, 250 F. App'x 45, 52 (5th Cir. 2007); *Weener Plastics, Inc. v. HNH Packaging, LLC*, 2009 WL 2591291, at *8 (E.D.N.C. Aug. 19, 2009); *Hope Cancer Treatment Found., Inc. v. Mountaineer Park, Inc.*, 2007 WL 184820, at *2 (W.D. Pa. Jan. 19, 2007); *Argyll Equities LLC v. Paolino*, 211 F. App'x 317, 319 (5th Cir. 2006).
[2]  *Bartels*, 880 F.3d at 676; *Blanca Peak Res. v. Big Star Energy Ltd.*, 2020 WL 1445785, at *1 (N.D. Tex. Mar. 24, 2020); *Weener*, 2009 WL 2591291, at *4; *Links Design, Inc. v. Lahr*, 731 F. Supp. 1535, 1536 (M.D. Fla. 1990); *Albany*, 924 F.3d at 1308-09; *Simonoff v. Expedia, Inc.*, 643 F.3d 1202, 1205 (9th Cir. 2011); *Yakin*, 566 F.3d at 76; *Collin*, 250 F. App'x at 50; *Nahigian v. Juno-Loudoun, LLC*, 661 F. Supp. 2d 563, 567-68 (E.D. Va. 2009); *Paolino*, 211 F. App'x at 319.

entirely. *See Presson v. Haga*, 2018 WL 4184344, at *3 (E.D. Mo. Aug. 31, 2018) (distinguishing, and choosing not to apply, cases involving removal in interpreting a forum selection clause). As a result, these cases likewise are of no aid to Bielema's cause.

In the face of irrefutable authority, Bielema strains to argue that there is no significance to the word "in" in forum selection clauses. This argument is contrary to this Court's decision in *Northport* and flies in the face of numerous cases, including those cited in Bielema's own brief. *Northport*, 2020 WL 1846531, at *3 ("The Court agrees that the 'of'/'in' distinction identified in these cases can serve to clarify the intent of the parties to a forum-selection clause[.]"); *see also Simonoff*, 643 F.3d at 1206-07. It is clear that the word "in" is technically meaningful in forum selection clauses. The Foundation is not the first to have "imagined" this distinction; numerous courts have relied on it. As a result, the cases Bielema cites with the word "in" are unhelpful.[3]

Perhaps most notable is the explanation from the Fifth Circuit in *Alliance Health Grp., LLC v. Bridging Health Options, LLC* – a case upon which Bielema and nearly all of his supporting cases rely. There, the forum selection clause stated: "exclusive venue for any litigation related hereto shall occur **in** Harrison County, Mississippi." 553 F.3d 397, 399 (5th Cir. 2008) (emphasis added). The court determined that the federal court could hear the case based, in part, on the word "in." *Id*. at 400. Importantly, the court explained, "***The clause at issue does not state that venue shall be some county, which might have suggested an intent to limit venue to a single tribunal.*** On the contrary it merely says that venue shall exclusively occur in Harrison County, a markedly less specific construction." *Id*. at 401 (emphasis added). Here, the forum provision includes precisely the language *Alliance* used as a point of comparison: "Washington County, Arkansas, **shall be** the exclusive venue[.]" Thus, under Bielema's own authority, this dispute must be heard

---

[3]   Notably, Bielema removed many of these cases when forced to reduce the pages in his brief.

by a single tribunal, Washington County Circuit Court.

Bielema attempts to distinguish cases cited in the Foundation's brief based on the fact that they involved one undivided judicial district. He argues that because one division encompasses the entire state, filing suit in federal court does not guarantee that a case would be tried in the designated county. But that is simply not the law. The venue statute specifically provides that "[a] district court may order any civil action to be tried at any place within the division in which it is pending." 28 U.S.C. § 1404(c). Additionally, these single division cases comprise only a handful of the cases that dictate dismissal in favor of state court. *See Northport*, 2020 WL 1846531; *Robrinzine*, 2016 WL 3459733, at *3; *see also Tri-Lakes Petroleum Co., LLC v. Brooks*, 2014 WL 1789391, at *1 (N.D. Okla. May 5, 2014).[4] For example, in *Robrizine*, the court interpreted the forum clause providing, "Franklin County Ohio shall be designated as the venue for the resolution of any claim[.]" 2016 WL 3459733, at *6. The court held that the clause required an Ohio state court to hear the dispute even though a federal court sits in Franklin County. *Id*.

In sum, under this Court's precedent and guided by the majority of other courts that have addressed the issue, the forum selection clause mandates dismissal in favor of state court.[5]

## II.    Extrinsic Evidence Shows that the Parties Intended for the Dispute To Be Heard Solely by the Washington County Circuit Court

If the Court determines that the forum selection provision is ambiguous, then it may "appropriately consider extrinsic evidence to interpret this contract provision." *Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 693 n.8 (8th Cir. 1997); *Northport*, 2020 WL 1846531, at *2. "In ascertaining this intention, the court should place itself in the same situation as the parties

---

[4]    Contrary to Bielema's assertion, Oklahoma has three districts and is in Tenth Circuit.
[5]    Arkansas state courts sit in each county. *Northport*, 2020 WL 1846531, at *4. Washington County is no different, and all trials are held there, not Madison County.

who made the contract in order to view the circumstances as the parties viewed them at the time the contract was made." *Northport*, 2020 WL 1846531, at *3.

The course of dealings between the parties demonstrates that they intended for any disputes between them to be heard in Washington County Circuit Court. The parties' two prior contracts included forum selection clauses specifically designating Washington County Circuit Court. The evidence also shows that the controlling law and "exclusive venue" provisions in the Final Buyout Agreement were not negotiated. Exhibit A, Scott Varady Aff., ¶¶ 5-8.[6] Contemporaneous email exchanges demonstrate that they discussed and negotiated many terms, but the controlling law and "exclusive venue" provisions were never discussed. *Id*. ¶ 7 & Ex. 1. Thus, the parties understood and intended for the venue provision to have the same effect as the prior agreements.

Bielema argues that when the Final Buyout Agreement was executed Bielema was moving out of state so the parties contemplated diversity jurisdiction and intended to permit suit in federal court. Notably, though, the complaint claims only that he was aware that the venue clause would allow him to litigate in state or federal court, not that venue was a negotiated term. Am. Compl. ¶ 6. In his brief, he now suggests that the venue provision was negotiated. But this argument is unsupported[7] and lacks credibility. He argues that the final agreement's inclusion of the phrase "without regard to its choice of law principles" demonstrates that the parties were for the first time considering an interstate dispute. He contends that another state having a significant relationship to the dispute "was too remote to mention" before 2018. That post-hoc rationalization is ludicrous and clearly contrived in an attempt to salvage an improper forum-shopping effort by Bielema that has now been challenged. SEC football is an interstate commercial activity and one can imagine

---

[6]   The Foundation offers this Affidavit and supporting documentation in response to Bielema's erroneous and unfounded assertions regarding the "exclusive venue" provision.

[7]   *See P.S. Prod., Inc. v. Activision Blizzard, Inc*., 140 F. Supp. 3d 795, 806 (E.D. Ark. 2014) (explaining plaintiff may not amend complaint through response to motion to dismiss).

innumerable scenarios from coaching to recruiting to marketing in which another state would have been involved prior to 2018. Additionally, contrary to Bielema's suggestion, all three agreements have used the word venue, not forum, and his reliance on *Simonoff*'s definition of "exclusive" is misplaced because that case involved the important word "in." 643 F.3d at 1206 n.3.

Finally, the Foundation has never conceded that the forum selection clause should be construed against it. Indeed, the Eighth Circuit has held that in cases involving forum selection clauses, the doctrine of *contra proferentem* should not be applied where, as here, the parties are of "relatively equal bargaining strength[]" and the non-drafting party was represented by counsel. *Terra Int'l, Inc.*, 119 F.3d at 692. Moreover, the doctrine does not apply when the question may be resolved in light of facts developed via extrinsic evidence, as it can be here. *See Penford Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 662 F.3d 497, 505 (8th Cir. 2011). Finally, there is a bargained-for provision prohibiting application of this doctrine. Therefore, the Court should decide any ambiguity based on the ordinary rules of construction and extrinsic evidence.

### III.    The Court Need Not Accept the Truth of Bielema's Contradictory Allegations

Not content simply to argue that the Foundation is not an arm of the state (which is an about-face from the allegations in his original complaint), Bielema doubles down in his brief, arguing that the Foundation could never be an arm of the state, which begs the question – why did he so allege in the first instance? His own brief underscores the absurdity of his original position. As a result, the Court is not required to accept the truth of his new allegations because they directly contradict his previous allegations. *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1324 (Fed. Cir. 1998).

WHEREFORE, the Foundation hereby requests that Plaintiff's Amended Complaint be dismissed and that the Court grant it any other relief to which it is entitled.

Respectfully submitted,

Marshall S. Ney, AR91108
Robert W. George, AR98134
Katherine C. Campbell, AR2013241
Blake Z. Brizzolara, AR2017229
FRIDAY, ELDREDGE & CLARK, LLP
3350 S. Pinnacle Hills Parkway, Suite 301
Rogers, AR  72758
Office:          (479) 695-6049
Facsimile:      (501) 244-5389
mney@fridayfirm.com

By:   _____
         Marshall S. Ney, AR Bar 91108

## <u>CERTIFICATE OF SERVICE</u>

I, Marshall S. Ney, do hereby certify that the foregoing is being electronically filed with the Court and that the below listed persons will receive a copy of the foregoing via the Court's electronic notification system (ECF), on or about this _____ day of August, 2020:

Thomas A. Mars
tom@mars-law.com

R. Craig Wood
cwood@mcguirewoods.com

Benjamin P. Abel
babel@mcguirewoods.com

John C. Everett
john@everettfirm.com

John E. Tull, III
jtull@qgtlaw.com

Ryan K. Culpepper
ryan@theculpepperfirm.com

 

 
                                         _____
                                           Marshall S. Ney

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BRET A. BIELEMA                                                    PLAINTIFF

v.                                    5:20-cv-05104-PKH

THE RAZORBACK FOUNDATION, INC.                                    DEFENDANT

<u>AFFIDAVIT OF SCOTT VARADY IN SUPPORT OF</u>
<u>DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS</u>

STATE OF ARKANSAS          )
                           ) ss.
COUNTY OF WASHINGTON       )

     **SCOTT VARADY,** being duly sworn according to law, upon his oath, states:

     1.     My name is Scott Varady, and I am above the age of 21 and competent in all respects to submit this Affidavit.

     2.     I am the Executive Director and General Counsel of The Razorback Foundation, Inc. (the "**Foundation**"). I have served in this role since December 2015.

     3.     I was involved in the negotiations and drafting of the "Final Buyout Agreement" (as referenced in the Amended Complaint) with Neil Cornrich and Jonathan Hurst who represented and served as counsel for Bret Bielema.

     4.     I am submitting this Affidavit in connection with and in support of Defendant's Reply in Support of its Motion to Dismiss Plaintiff's Amended Complaint (the "**Reply**").

     5.     Attached hereto as Exhibit 1 are true and correct copies of email correspondence with Mr. Bielema's counsel related to the Final Buyout Agreement.  The attachments to the emails are not included as part of Exhibit 1 because these documents were attached to the Amended Complaint and therefore are already part of the record.

EXHIBIT A

6.      Attached hereto as Exhibit 2 is a true and correct copy of the draft Final Buyout Agreement at the time of these email communications.

7.      The controlling law and "exclusive venue" provisions of the Final Buyout Agreement did not change from the initial draft of the Final Buyout Agreement that I sent to Neil Cornrich on November 29, 2017, to the version of the Final Buyout Agreement that was signed by the parties (Am. Compl. Ex. 5).  Bret Bielema's representatives did not discuss or object to the controlling law and "exclusive venue" provisions of the Final Buyout Agreement, and there were no negotiations over or objections to these provisions.  Bret Bielema's representatives never requested or discussed federal diversity jurisdiction.

8.      The Razorback Foundation intended for Washington County Circuit Court to be the exclusive venue for any legal disputes consistent with previous guaranty agreements between the parties, and Bret Bielema's representatives did not express any views to the contrary.


FURTHER, AFFIANT SAYETH NOT.

Dated this 5th day of August, 2020.

Scott Varady
Executive Director and General Counsel
The Razorback Foundation, Inc.

FEC\44844\0001\7822323.v1-8/5/20

STATE OF ARKANSAS     )
                            ) ss.     **ACKNOWLEDGMENT**
COUNTY OF WASHINGTON  )

On this 5th day of August, 2020, before me the undersigned Notary Public, personally appeared **Scott Varady** ("**Varady**"), designated by the Foundation to execute the foregoing instrument, to me personally well known, who stated that he was the Executive Director and General Counsel of The Razorback Foundation, Inc. and was duly authorized in that capacity to execute the foregoing instrument for and in the name and behalf of the Foundation, and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration, use and purposes therein mentioned and set forth.

IN WITNESS WHEREOF I have hereunto set my hand and official seal.

_Jackie M. Rollins_
Notary Public

My Commission Expires:

_9-30-2021_

JACKIE M. ROLLINS
WASHINGTON COUNTY
NOTARY PUBLIC - ARKANSAS
My Commission Expires September 30, 2021
Commission No. 12364622

3

**From:** Scott Varady <svarady@razorbackfoundation.com>
**Date:** Saturday, December 23, 2017 at 12:53 PM
**To:** Neil Cornrich <Neil@ncsports.us>
**Cc:** Jonathan Hurst <jonathan@ncsports.us>
**Subject:** Re: Bret Bielema Buyout

Dear Neil and Jonathan:

Thank you for taking time to visit this morning, Jonathan.  Below please find responses in blue to Neil's points.

In our efforts to prepare the Release Agreement, we were straightforward in honoring the literal text and spirit of the documents.

The core issues appear to be:  mitigation, offset and the mechanism to implement those obligations in a mutually acceptable way.

1. Paragraph 11 of the Guaranty Agreement establishes a mandatory obligation on Coach to seek other employment.
2. Paragraph 11 of the Guaranty Agreement requires that all income (except passive investments and interest earnings) be offset against the buyout obligation.
3. Similar to you, we do not want to be in a posture that requires either side to have to litigate to ensure that the parties' substantive rights under the Guaranty Agreement have not be denied, diminished or subverted.  Thus, I think both parties are best served by having a process to ensure that Coach is paid what he is entitled to receive, and the Foundation receives the mitigation and offset to which it is entitled under the express language of the Guaranty Agreement.  Your response relating back to the Employment Agreement language is insufficient because it does not provide the process or certainty that will benefit each side.  We proposed a structure that we thought was fair and provided clear certainty to both sides.  Just as Coach is entitled to the benefit of the bargain on his buyout amount, so too is the Foundation entitled to the substantive benefit of its bargain on the mitigation and offset rights.  The Foundation's substantive rights could easily be subverted, among other ways, by Coach accepting a new coaching position and structuring low front-end payments (below market rate) and then receiving an accumulated market rate payments in the back years (after the Guaranty Agreement obligations expire); we do not want to litigate over that or be in a position to breach our fiduciary responsibilities to the Foundation to enforce existing contracts by diminishing or diluting the organization's existing rights to mitigation and offset.  If you wish to propose an alternative structural mechanism than what we presented, we are happy to consider it.  I will tell you that, for what it's worth, the University used the same exhibit to Jeff Long's release agreement (we are not trying to be unreasonable).
4. With all that background, the Foundation position is that Coach has an affirmative duty to seek other employment and the Foundation is entitled to offset all income earned by Coach (excluding passive investments and interest earnings).  We are happy to discuss the best way to create a clear process to allow both parties certainty without the need to engage in future litigation to enforce their respective rights.

EXHIBIT 1

Please feel free to call to discuss.  With you, Jonathan, Ken and me, we ought to be able to resolve this quickly in my judgment.  Thanks for your help.  Again, I respond to each of your points below.

Happy Holidays to each of you and your families!

Sincerely,
Scott

**T. Scott Varady**
Executive Director & General Counsel
The Razorback Foundation, Inc.
1295 S. Razorback Rd., Ste. A
Fayetteville, AR 72701

T 479.443.9526
F 479.443.9527
C 479.856.4348

Web | Facebook | Twitter



*This e-mail, including any attachments, may contain confidential information, and is intended for the person/entity to whom it was originally addressed.  Any use by others is strictly prohibited.  If you are not the intended person/entity, please contact the sender and delete the original message.*

**From:** Neil Cornrich <Neil@ncsports.us>
**Date:** Monday, December 11, 2017 at 2:59 PM
**To:** Scott Varady <svarady@razorbackfoundation.com>
**Subject:** RE: Bret Bielema Buyout

Scott,

After reviewing the attached Release proposal, Coach Bielema would request that the University make the following modifications before proceeding:

1. **Opening Paragraph.** Please add the language "and was amended on or about February 6, 2015" as indicated below:

    > WHEREAS, the Board of Trustees of the University of Arkansas, acting for the University of Arkansas, Fayetteville's Athletic Department (the "University") and Bielema entered into an Employment Agreement ("Employment Agreement") that was effective as of December 4, 2012 **and was amended on or about February 6, 2015**; and

    Response:      Accepted.

2. **Prohibition Against Litigation (Section 2)**. The following stricken language was not agreed to in either of Coach Bielema's contracts (Employment Agreement or Guaranty). It should either be removed as below or made mutual:

    > **Prohibition Against Litigation.** In consideration of the benefits conferred in this Agreement, Bielema hereby covenants and agrees not to sue any of the Releasees on any of the released Claims (or any other matter whatsoever relating to any matter occurring on or before the execution of this Agreement) or join as a Party with others who may sue on any such Claims (or any other matter whatsoever relating to any matter occurring on or before the execution of this Agreement). ~~Bielema hereby agrees to indemnify and hold each and all of the Releasees harmless from and against any and all losses, costs, damages, or expenses, including, without limitation, attorneys' fees and costs (including, without limitation, all costs incurred in litigation such as, for example and without limitation, expert witness fees and all appellate costs and fees) incurred by the Releasees, or any of them, arising out of any breach of this Agreement by Bielema or the fact that any representation made herein by Bielema was false when made.~~

    **Response:**      Accepted on the condition precedent that we resolve all other outstanding issues.

3. **Bielema's Duty of Mitigation and the Foundation's Right of Offset (Section 5.B).**

    - **Duty to Mitigate.** As you may be aware, the following obligation proposed by the University is not in either of Coach Bielema's contracts (Employment Agreement or Guaranty). While we recognize the University's desire to be notified of Coach Bielema's continued efforts to seek other employment, the University should eliminate this proposed requirement to provide written summaries every three months:

        > 5.B. For any period of time that Bielema is unemployed, he shall provide a written summary to the Foundation of his efforts to find other employment every three (3) months during the life of the Agreement.

        Response:  Not Accepted.  We are open to modifying the timing of a summary, but we have an obligation to ensure that Coach is fulfilling his obligation to seek

to mitigate.  A "summary" is a very simple way to document Coach's attempt to seek other employment without creating an onerous burden.  We are open to the timing of it.  What practical alternative are you suggesting to the mandatory obligation to seek re-employment here?

- **Right to Offset – Types of Employment.** Section 5.B of the proposed Release refers broadly to "Other Employment" regarding the University's ability to offset its termination payments to Coach Bielema. However, Section 15(b) of Coach Bielema's Employment Agreement restricts such employment to a "Coaching Position" as per the following excerpt:

> (b)  Offset.  The parties covenant and agree that the Total Guaranty Payment paid to Coach paid by the University's third-party guarantor shall be offset and reduced on a monthly basis by the gross compensation earned by Coach personally or through business entities owned or controlled by Coach from employment as a head or assistant coach or as an administrator either at a college or university or with a professional sports organization (collectively referred to hereafter as a "Coaching Position").  For purposes of this provision, "gross compensation"

Therefore, Section 5.B of the attached Release should be modified to incorporate the above "Coaching Position" language (in lieu of the currently proposed "Other Employment" language).

Response:  Not Accepted.

We used language *directly* out of the Foundation's Guaranty Agreement.  "The Parties understand and agree that if Bielema is successful in gaining *such re-employment, or alternative employment of any kind,* the Foundation's obligation to make the monthly payments of the Guaranty Payment shall be reduced (*i.e.*, offset) dollar-for-dollar by the amount of compensation (including, the dollar value of any benefits packages) Bielema earns from such employment.  The Foundation's right to reduce (*i.e.*, offset) the Guaranty Payment shall be ongoing beginning on November 25, 2017, and ending on December 31, 2020.  The Foundation's right to offset *shall not include amounts Bielema earns from passive investments or interest* not associated with any new employment."  Please compare the italicized language to the Guaranty Agreement.

Below please find Paragraph 11 of the Guaranty Agreement:

the University of Arkansas and/or the Foundation except for the amounts already earned and not paid to Bielema up until the date and time of any termination of the Employment Agreement.

10.     If Bielema is terminated for the convenience of the University of Arkansas in consideration of the amount specified in paragraph 8, in addition to any agreement to pay compensation with the Razorback Foundation, Bielema shall release and discharge the Foundation, its officers, trustees, and employees from and against any liability of any nature whatsoever related to or arising out of this Agreement and/or any amendments hereto, Bielema's employment at the University of Arkansas, and Bielema's termination for convenience of the University of Arkansas, including, but not limited to, the following: any and all claims arising under or relating to any Federal or state constitutions, laws, regulations, common law, or any other provision of law. Bielema further covenants and agrees that he knowingly and voluntarily accepts this guaranty, after consulting with his legal counsel or after voluntarily choosing not to consult legal counsel, in full and complete satisfaction of any and all obligations of the Foundation and as an alternative to the time, expense, and trouble of any future litigation. Bielema acknowledges and intends for the Foundation to rely upon this provision in entering into this Agreement.

Bielema further covenants and agrees that any exercise of ownership or control by him over any partial or total payment under paragraph 8 of this Agreement shall constitute an act of ratification and/or sufficient and valuable consideration which absolutely and unconditionally forever releases, discharges and waives any and all alleged liability of the Foundation, its officials, representatives, and employees, in both their official and individual capacities, from and against any and all claims of any nature whatsoever (including, but not limited to, any and all claims arising from or relating to any Federal or state constitutions, laws, regulations, common law, or any other provision of law) relating to or arising out of this Agreement, Bielema's employment at the University of Arkansas, and Bielema's termination for convenience of the University of Arkansas for any and all such claims which arise or may have arisen between Bielema's initial date of employment, and the date of Bielema's termination for convenience; provided, however, that the scope of the release, discharge and waiver granted by Bielema herein shall not include a release, discharge, or waiver of any claims arising from the failure to pay all sums due under this Agreement.

11.     If Bielema is terminated by the University of Arkansas for its convenience and the Foundation is obligated to pay the amounts specified in paragraph 8 herein, Bielema agrees that those payments shall be subject to the following mitigation provisions. Bielema shall be required to do the following: Bielema shall have the duty to mitigate his damages by making reasonable efforts to gain re-employment. The parties understand and agree that if Bielema is successful in gaining such re-employment, or

alternative employment of any kind the Foundation's Guaranty Payment obligations shall be reduced by the amount of compensation Coach earns from such employment (so long as such employment coincides with the Guaranty Payments). The Foundation's right to reduce its obligations shall not include amounts Coach may earn from passive investments or interest not associated with new employment.

12.     If Bielema is discharged under paragraph 8 herein above and institutes litigation concerning anything against the University of Arkansas or the Foundation except for nonpayment under this Agreement then all amounts specified in paragraph 8 herein will be waived by Bielema and he will not be entitled to any compensation as specified herein. If subsequent to discharge Bielema has already received a portion of or all of the amount specified in paragraph 10 and then institutes litigation, he shall immediately repay said amounts and if he does not repay said amounts then the Foundation shall be entitled to a judgment for the amounts he has received plus interest at the highest rate allowed by Arkansas law.

13.     Bielema agrees that the Foundation's act of entering into this agreement on behalf of the University of Arkansas guarantying its obligations to Bielema will be consideration to Bielema for his agreement to pay back to the University of Arkansas a certain amount as set forth in his employment agreement with the University of Arkansas (for purposes of this Agreement, Paragraph 16 "Termination by Coach – Salary Repayment" of Bielema's employment agreement with the University of Arkansas is incorporated herein as it relates to the amount Bielema is required to pay back to the University of Arkansas). In addition to his agreement to pay that amount to the University of Arkansas, he agrees that all obligations of the Foundation shall cease upon the date of his resignation, except for the Foundation's obligation to provide amounts earned but not yet paid at the time of Bielema's resignation.

The payments required pursuant to Paragraph 16 "Termination by Coach – Salary Repayment" of Bielema's employment agreement with the University of Arkansas will be paid by Bielema to the University of Arkansas in accordance with his Employment Agreement entered into on the _____ day of _____, 2015.

14.     If any provision of this Agreement is declared invalid or unenforceable, such provision shall be deemed modified to the extent necessary and possible to render it valid and enforceable. Notwithstanding, the unenforceability or invalidity of any provision shall not affect any other provision of this Agreement, and this Agreement shall continue in full force and effect and be construed and enforced as if such provision had not been included, or had been modified as above provided, as the case may be.

15.     This Agreement is governed by and shall be construed and enforced under the laws of the State of Arkansas, and venue for this Agreement shall lie solely with the

- **Restrictions on the Structure/Value of Other Employment Packages.** As you may be aware, the subject matter of the following proposed mitigation/offset language is not addressed in either of Coach Bielema's contracts (Employment Agreement or Guaranty). Therefore, this portion of the Release should be removed in its entirety:

  > *5.B. The Parties further understand and agree that Bielema's duty of mitigation includes the obligation to maximize his earning potential with a new employer. Moreover, Bielema or any individual or entity acting on his behalf shall not structure his compensation or any compensation package with a new employer in any manner to avoid or to deny deny the Foundation's right of offset of the Guaranty Payment. Accordingly, the Foundation's right of offset shall include, but not be limited to, the right to offset the total economic value of any compensation package, employment agreement, or other compensation formula utilized with any new employer. For the avoidance of all doubt, the Parties understand and agree that the duty to make the Guaranty Payment shall not be treated as a subsidy for any future employer to pay Bielema less than market value for his services.*

  > Response:          What is an acceptable and practical approach to Coach Bielema?

- **Disclosure of Earnings & Tax Returns**. The University's proposed obligation for Coach Bielema to (1) disclose his payroll earnings and (2) provide copies of his federal tax returns is not addressed in either of Coach Bielema's contracts (Employment Agreement or Guaranty). While we recognize the University's desire for supporting information about Coach Bielema's potential new employment, the following language should be removed, as well as the proposed Authorization for Disclosure of Employment Compensation**:**

  > *5.B. Concurrent with the execution of this Agreement, Bielema shall also execute the attached Authorization for Disclosure of Employment Compensation for the time period beginning November 25, 2017 and ending on December 31, 2021, and for the same time period, Bielema shall furnish a copy of his federal tax returns (including, but not limited to all schedules) each year to permit the Foundation to verify all Bielema's compensation.*

  Coach Bielema is amenable to the following language (also in Section 5.B) proposed by the University as a fair and reasonable way to cooperate with the University in these matters going forward:

*5.B. The Parties shall work in good faith to share any required information and make all permitted reductions or offsets required by this Agreement.*

In light of the several issues delineated above, the simplest way to conform the duty to mitigate/offset/report is to simply incorporate the same provisions from the Employment Agreement. To that end, please delete proposed Section 5.B in its entirety and replace it with the following language:

*"Bielema acknowledges his duty to mitigate set forth in Paragraph 15(a) of the Employment Agreement and further acknowledges that the Guaranty Payment set forth above shall be offset according to the terms of Paragraph 15(b) of the Employment Agreement, the specific provisions of both of which shall be and hereby are expressly incorporated herein."*

Response:      What is an acceptable and practical approach to Coach Bielema?  The referenced language does not provide a mechanical way or process for the parties to follow in implementing the mitigation and offset requirements.

4. **Entire Agreement (Section 8).** Please add the following language in bold:

*This Agreement contains the entire agreement of the Parties with respect to the matters contained herein, and there are no other agreements, whether oral or written, between the Parties concerning the subject matter of this Agreement,* **except to the extent expressly referred to and incorporated herein.** *Notwithstanding the foregoing, this Agreement does not cancel or limit any release and waiver provisions contained in the Employment Agreement (as amended) or Guaranty Agreement.*

Response:      Obviously, this will depend on the final content of the Release Agreement.  We are not necessarily opposed to it, but we don't know that it will be needed in the end.

5. **Confidentiality (Section 17).** Please modify the final sentence of this section as follows:

*In the event that ~~Bielema~~ **either party** fails to comply fully with this Section 17 of the Agreement, then the ~~Foundation~~ **non-breaching party** shall be entitled to be indemnified by ~~Bielema~~ **the breaching party** for actual damages the ~~Foundation~~ **non-breaching party** incurs as a result of the breach of this Section 17, including reasonable attorney's fees, and ~~Bielema~~ **the parties** shall remain bound by the terms and conditions of this Agreement.*

Response:  I recommend we delete the confidentiality provision.  The University has requested a copy of our final agreement, and consistent with NCAA principles of institutional control, we will have to release it to the University.

Thank you very much.

NC

---

Neil M. Cornrich
**NC Sports, LLC**
One Chagrin Highlands
2000 Auburn Drive, Suite 315
Beachwood, Ohio  44122
(216) 514-9999
(216) 514-8500 fax
Email: neil@ncsports.us
Website: neilcornrich.com
Twitter: @NeilCornrich

NC SPORTS, LLC - CONFIDENTIAL COMMUNICATION This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom it is addressed. This communication may contain material protected by lawyer-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail and any file attachments is strictly prohibited. If you received this e-mail in error, you must destroy the original transmission and its contents. Please immediately notify us by telephone at 216-514-9999 or by reply e-mail to the sender.

**From:** Scott Varady [mailto:svarady@razorbackfoundation.com]
**Sent:** Wednesday, November 29, 2017 5:26 PM
**To:** Neil Cornrich
**Cc:** Kenneth Mourton; Billye H. Veteto
**Subject:** Bret Bielema Buyout
**Importance:** High

Dear Neil,

As a follow-up to our recent conversation, I would like to review two issues with you.  First, I will address the calculation of the Guaranty Payment owed under the Personal Services and Guaranty Agreement ("Guaranty Agreement").  Second, I will address the calculation of the final payment the Foundation owes to Coach Bielema for sums earned, but not yet paid.  The second issue is independent of the Guaranty Payment.

For your convenience and review, I am attaching copies of the following documents:

- Personal Services and Guaranty Agreement
- Employment Agreement;
- First Amendment to Employment Agreement; and

- Release and Waiver Agreement.

As I mentioned in our visit, the Employment Agreement is incorporated into the Guaranty Agreement.  The Employment Agreement sets out the formula for determining, subject to the duty of mitigation and the right of offset, the maximum buyout to be paid to Coach Bielema.

## ISSUE ONE: THE GUARANTY PAYMENT

As recited in the Employment Agreement, the formula for determining the amount owed to Coach Bielema is as follows:

1. Compute the value of the monthly guaranty payment; and

2. Multiply the monthly guaranty payment value by the total number of months remaining on the Employment Agreement (as amended) as of the effective date of the termination with any partial months being prorated.

3. Subject to the duty of mitigation and the right of offset, the Foundation would make the monthly guaranty payments through the end of the term of the Employment Agreement.

As an easy example, we can look at the final year of the Employment Agreement, as amended.  Please note that the First Amendment to the Employment Agreement states that, if Coach Bielema is terminated for convenience at any time between January 1, 2020, and December 31, 2020, then the maximum buyout, subject to the duty of mitigation and the right of offset, would be $4,000,000.

Assume that the University terminated Coach Bielema for convenience with six months remaining on the Term of the Employment Agreement.

Step One

According to the formula for determining the monthly value of the guaranty payment, $4,000,000 would be divided by 12 months (the period of months covered by the designated buyout amount).  This calculation renders a monthly guaranty payment of $333,333.33 ($4M buyout amount/12 remaining months if terminated in the final year of the Employment Agreement).

Step Two

Multiply the monthly guaranty payment of $333,333.33 by the number of months remaining in the Term of the Employment Agreement as of the effective date of the termination with any partial months being prorated (there are no partial months in this example).  In this example, six (6) months of the final year remain, and thus the following calculation applies:  $333,333.33 x 6 = $2,000,000.  Therefore, the Foundation would owe Coach Bielema a total of $2,000,000 to be paid in equal monthly installments on

the final working day of each calendar month in the amount of $333,333.00 per month (subject to the duty of mitigation and offset).

**The Calculation of the Buyout Owed to Coach Bielema**

In applying the buyout formula to Coach Bielema's termination for convenience on November 24, 2017, and subject to the duty of mitigation and the right of offset, the Foundation owes Coach Bielema the sum of $11,935,000 to be paid in equal monthly installments on the final day of each calendar month, with the first month being a prorated amount.  Please see the step-by-step process outlined in the following calculations.

**Coach Bret Bielema**
**Contract Guaranty Amount**
**Termination Date:  11/24/17**

**Numerator - Full amount of Guaranty Payment (dependent upon year)  -  Divided by the total number of months remaining on the Term of the Employment Agreement beginning with the date that the Guaranty Payment is in effect.  Here, the amount is $15,400,000 beginning on January 1, 2017.  Thus, in determining the "Monthly Value of the Guarantee Payment," this sum covers the 48-month period beginning on January 1, 2017 and ending on December 31, 2020.    Below is the application of the formula.**

| | | |
|---|---|---|
| Guaranty Amount | $15,400,000.00 | *Paragraph #5-Amendment #1* |
| Term - # of months from 1/1/17 | 48 | *Jan 1, 2017 - Dec 31, 2017* |
| | $320,833.33 | *"Monthly Value of Guarantee Payment"* |
| ## of Full Months Remaining on Term | 37 | *Full Months (Dec 2017 - Dec 2020)* |
| | $11,870,833.33 | |
| Add:  November 2017 Prorated Payment | $64,166.67 | |
| **TOTAL OWED @ 11/25/17** | **$11,935,000.00** | |

| November Calculation – Prorated Amount | |
|---|---|
| Monthly Value of Guarantee Pymt | $320,833.33 |
| # of Days in November | 30 |
| Daily Value | $10,694.44 |
| November 25 - November 30, 2017 | 6 |
| **November Prorated Amount** | **$64,166.67** |

Consistent with the letter and spirit of the Guaranty Agreement, we share this calculation in good faith to fulfill the Foundation's commitments to Coach Bielema.  The Guaranty Payment is intended to pay Coach Bielema the specified amount for the remaining period of the unpaid balance of the term (subject

to mitigation and offset).  Some published reports calculated the buyout to be as low as $5.9M and you referenced a payment of $15,400,000 without having the benefit to review the documents at the time.  I note that the contract specifies that the rule of construction that any ambiguity is construed against the drafting party has no effect and that all parties participated equally in the wording of the Guaranty Agreement.  We believe our calculation is consistent with the intent and wording of the Guaranty Agreement, and we are confident that we can agree promptly to facilitate the start of the payments to Coach Bielema.

Subject to the contingent precedent that we execute a Release and Waiver Agreement, our first payment to Coach Bielema would be due on Thursday, November 30, 2017.  We are prepared to do so if Coach Bielema executes the Release and Waiver Agreement we have attached to this email.

I hope your team has had a chance to review the documents and will be able to quickly review our calculations so that we can conclude this matter.  Beyond this issue, the Foundation is responsible to pay Coach Bielema for any outstanding obligations that have accrued prior to his termination but have not yet been paid.  I will address that issue now.

**ISSUE TWO: Amount Owed But Not Yet Paid**

As stated, the amounts earned by Coach Bielema under his Personal Services and Guaranty Agreement but that have not yet been paid total as follows.

**Calculation of November Prorated Payment for PSC Payment**

**Termination Date**            11/24/2017

| | | |
|---|---|---|
| Monthly PSC Amt | $ 41,666.67 | |
| PSC Per Day | $ 1,388.89 | |
| ## of Days thru Term Date | 24 | 11/1/17-11/24/17 |
| **TOTAL Owed thru 11/24/17** | **$ 33,333.34** | |

Please let us know if you have any questions or comments on this issue, and we will process and deliver the payment to Coach Bielema by a hard copy check.

**Conclusion**

Thank you very much for reviewing these issues.  We look forward to visiting with you.

Sincerely,
Scott

## R E L E A S E   A N D   W A I V E R   A G R E E M E N T

THIS RELEASE AND WAIVER AGREEMENT (the "Agreement") is entered into and made effective on this _____ day of November ("Effective Date") between The Razorback Foundation, Inc., an Arkansas nonprofit corporation (the "Foundation"), its successors and assigns, and Bret Bielema ("Bielema"). The parties identified above may be referred to herein collectively as the "Parties," and any individual party identified above may be referred to herein as a "Party."

## W I T N E S S E T H

WHEREAS, the Board of Trustees of the University of Arkansas, acting for the University of Arkansas, Fayetteville's Athletic Department (the "University") and Bielema entered into an Employment Agreement ("Employment Agreement") that was effective as of December 4, 2012; and

WHEREAS, the Foundation and Bielema entered into a "Personal Services and Guaranty Agreement" ("Guaranty Agreement") on February 6, 2015 (that became effective as of December 4, 2012), that incorporated the Employment Agreement by reference and also operates as a third-party guaranty agreement and full release and waiver of any and all liabilities, debts, obligations and amounts owed to Bielema by the University; and

WHEREAS, the University terminated the Employment Agreement (as amended) with Bielema for convenience on November 24, 2017; and

WHEREAS, the Foundation and Bielema mutually desire to enter into this Agreement subject to all terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the terms and conditions herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree as follows:

**1.     Release.**  In exchange for the good and valuable consideration set forth in this Agreement, Bielema hereby irrevocably and unconditionally releases, waives, acquits, forever discharges, and agrees to hold harmless the following: (a) the University (as defined above); (b) the current and former Trustees of the Board of Trustees of the University of Arkansas; (c) the University's officers, representatives, volunteers and employees; (d) the Foundation ("as defined above"); (e) the Foundation's current and former directors, officers, volunteers and employees; (f) any and all of the University's and Foundation's members, predecessors, successors, assigns, agents, directors, trustees, officers, employees, representatives, divisions, subsidiaries, affiliates (and agents, directors, trustees, officers, employees, representatives and attorneys of such divisions, subsidiaries and affiliates), and all persons acting by, through, under or in concert with any of them (collectively, the "Releasees"), from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, and expenses of any nature whatsoever, known or unknown, suspected or unsuspected, including, but not limited to, rights arising out of alleged

Page **1** of **8**

EXHIBIT 2

violations or breaches of any contracts, express or implied, or any tort, or any legal restrictions on the Foundation's or the University's rights to terminate employees, or any federal, state or other governmental statute, regulation, or ordinance, including, without limitation: (1) Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991; (2) the Americans with Disabilities Act, as amended; (3) 42 U.S.C. § 1981; (4) the Age Discrimination in Employment Act; (5) the Older Workers Benefit Protection Act; (6) the Equal Pay Act; (7) the Employee Retirement Income Security Act; (8) Section 503 of the Rehabilitation Act of 1973, as amended; (9) the False Claims Act (including the qui tam provision thereof); (10) the Consolidated Omnibus Budget Reconciliation Act of 1986; (11) intentional or negligent infliction of emotional distress or "outrage"; (12) defamation; (13) interference with employment and/or contractual relations; (14) wrongful discharge; (15) invasion of privacy; (16) breach of contract, express or implied (including, but not limited to, breach of Bielema's Employment Agreement, as amended, with the University of Arkansas or any other contract); (17) Title IX of the Education Amendments of 1972, as amended; (18) the Arkansas Whistle-Blower Act; (19) the Arkansas Civil Rights Act; and (20) any other basis in law, including, without limitation, any constitutions, federal or state statutes (all as amended, and including, but not limited to, any form of retaliation), federal or state regulations, common law or any other basis, including but not limited to, any liability of any nature related to or arising out of the Guaranty Agreement, Bielema's employment at the University of Arkansas, Bielema's termination for convenience at the University of Arkansas (collectively, the "Claim" or "Claims"), which Bielema now has, owns or holds, or claims to have, own or hold, or which Bielema at any time heretofore had, owned or held, or claimed to have, owned or held, against each or any of the Releasees at any time, up to and including the Effective Date of this Agreement, which is stated above. The foregoing provision shall be referred to as the "Release," and any person or entity falling within the scope of the Release shall be referred to as a "Releasee" or "Releasees." Bielema grants this Release voluntarily and in exchange for the valuable consideration contained in this Agreement and as required pursuant to the terms and conditions of the Employment Agreement, as amended, with the University as well as the Guaranty Agreement. The Release shall survive indefinitely and may not be revoked for any reason.

2.   **Prohibition Against Litigation.**  In consideration of the benefits conferred in this Agreement, Bielema hereby covenants and agrees not to sue any of the Releasees on any of the released Claims (or any other matter whatsoever relating to any matter occurring on or before the execution of this Agreement) or join as a Party with others who may sue on any such Claims (or any other matter whatsoever relating to any matter occurring on or before the execution of this Agreement). Bielema hereby agrees to indemnify and hold each and all of the Releasees harmless from and against any and all losses, costs, damages, or expenses, including, without limitation, attorneys' fees and costs (including, without limitation, all costs incurred in litigation such as, for example and without limitation, expert witness fees and all appellate costs and fees) incurred by the Releasees, or any of them, arising out of any breach of this Agreement by Bielema or the fact that any representation made herein by Bielema was false when made.

3.   **Representations and Warranties; Dismissal.**  Bielema hereby represents and warrants that he has not filed, nor has he assigned to others the right to file, any complaints, charges, or lawsuits against any of the Releasees with any governmental agency, any court, or judicial body, and that Bielema will not file, nor will he assign to others the right to file, or to make any further Claims against the Releasees at any time hereafter for actions taken up to and including

the Effective Date of this Agreement, which is stated above.  To the extent there is any such litigation, administrative complaint or any other action of any nature whatsoever currently ongoing, about to be initiated, or authorized to be asserted against the Releasees, Bielema covenants and agrees to immediately dismiss with prejudice any lawsuit, claims, or charges of any kind whatsoever under any law or theory, any federal or state constitution, statute, regulation or common law, that he has filed or authorized for filing against the Releasees any state or federal court, agency or department or other tribunal of any nature whatsoever.  Bielema shall execute any and all motions or other documents and pleadings necessary or take any other necessary actions requested by the Releasees to effectuate the same.  In the event Bielema fails to take the required actions under this provision, then Bielema appoints the Foundation as his attorney-in-fact for the sole purpose of executing any and all necessary documents to dismiss any such proceeding against any of the Releasees.  Bielema hereby covenants and promises that he will not file any charges, claims, or lawsuits against the Releasees for any alleged acts, omissions and/or events, whether now known or unknown, that have or may have occurred prior to the execution date of this Agreement by all Parties.  In the event Bielema initiates litigation concerning the subject matter of this Agreement, Bielema covenants and agrees that this Agreement shall entitle the Releasees to a stipulation that all claims identified in this Agreement have been forever released and discharged, and this document shall serve as the stipulation and consent to the dismissal of the litigation.

**4.     Representations Regarding Existing Claims.**  Bielema acknowledges and represents that he has no knowledge of any acts or omissions by any of the Releasees or by any employee of the University or the Foundation that he believes could possibly constitute any basis for a claimed violation of any federal, state, or local law, any common law, or any rule, regulation or bylaw promulgated by the NCAA, the Southeastern Conference, or any other administrative body.

**5.     Guaranty Payment, Duty of Mitigation, and the Foundation's Right of Offset.**

A.     Guaranty Payment.  In consideration of the irrevocable release and waiver of any and all Claims granted by Bielema in this Agreement (including, but not limited to, the Release) as well as his performance of all other terms and conditions in this Agreement and the Employment Agreement with the University (as amended), the Foundation shall pay Bielema the first monthly sum of Sixty-Four Thousand One Hundred Sixty-Six Dollars and Sixty-Seven Cents ($64,166.67) for the pro-rata period of November 25, 2017 thru November 30, 2017, and all remaining monthly payments will be in equal amounts of Three Hundred Twenty Thousand Eight Hundred Thirty-Three Dollars and Thirty-Three Cents ($320,833.33) for the period beginning on December 1, 2017, and ending on December 31, 2020, subject to Bielema's duty of mitigation and the Foundation's right of offset, with each such payment being paid on the final working day of each calendar month. Accordingly, subject to Bielema's duty of mitigation and the Foundation's right of offset specified herein, the total amount of the payment owed to Bielema shall not exceed a maximum of Eleven Million Nine Hundred Thirty-Five Thousand and No/100 Dollars ($11,935,000.00) (the "Guaranty Payment"). Given that the Guaranty Payment may be adjusted to reflect any offsets permitted under this

Agreement, the Parties understand and agree that the term "Guaranty Payment" shall refer to the actual amount owed to Bielema as adjusted for any offsets and thus may be less than $11,935,000.00, as specified, but in no event shall exceed that sum. Bielema covenants and agrees that the Foundation, the University and the other Releasees shall not owe him any other sums or amounts of any kind or nature whatsoever than those expressly set forth in this Agreement.

B.   <u>Bielema's Duty of Mitigation and the Foundation's Right of Offset</u>.  Bielema shall have an affirmative duty of mitigation to diligently seek and to obtain other employment. For any period of time that Bielema is unemployed, he shall provide a written summary to the Foundation of his efforts to find other employment every three (3) months during the life of the Agreement. The Parties understand and agree that if Bielema is successful in gaining such re-employment, or alternative employment of any kind, the Foundation's obligation to make the monthly payments of the Guaranty Payment shall be reduced (*i.e.*, offset) dollar-for-dollar by the amount of compensation (including, the dollar value of any benefits packages) Bielema earns from such employment. The Foundation's right to reduce (*i.e.*, offset) the Guaranty Payment shall be ongoing beginning on November 25, 2017, and ending on December 31, 2020. The Foundation's right to offset shall not include amounts Bielema earns from passive investments or interest not associated with any new employment. The Parties further understand and agree that Bielema's duty of mitigation includes the obligation to maximize his earning potential with a new employer. Moreover, Bielema or any individual or entity acting on his behalf shall not structure his compensation or any compensation package with a new employer in any manner to avoid or to deny deny the Foundation's right of offset of the Guaranty Payment. Accordingly, the Foundation's right of offset shall include, but not be limited to, the right to offset the total economic value of any compensation package, employment agreement, or other compensation formula utilized with any new employer. For the avoidance of all doubt, the Parties understand and agree that the duty to make the Guaranty Payment shall not be treated as a subsidy for any future employer to pay Bielema less than market value for his services.

The Parties understand and agree that the Guaranty Payment to Bielema shall be offset and reduced on a monthly basis by the gross compensation earned by Bielema personally or through business entities owned or controlled by Bielema (collectively referred to hereafter as "Other Employment"). For purposes of this provision, "gross compensation" shall mean, without limitation, gross income from base salary or wages, talent fees, or any other types of compensation paid to Bielema by an employer, including by a business entity owned by or controlled by Bielema, consulting fees, honoraria, fees received by Bielema as an independent contractor, or other income of any kind whatsoever from Other Employment. Concurrent with the execution of this Agreement, Bielema shall also execute the attached *Authorization for Disclosure of Employment Compensation* for the time period beginning November 25, 2017 and ending on December 31, 2021, and for the same time period, Bielema shall furnish a copy of his federal tax returns

Page **4** of **8**

(including, but not limited to all schedules) each year to permit the Foundation to verify all Bielema's compensation. While the Foundation's obligation to pay the Guaranty Payment remains in effect, within fourteen (14) calendar days after accepting any employment and within fourteen (14) calendar days after the end of each month thereafter, Bielema shall furnish to the Foundation an accounting or report of all gross compensation received by Bielema during the immediately preceding month from Other Employment. The Foundation shall reduce the amount of the monthly Release Payment due and payable to Bielema based upon the gross compensation for the immediate previous month as reflected in the Other Employment gross compensation report. If Bielema fails or refuses to notify the Foundation of Bielema's employment, misrepresents to the Foundation the amount of gross compensation received from Other Employment by Bielema, or fails or refuses to furnish the monthly Other Employment gross compensation reports after receiving a formal, written request to do so, then, after giving Bielema fourteen (14) days written notice, the obligation of the Foundation to continue paying the Guaranty Payment shall cease immediately. The Parties shall work in good faith to share any required information and make all permitted reductions or offsets required by this Agreement.

6.    **Governing Law.**  This Agreement shall be governed by the laws of the State of Arkansas without regard to its choice of law principles. Washington County, Arkansas, shall be the exclusive venue for any action arising under or relating to this Agreement. Nothing contained in this Agreement shall be deemed, construed or operate as a waiver of any immunities to suit available to the Board of Trustees of the University of Arkansas or its trustees, officers, representatives and employees.

7.    **Counterparts; Facsimiles.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. For purposes of executing the Agreement, a document signed and transmitted by facsimile machine, electronic mail, or other commercially accepted electronic or mechanical means is to be treated as an original document and shall make this Agreement binding upon the Parties.

8.    **Entire Agreement.**  This Agreement contains the entire agreement of the Parties with respect to the matters contained herein, and there are no other agreements, whether oral or written, between the Parties concerning the subject matter of this Agreement. Notwithstanding the foregoing, this Agreement does not cancel or limit any release and waiver provisions contained in the Employment Agreement (as amended) or Guaranty Agreement.

9.    **Severability.**  Each provision of this Agreement is severable from all other provisions of the Agreement. If any governmental authority having jurisdiction over the matters herein determines, during or at the conclusion of any litigation, that any provision of the Agreement is invalid or unenforceable, the provision will be deemed modified only to the extent necessary to render it valid and enforceable, and all remaining provisions of the Agreement will remain in full force and effect.

Page **5** of **8**

10.   **Third-Party Beneficiaries.**   For the avoidance of all doubt, the Foundation and Bielema covenant and agree that the Board of Trustees of the University of Arkansas, its Trustees, and the University of Arkansas, Fayetteville, its officers, representatives, and employees (all in their individual and official capacities) are express third-party beneficiaries under this Agreement, are covered by the term "Releasees" as defined in this Agreement, and each and all of whom shall have the legal right to enforce each and every term of this Release.

11.   **Non-Disparagement.**   The Parties agree not to make disparaging remarks regarding Bielema, the Foundation, its directors, officers, and employees, or the University of Arkansas, its governing Board, or its officers, representatives and employees, and to state, if asked, that any differences between or among them were resolved on an amicable basis.   The promises set forth in this Agreement, and the document itself, shall not be used by either Party in any manner, whether directly or indirectly, for any purpose other than to enforce their respective rights hereunder, unless otherwise compelled by law.

12.   **Enforcement of Agreement.**   The Parties agree that a violation on their part of any covenants contained in this Agreement, following notice and reasonable opportunity to cure, will give rise to an action to enforce this Agreement to the extent permitted by Arkansas law.   Such remedy shall be cumulative and nonexclusive of any other remedies the Parties may have, including, but not limited to, the recovery of any sums paid to Bielema and any remaining obligations owed to the Foundation by Bielema pursuant to this Agreement. Nothing contained in this provision or this Agreement, however, shall be construed, interpreted or operate as a waiver of any immunities to suit available to any of the Releasees (including in their official or individual capacities), and all immunities to suit are affirmatively reserved.

13.   **No Implied Waiver.**   The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by any Party, nor shall any such waiver operate or be construed as a rescission of this Agreement.

14.   **Construction.**   The Parties agree that the rule of construction that ambiguity is construed against the drafting Party shall have no application in any dispute over the interpretation of this Agreement. By entering into this Agreement, the Parties do not admit any liability with regard to any matter relating to Bielema's employment and termination of employment at the University, and the Parties expressly deny all such liability.   Moreover, the fact that the Parties entered into this Agreement shall not be used to establish any such liability.

15.   **Costs.**   The Parties shall each be responsible for their own attorney's fees and costs incurred in connection with all matters giving rise to this Agreement.

16.   **Headings and Recitals.**   The headings in this Agreement are for convenience purposes only and shall not be assigned any substantive meaning in the interpretation and application of this Agreement. The Recital Clauses set forth at the beginning of this Agreement are substantive provisions of this Agreement and shall be treated as such and construed in harmony with all other provisions of this Agreement.

17.    **Confidentiality.**  To the extent permitted by Arkansas law, the Parties agree that the terms and conditions of this Agreement shall forever remain confidential; provided, however, the Foundation, in its sole discretion, shall have the sole and exclusive right to disclose any sum required to be paid or actually paid to Bielema under this Agreement, including, but not limited to, any reporting requirements mandated by the Internal Revenue Service.  Bielema shall not communicate the terms and conditions of this Agreement or disclose the existence of the contents of this Agreement to any third person or entity, except that Bielema may discuss the Agreement with his attorneys or accountants provided that the ongoing duty of confidentiality shall apply to them as well except as required by law.  Bielema agrees to ensure that any individual entrusted with information concerning the terms of the Agreement under this clause will likewise enter into a written agreement with Bielema to maintain the confidentiality of the terms of this Agreement.  In the event that Bielema fails to comply fully with this Section 17 of the Agreement, then the Foundation shall be entitled to be indemnified by Bielema for actual damages the Foundation incurs as a result of the breach of this Section 17, including reasonable attorney's fees, and Bielema shall remain bound by the terms and conditions of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, as of the day and year first above written.


**The Razorback Foundation, Inc.**


By: _____          By: _____
      Scott Varady                                     Bret Bielema
      Executive Director of the
      Razorback Foundation, Inc.

## AUTHORIZATION FOR DISCLOSURE OF
## EMPLOYMENT COMPENSATION

**Re:**   **MR. BRET BIELEMA**
      **DOB:**
      **SS#:**


I, _____, do hereby authorize my past and present employers to release any and all payroll or earnings statements, documents, correspondence, agreements and records reflecting any amounts of payment, compensation or income accrued, earned, paid, or otherwise received, by me personally (as an employee or as an independent consultant) or through business entities owned or controlled by me during the period beginning on November 25, 2017, and ending on December 31, 2021, including without limitation, gross income from base salary or wages, talent fees, benefits, bonuses, and other types of compensation paid to me by an employer, including by a business entity owned by or controlled by me, consulting fees, honoraria, fees received by me as an independent contractor, or other income of any kind whatsoever, to the following:

                **Chief Financial Officer**
                **The Razorback Foundation, Inc.**
                **1295 S. Razorback Rd., Ste. A**
                **Fayetteville, AR 72702**

The purpose of access to and release of my employment compensation records is at my request in connection with an Employment Release Agreement executed by myself and the Razorback Foundation, Inc.

Any reproduction or photocopy of this authorization shall be valid as the original and shall remain in effect through December 31, 2021.


_____
**Signature**


_____
**Date**