# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF ARKANSAS
# FAYETTEVILLE DIVISION

**BRET BIELEMA**  **PLAINTIFF**

vs.

**THE RAZORBACK FOUNDATION, INC.**  **DEFENDANT**

Case No. 5:20-cv-05104-PKH

**THE RAZORBACK FOUNDATION, INC.**  **COUNTER- PLAINTIFF**

vs.

**BRET BIELEMA and NEIL CORNRICH**  **COUNTER- DEFENDANTS**

## BRIEF IN SUPPORT OF
## COUNTER-DEFENDANTS' JOINT MOTION FOR RULE 11 SANCTIONS

Through the undersigned counsel, the Counter-Defendants, Bret Bielema ("Coach Bielema") and Neil Cornrich ("Cornrich"), state the following in support of their Joint Motion for Rule 11 Sanctions:

### INTRODUCTION

This joint motion for Rule 11 sanctions is nothing short of extraordinary. Not once in their 200 years of collective experience have any of the undersigned counsel filed a Rule 11 motion against any lawyer. What's more, most of the undersigned counsel have had prior professional relationships with opposing counsel that, in some instances, involved being former colleagues in a law firm and a corporate legal department. Unfortunately, the most extraordinary aspect of this Rule 11 motion is the subject of the motion itself: *a recently invented claim of fraud and conspiracy for which there is no supporting evidence, filed by opposing counsel without any investigation of the facts*.

1

At issue here is whether counsel for the Foundation: (1) made a reasonable inquiry under the circumstances to determine whether there was evidentiary support for the allegations of fraud and conspiracy as set forth above; and (2) whether opposing counsel made those allegations for an improper purpose. Under the circumstances, and for the reasons explained below, the inclusion of the conspiracy allegations and the fraud claim in the Foundation's Counterclaim is a blatant violation of Rule 11 which justifies the imposition of sanctions.

## RULE 11 STANDARD OF REVIEW

Federal Rule of Civil Procedure 11(b) provides that when an attorney "present[s] to the court a pleading, written motion, or other paper," he or she "certifies that to the best of the [attorney's] knowledge, information, and belief, formed after *an inquiry reasonable under the circumstances . . .* that: (a) the "factual contentions have evidentiary support or, *if specifically so identified*, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," and (b) it is not being presented *for any improper purpose*, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1)(emphasis added).[1]

The primary purpose of Rule 11 sanctions "is to deter attorney and litigant misconduct." *Kirk Capital Corp. v. Bailey*, 16 F.3d 1485, 1490 (8th Cir. 1994). More specifically, Rule 11 is aimed at preventing lawyers from "misusing judicial procedures as a weapon for personal or economic harassment." *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 830 (9th Cir. 1986).

---

[1] Chief Justice Warren E. Burger described the signature requirement as follows: "When the elder statesmen among you here today came to the bar, I am sure you were told, as I was, that your signature on a pleading or motion was something like your signature on a check. There was supposed to be something to back it up." *Rodgers v. Lincoln Towing Serv.*, Inc., 596 F. Supp. 13, 27 (N.D. Ill. 1984) (quoting Address by then Chief Justice Warren Burger, American Law Institute Annual Meeting (May 15, 1984)), *aff'd*, 771 F.2d 194 (7th Cir. 1985).

Rule 11 requires that an attorney's conduct be objectively reasonable under the circumstances. *Norsyn, Inc. v. Desai*, 351 F.3d 825, 831 (8th Cir. 2003). The requisite factual inquiry can be obtained through personal interviews with key witnesses as well as review of relevant documents. However, it is not permissible to plead a claim and use discovery as the sole means of determining whether a client has a valid claim. *Szabo Food Serv., Inc. v. Canteen Corp*., 823 F.2d 1073, 1083 (7th Cir. 1987). If an attorney believes in good faith that evidentiary support for factual contentions will be obtained through formal discovery, Rule 11 requires that the attorney signing the pleading say so and specifically identify that expected evidence. As further discussed below, pleading on "information and belief" is not an acceptable alternative to complying with this specific requirement of Rule 11.

Mere conjecture or wishful thinking may not serve as a substitute for a reasonable inquiry into the facts. *See Fisher v. CPC Int'l, Inc*., 591 F. Supp. 228, 235-36 (W.D. Mo. 1984); *Sen. Howell T. Heflin*, *Remarks at the 44th Judicial Conference of the District of Columbia Circuit*, 100 F.R.D. 109, 205 (1983) (Amended Rule 11 "provides that the attorney's belief in the validity of the filing must have been formed after *reasonable inquiry*, and cannot simply represent *loyalty to the client or wishful thinking*.") (emphasis added). According to the 1993 Advisory Committee Notes, the new standard of conduct was "intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments."

According to the pre-amendment Advisory Committee Notes, "what constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper; whether the pleading, motion, or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar."

*Heightened Rule 11 Standard for Allegations of Fraud*

Rule 9(b) imposes an obligation on the party alleging fraud to plead such allegations with specificity. The particularity requirement of Rule 9(b) ensures that fraud allegations are concrete enough to give the responding parties fair notice of the grounds of the claim so they can prepare a defense. However, it also protects defendants' reputations from the harm that comes from being wrongly accused of serious wrongdoing. Moreover, Rule 9(b) deters the filing of groundless accusations designed to coerce a settlement from innocent defendants by raising the financial and reputational stakes of protracted litigation.

The filing of a fraud claim without proof of the allegations can cause serious damage to a defendant's reputation. For that reason, federal courts have applied a heightened standard when reviewing fraud allegations for compliance with Rule 11. *In re Ramada Inns Securities Litigation*, 550 F. Supp. 1127, 1132 (D. Del. 1982) ("[T]he combined effect of Rules 9(b) and 11 is that an attorney, before commencing any action involving fraud or mistake, must have *more specific information reasonably believed to be trustworthy* than . . . if [they] were commencing any other kind of action.") (emphasis added); *see also Rojas v. First Bank Nat'l Ass'n*, 613 F. Supp. 968 (E.D.N.Y. 1985) (plaintiff filed frivolous fraud and civil RICO claims; seriousness of charges affects Rule 11 analysis); *Saine v. A.I.A., Inc.*, 583 F. Supp. 1299, 1306 n.5 (D. Colo. 1984) ("a charge of fraud is a serious matter with attendant consequences to a person's reputation and goodwill.").

To meet the requirement of pleading fraud with particularity, litigants must possess more than just a creative imagination. A number of district courts have assessed sanctions where, as here, parties failed to obtain any evidence of fraud that would allow them to plead fraud with the required particularity. *See, e.g., Hershey v. E.F Hutton & Co., Inc.*, 113 F.R.D. 181 (S.D. Ala. 1986); *Taylor v. Prudential-Bache Securities, Inc.*, 594 F. Supp. 226 (N.D.N.Y. 1984); *Tedeschi v. Smith Barney,*

*Harris Upham and Co., Inc.*, 579 F. Supp. 657 (S.D.N.Y. 1984); *see also Goldman v. Belden*, 580 F. Supp. 1373 (W.D.N.Y. 1984), *vacated on other grounds,* 754 F.2d 1059 (2d Cir. 1985).

***The Plausibility of an Allegation is a Relevant Rule 11 Consideration***

In *Bell Atlantic Corp. v. Twombly*, the Supreme Court held that a complaint that merely states the legal theory of a claim is not sufficient. 550 U.S. 544, 561 (2007). "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' for his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (citations omitted). Thus, a complaint alleging conspiracy must include "enough factual matter (taken as true) to suggest that an agreement was made." *Id*. at 556.

Two years later, the Court made clear that the stricter pleading standard announced in *Twombly* applies to all civil actions in federal court. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *Iqbal* sets out a two-pronged approach for evaluating whether a complaint satisfies Rule 8's pleading requirement. First, the court must "identify[] the allegations in the complaint that are not entitled to the assumption of truth." *Id.* at 680. That is, the court must separate pleaded facts from pleaded conclusions. Next, the court must evaluate the factual assertions to determine whether they "*plausibly* suggest an entitlement to relief." *Id.* at 681. The Court held that whether a complaint is "plausible" turns on whether it contains sufficient nonconclusory factual allegations to support a reasonable inference that the conduct occurred. Assessing the plausibility of a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In the end, the pleaded facts must not merely be "consistent with" the claimant's entitlement to relief, but must suggest so more plausibly than the lawful alternative scenarios those facts would also fit. *See id.* at 680.

*Pleading on "Information and Belief" is Not a Defense to a Rule 11 Violation*

While the rule established in *Twombly* does not expressly apply to Rule 11, an assessment of "plausibility" under Rule 11 would align with the reasoning articulated by the Supreme Court in *Twombly* and further explained in *Iqbal*. Furthermore, *Twombly* made clear that invoking the phrase "information and belief" does nothing to lessen an attorney's obligation to satisfy Rule 8's pleading requirements. Nor is that phrase a defense to an attorney's obligations to comply with Rule 11. After all, the specific language of Rule 11 incorporated "information and belief" as part of the attorney's certification. See Fed. R. Civ. P. 11(b) (proponent of the paper certifies its propriety "to the best of the [proponent's] knowledge, information, and belief . . .").

**THE COUNTERCLAIM ALLEGATIONS THAT VIOLATE RULE 11**

On September 3, 2020, responding to the Amended Complaint filed by Coach Bielema, counsel for the Foundation filed an Answer and Counterclaim. The specific allegations in the Counterclaim that are the subject of this Motion are italicized below:

> 4. Instead, the facts demonstrate that Bielema saw the buyout period (November 2017– December 2020) as an opportunity for him to move to the NFL while the Foundation subsidized his training with millions of dollars. *To accomplish this goal, Bielema and his agent, Neil Cornrich, conspired to place Bielema with the New England Patriots without regard to Bielema's legal obligation to diligently seek and to obtain other employment to meet his affirmative duty of mitigation to reduce the amount of money to be paid by the Foundation that was required by the Release Agreement.*
>
> 5. *As part of their scheme, Bielema and Cornrich fraudulently induced the Foundation to enter into the Release Agreement knowing Bielema would not fulfill his legal commitments and then intentionally breached the Release Agreement as soon as it was signed by accepting a position that did not come close to maximizing his earning potential.* Bielema violated his promises to mitigate the Foundation's financial obligations by failing to use his best efforts to obtain, or even to look for, other employment. Specifically, he agreed to a position with the New England Patriots.
>
> \* \* \* \* \*
>
> 10. Bielema's breach was made possible by the efforts of his agent, Neil Cornrich. Cornrich helped negotiate the Release Agreement, so he had full knowledge of

Bielema's obligations under the Release Agreement. *Further, Cornrich made representations regarding Bielema's duty to mitigate to induce the Foundation to enter* into the Release Agreement, while knowing such representations were false. Cornrich represents a list of high-profile coaches, including Bill Belichick, among many others. Upon information and belief, *Cornrich worked with his other clients, including Bill Belichick (whether known to him or not), to orchestrate an arrangement under which Bielema could stay in a position where he received compensation just below the offset threshold under the Release Agreement, thereby allowing Bielema to maximize his payments under the Release Agreement and deprive the Foundation of the benefit of its bargain. Cornrich did so while knowing that such terms were contrary to the agreement of the parties and in willful disregard of the Release Agreement's requirements.* Comparing Bielema to Cornrich's other clients who acquired much higher paying jobs around the same time clearly shows that *Bielema and Cornrich plotted together to conspire against the Foundation.*

\* \* \* \* \*

21. Upon information and belief, *by the time the Release Agreement was executed, Bielema had already brokered a deal with the New England Patriots where he would be making less than the $150,000 threshold amount.*

\* \* \* \* \*

23. Indeed, [Bielema and Cornrich] had no need to object to this provision, which would have benefited the Foundation, because *Bielema and Cornrich knew – prior to execution of the Release Agreement – that they had negotiated a set-up where Bielema could stay with the Patriots throughout the term of the Release Agreement and receive an income below the offset threshold amount.*

\* \* \* \* \*

68. To induce the Foundation to execute the Release Agreement, *Cornrich represented that Bielema would obtain a significant coaching job in the next coaching hiring cycle in 2018 as part of the "Plan" that would eliminate or greatly reduce the Foundation's obligations under the Release Agreement.*

\* \* \* \* \*

71. *Bielema and Cornrich knew at the time of making such representations that such representations were false or that Bielema did not have a sufficient basis of information to make such representation.*

72. Specifically, upon information and belief, *Bielema and Cornrich knew at the time of making such representations that Bielema did not intend to carry out such promise, as evidenced by the facts alleged herein, specifically paragraphs 19-23.*

73. Upon information and belief, *Cornrich used his connection with Bill Belichick and the Patriots to negotiate a salary for Bielema from the Patriots that was below the level necessary to trigger the Foundation's right to offset so that*

7

> *Bielema could maximize his personal financial gain to the detriment of the Foundation. Additionally, Cornrich's actions benefitted the Patriots, and, by extension, his other client, Bill Belichick, to the detriment of the Foundation.*

*\* \* \* \* \**

> 77. *The Foundation suffered damages as a result of such misrepresentations in an amount exceeding $4,555,833.29 (i.e., the full amount of payments made by the Foundation to Bielema under the Release Agreement to date), but which the Foundation reserves the right to prove in greater amounts at trial, in addition to costs, pre-judgment and post-judgment interest, and attorneys' fees.*
>
> 78. *In addition to the other damages to which the Foundation is entitled to recover from Plaintiff / Counter-Defendants, the Foundation is entitled to recover punitive damages from Bielema and Cornrich.*

### BASIS OF RULE 11 VIOLATIONS

Throughout its Counterclaim, the Foundation has alleged a conspiracy to defraud in general terms without any of the specifics that Rule 9(b) requires. With few exceptions, the allegations in support of Count III are general, conclusory assertions – not specific facts.

As further explained below, the highlighted allegations that violate Rule 11 *were not based* on any of the following:

a. Direct evidence (admissible or otherwise);

b. Circumstantial evidence (admissible or otherwise);

c. Inferences drawn from witness statements or evidence – reasonable or otherwise;

d. Logic;

e. Common sense;

f. Inquiry of any kind by opposing counsel; or

g. Any interest by opposing counsel in determining what the facts are despite: (1) several offers by the undersigned counsel for Coach Bielema to meet for the purpose of sharing relevant information; and (2) receipt of correspondence from

the undersigned counsel for Coach Bielema mentioning reliable information that is directly contrary to the offending allegations in the Foundation's Counterclaim.

Not only are the Foundation's conspiracy allegations and fraud claim factually and facially implausible; they also fail the requirements for pleading fraud in the Eighth Circuit. A plaintiff asserting fraud "must plead with particularity the who, what, when, where, and how of [an] alleged scheme."[2] In addition to these requirements, a complaint or counterclaim "must assert *concrete and personal benefit* to the individual defendants resulting from the fraud." *Id.* at 894 (emphasis added).[3] The allegations highlighted above attempt to make connections that don't exist between a series of unrelated events and behaviors. The Foundation's narrative assumes that: (a) Bielema and Cornrich conspired in January 2018 to defraud the Foundation by underhandedly negotiating a new buyout agreement that would *reduce the Foundation's obligation to pay Coach Bielema by $3.465 million*; (b) so they could then conspire with Bill Belichick to cheat the Foundation with an imagined salary discount the Patriots wouldn't have noticed; (c) for a "personal financial gain" that would have yielded no identified benefit, financial or otherwise, to any supposed conspirator.

---

[2] *In re K-Tel Intern. Securities Litigation*, 300 F.3d 881, 907 (8th Cir. 2002) (interpreting Private Securities Litigation Reform Act). Notwithstanding Rule 9(b)'s statement that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally[,]" those general allegations must be plausibly supported by the pleaded facts. *E.g.*, *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020) (actual malice in defamation suit); *Munro v. Lucy Activewear, Inc.*, 899 F.3d 585, 590-591 (8th Cir. 2018) (affirming dismissal of common-law fraud claim because "[plaintiff]'s complaint does not set forth any supporting facts showing that [the defendant] intended to defraud him when the promises were made."); *accord*, *Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC*, 949 F.3d 417, 423 (8th Cir. 2020).

[3] Lacking any plausible financial benefit to Bielema or any of the other particulars required by Rule 9(b), the conspiracy allegations and fraud claim would not survive a motion for judgment on the pleadings pursuant to Rule 12(c). Counter-Defendants reserve the right to file such a motion in the event the claim is not stricken by the Court *sua sponte*.

This is reflected in Paragraph 73 of the Counterclaim, where the Foundation alleged that Coach Bielema's agreement to accept a salary that fell below the $150,000 offset amount would "maximize [Coach Bielema's] personal financial gain to the detriment of the Foundation[.]" № 35 at 48 ¶ 73. But no participant in that conspiracy had a plausible motive to conspire. If Coach Bielema had wanted to "maximize his personal financial gain" as part of a conspiracy with Bill Belichick, he would at least have conspired to set his 2018 annual salary at $150,000 – the amount that was exempt from the Foundation's right of offset that year. True, earnings above $150,000 would have ended up in the Foundation's bank account, not Coach Bielema's. But he received no "benefit" by earning less. Coach Bielema's salary was paid by the New England Patriots, not Bill Belichick. The only potential beneficiary of the nonsensical conspiracy scheme would have been the Patriots.

The second premise of the Foundation's baseless theory is also implausible. In order to embrace the Foundation's conspiracy theory, the finder of fact would have to conclude that the head coach of a multi-billion dollar NFL team that has enjoyed a beneficial relationship with Razorback football for many years conspired with his agent to save the Patriots (in context) an imagined pittance in exchange for no personal benefit; cheat the Foundation for no sensible reason; or both. Even disinterested parties have observed that none of these explanations make sense:

> It seems unlikely that Bielema's salary as a low-level coach would have meaningfully impacted the team – or, arguably, that the team would go to the trouble of manipulating Bielema's pay so that the foundation would owe slightly more money.

<u>Bielema Countersued by Arkansas Foundation Claiming Belichick's Agent Kept Salary Low</u>, *Sportico* (Sept. 4, 2020).

The Foundation also alleges on no evidence that Coach Bielema and Cornrich conspired to defraud by pre-arranging a position with the Patriots instead of seeking other employment. This allegation is patently false and also suggests a lack of good faith. The Foundation was provided with

10

indisputable evidence to the contrary almost two years ago. Coach Bielema's Amended Complaint includes a number of documented examples of his efforts to obtain a DI head coach position, most of which were voluntarily shared with the Foundation's counsel in early 2018. He undertook those efforts even though the then-operative buyout agreement required only that he "shall have the duty to mitigate his damages by making reasonable efforts to gain re-employment." *№ 19-4* at 4-5 ¶ 11. If pre-arranging a position with the Patriots had been part of what the Foundation calls "the Plan," why would Bielema and Cornrich have started expressing Bielema's interest in a DI head coach position nearly two months before the Final Buyout Agreement was signed? And why would they both have continued to do so throughout the remainder of 2018 and 2019? What's more, if the Foundation had made a reasonable inquiry before "certifying" its implausible conspiracy theory to the Court, it would have known that Coach Bielema never had any communications with Coach Belichick about a job with the Patriots until after the Final Buyout Agreement was finalized.

Likewise, for the past 22 months, the Foundation has asserted without any evidence that Bielema's compensation was manipulated and fell far below: (a) what the Patriots have paid other staff members in comparable positions; and/or (b) what the Patriots would have been willing to pay Bielema. To this day, the Foundation doesn't have a clue what the Patriots have paid others in positions that were similar to the "Special Assistant to the Head Coach" position that Coach Bielema was offered and accepted. Likewise, they have no evidence that Coach Bielema could have negotiated a higher salary.

Moreover, the Foundation appears to regard the allegations of fraud and conspiracy as "too good to check" even now. Shortly before the Foundation's Counterclaim was filed, Coach Bielema's counsel informed the Foundation's counsel that their assumptions about Coach Bielema's salary being manipulated were wrong and that comparable salary benchmarks in the Patriots organization

would debunk their conspiracy theory.[4] After being put on notice of these key facts, the Foundation's counsel turned a blind eye to this exculpatory evidence and proceeded to sue Coach Bielema and Cornrich for fraud and punitive damages. Consistent with this approach, the Foundation's recently issued *subpoena duces tecum* to Bill Belichick requested the production of various categories of documents regarding Bret Bielema's employment by the Patriots but requested no information about the salaries for comparable positions. Nor does the Foundation seek to depose Bill Belichick, a central supposed "conspirator" in all these events.

That isn't the only time the Foundation's counsel deliberately remained ignorant of any facts that would undermine their client's legal claims. As spelled out in the Amended Complaint, counsel for Coach Bielema made several attempts during 2019 to meet with opposing counsel to discuss the facts of this case and was rebuffed at every turn. On August 23, 2020, the Foundation's lead counsel summarized his perspective by saying: "The only facts that are relevant are the ones in our Demand Letter." That statement accurately summarizes the approach the Foundation has taken since the outset of this dispute.

The Foundation's January 31, 2018 Demand Letter identified a litany of specific grounds the Foundation was relying on to justify its position that Coach Bielema had broken the Final Buyout Agreement. ***Exhibit 1***. Notably, however, the Demand Letter said nothing about Coach Bielema and Cornrich (or anyone else) engaging in a conspiracy to defraud the Foundation. Nor did it suggest Coach Bielema and/or Cornrich had deliberately made misrepresentations to the Foundation during

---

[4] "If the Foundation is banking on being able to prove a breach of contract based on its much-publicized conspiracy theory, we can assure you that road is a dead-end street. Although the Foundation has never asked for any information about comparable salaries in the Patriots organization, the comparable benchmarks to Coach Bielema's 2018 salary will leave the Foundation without a shred of evidence to support its conspiracy theory." *Letter from Tom Mars to Marshall Ney*, August 26, 2020.

negotiation of the Final Buyout Agreement. Similarly, in the many exchanges of correspondence between counsel in the nearly 20 months between Bielema's receipt of the Foundation's Demand Letter and the filing of the Foundation's Counterclaim, opposing counsel never once mentioned anything about a potential counterclaim for fraud or the possibility of naming Cornrich as a second Counter-Defendant.

It would, therefore, appear that the conspiracy allegations and fraud theory were an eleventh-hour invention created by opposing counsel to raise the reputational and financial costs of this litigation for Coach Bielema. Furthermore, it would appear that Neil Cornrich was just an innocent bystander who was dragged into this litigation as a matter of necessity. After all, the Foundation couldn't allege a one-man conspiracy.

Under the circumstances, opposing counsel's certification of the legitimacy of its fraud claim was a blatant violation of Rule 11. As further evidence of just how baseless that claim is, the Foundation's Initial Disclosures did not include any documents, ESI, or any other evidence in support of it. Notably, the only two witnesses identified by the Foundation who supposedly have knowledge of the alleged fraudulent conspiracy are *Bret Bielema and Neil Cornrich* – both of whom have filed Answers vehemently denying the allegations the Foundation will rely on them to prove.

## CONCLUSION

The Foundation's conspiracy allegations and fraud claim are quintessentially frivolous. As shown above, those allegations weren't included in the Counterclaim with a good faith belief that they could be proved. They were filed instead for improper purposes based on a strategy of "make fraud accusations first; investigate later," an approach that defies the mandates of Rule 11.

That kind of reckless and improper pleading is precisely what Rule 11 was intended to deter. Given the egregious nature of the improper pleading and the irreversible reputational damage the

Counter-Defendants have already suffered from the publicity about these frivolous accusations, we respectfully request that the Court: (a) find that counsel for the Foundation failed to comply with both the "reasonable inquiry" and "improper purpose" prongs of Rule 11(b) in connection with the Foundation's fraudulent conspiracy claim; (b) exercise its discretion to impose appropriate sanctions on opposing counsel; and (c) provide the Counter-Defendants with all other appropriate relief to which they may be entitled.

Respectfully submitted,

By: /s/ Thomas A. Mars
Thomas A. Mars, AR Bar 86115
MARS LAW FIRM, P.A.
5500 Pinnacle Point Drive, Suite 202, Rogers, AR 72758
Phone: (479) 381-5535
tom@mars-law.com

John C. Everett, AR Bar 70022
EVERETT LAW FIRM
P.O. Box 1460
12217 W. Hwy. 62, Farmington, AR 72730-1460
Phone: (479) 267-0292
john@everettfirm.com

John E. Tull III, AR Bar 84150
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center St., Suite 1900, Little Rock, AR 72201
Phone: (501) 379-1705
jtull@qgtlaw.com

Ryan K. Culpepper, AR Bar 2012093
CULPEPPER LAW FIRM, PLLC
P.O. Box 70, Hot Springs, AR 71902
Phone: (501) 760-0500
ryan@theculpepperfirm.com

R. Craig Wood
Benjamin P. Abel
   (*admitted pro hac vice*)

McGUIRE WOODS LLP
Court Square Building
652 Peter Jefferson Parkway, Suite 350, Charlottesville, VA 22911
Phone: (434) 977-2558
cwood@mcguirewoods.com
babel@mcguirewoods.com


*Counsel for Plaintiff/Counter-Defendant Bret Bielema*

/s/ Richard N. Watts
Richard N. Watts AR Bar 82174
Watts, Donovan, Tilley & Carson, P.A.
2120 Riverfront Dr., Suite 275
Little Rock, Arkansas 72202
Phone: (501) 372-1406
richard.watts@wdtc.law

*Counsel for Neil Cornrich*