**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**BRET A. BIELEMA**                                                                        **PLAINTIFF**

**v.**                                              **5:20-cv-05104-PKH**

**THE RAZORBACK FOUNDATION, INC.**                          **DEFENDANT**

---

**THE RAZORBACK FOUNDATION, INC.**                    **COUNTER-PLAINTIFF**

**V.**

**BRET A. BIELEMA and NEIL CORNRICH**            **COUNTER-DEFENDANTS**

**DEFENDANT/COUNTER-PLAINTIFF'S OPPOSITION TO RULE 11 MOTION**

Defendant/Counter-Plaintiff, The Razorback Foundation, Inc. (the "**Foundation**"), by its attorneys, submits this Brief in Opposition to Counter-Defendants' Rule 11 Motion for Sanctions.

### I.        Introduction

Counter-Defendants have filed a motion for sanctions ("**Motion**" or "**Mot**.") against the Foundation for an alleged violation of Rule 11 of the Federal Rules of Civil Procedure.  The Motion should be denied.  The Foundation has asserted and sufficiently pleaded a fraud claim against Counter-Defendants in good faith after a reasonable inquiry into the facts.

As the Advisory Committee Notes state, Rule 11 motions "should not be employed . . .  to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes."  Fed. R. Civ. P. 11 (1993 Advisory Comm. Notes).  Rule 11 motions also should not be used "to emphasize the merits of a party's position, . . . to intimidate an adversary into withdrawing contentions that are fairly debatable, [or] to increase the costs of litigation[.]" *Id*.  But these improper purposes, plus a retaliatory motive, are Counter-Defendants' exact objectives in filing their Motion.

1

The Motion is nothing more than a high-stakes Motion to Dismiss designed to attract press attention. Counter-Defendants even reserve the right to move for judgment on the pleadings if the conspiracy allegations and fraud claims are not stricken by the Court. Mot. at 9 n.3. Counsel for Counter-Defendants have been looking to retaliate against the Foundation for attempting to limit the scope of discovery to issues relevant to this case and for raising the issue of the smear-campaign they have threatened against the Foundation, its affiliates, and its personnel.

As explained herein, the Motion is nothing short of an ongoing campaign to use the litigation process for improper purposes to squelch and silence a legitimate claim by the Foundation and to fulfill past threats to inflict damage and harm on every person and entity in their path through the media. The merits of the parties' respective claims are irrelevant if these ends are achieved. Indeed, counsel for Counter-Defendants previewed weeks ago that they planned to use a Rule 11 motion to try to gain some kind of tactical advantage. The Motion is baseless and should be denied.

## II.    Rule 11 is an Extreme, Unwarranted Measure

Rule 11 authorizes a court to impose sanctions on a party who files a pleading for an improper purpose, or if the court finds that the allegations lack evidentiary support *or are unlikely to do so after a reasonable opportunity for investigation or discovery.* Fed. R. Civ. P. 11(b) (emphasis added). The key issue in deciding whether sanctions are warranted in this matter is whether the Foundation conducted an objectively reasonable inquiry as to the factual and legal bases for its fraud claim prior to filing its Counterclaim. *See Miller v. Bittner*, 985 F.2d 935, 938-39 (8th Cir. 1993). Thus, the question for the Court is not whether the Foundation's claim can be proven at trial, which Counter-Defendants seem to argue, but "whether a reasonable and competent attorney would believe in the merit of an argument." *Id*. (citation omitted); *see also* Fed. R. Civ.

P 11 (1993 Advisory Comm. Notes) (explaining that Rule 11 does not require that a party prove that it will prevail with respect to its contentions or claims).

Whether a Rule 11 violation has occurred "is a matter for the court to determine, and this determination involves matters of judgment and degree." *O'Connell v. Champion Int'l Corp.*, 812 F.2d 393, 395 (8th Cir. 1987).  Indeed, the U.S. Supreme Court has instructed that "[t]he issues involved in determining whether an attorney has violated Rule 11 likewise involve fact-intensive, close calls." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 404 (1990) (citation omitted).  Thus, the inquiry necessarily requires consideration of the purpose of Rule 11 which is to "deter baseless filings in district court." *Id*. at 393.  The Advisory Committee Notes caution that Rule 11 motions "should not be made or threatened for minor, inconsequential violations[.]" Fed. R. Civ. P. 11 (1993 Advisory Comm. Notes).  Notably, as is applicable here, "[t]he rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories.  The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *Id.*

Even opposing counsel characterizes the relief they seek as "extraordinary."  Mot. at 1.  That is because sanctions are an extreme remedy.  "The imposition of sanctions is a serious matter and should be approached with circumspection." *O'Connell*, 812 F.2d at 395; *see also Steadfast Ins. Co. v. Arc Steel, LLC*, 2017 WL 9807434, at *3 (W.D. Mo. Nov. 30, 2017) ("Rule 11 sanctions are an extreme punishment.").  Indeed, the very cases on which Counter-Defendants rely highlight that Rule 11 is reserved for exceptional conduct.  For example, Counter-Defendants cite *Fisher v. CPC Int'l, Inc.*, 591 F. Supp. 228, 235 (W.D. Mo. 1984), but the facts in *Fisher* are not comparable to this case.  In *Fisher*, plaintiff's counsel ignored legal precedent providing the claims were "clearly time-barred" and barred under collateral estoppel, the claims were "factually and legally

untenable from the very beginning[,]" and "plaintiff's counsel knew or should have known so." *Id.* at 235-37.  That is not the case here.

Such an extreme remedy is certainly not warranted in this case, where the Counter-Defendants raise issues regarding the legal sufficiency of allegations that should have been presented in (and would survive) a Rule 12(b)(6) motion.  Courts have held that even a dismissal under Rule 12(b)(6) does not justify Rule 11 sanctions.  For example, the Eighth Circuit affirmed a district court's holding that a dismissal for failure to plead fraud as required by Rule 9(b) was not a "virtual presumptive justification for Rule 11 sanctions." *Teamsters Nat. Freight Indus. Negotiating Comm. v. MME, Inc.*, 116 F.3d 1241, 1242 (8th Cir. 1997) (per curiam); *see also Nat'l Fed'n of the Blind of Nebraska, Inc. v. Outlook Nebraska, Inc.*, 2011 WL 4802643, at *12-13 (D. Neb. Oct. 11, 2011) (dismissing complaint under Rule 12 but denying Rule 11 motion and explaining that just because the complaint was dismissed, "it does not necessarily follow that [Plaintiff's] position was so baseless as to warrant Rule 11 sanctions").

Courts likewise take the position that just because the proof does not bear out after discovery does not justify Rule 11 sanctions.  For instance, the Eighth Circuit affirmed a district court's denial of Rule 11 sanctions where plaintiff's civil conspiracy claim survived a motion to dismiss but ultimately failed to withstand summary judgment.  *See Exec. Air Taxi Corp. v. City of Bismarck, N.D.*, 518 F.3d 562, 571 (8th Cir. 2008).  There, the district court reasoned that "the claim certainly had legal, if not evidentiary, support[,]" and although the factual basis for the claim was "thin and ultimately failed to withstand summary judgment," it was not "so baseless as to warrant Rule 11 sanctions."  *Id.*   In another case in the Eastern District of Arkansas, Defendants moved for sanctions at the close of discovery arguing that plaintiff's attorney had no evidentiary support for his claim.  *Canada v. Dominion Enterprises*, No. 4:13CV00345 JLH, 2014 WL

4

2204913, at *4 (E.D. Ark. May 27, 2014).  In response, plaintiff's counsel argued that they made reasonable inferences based on "the most logical possibilities."  *Id*.  The court denied the motion for sanctions, explaining that "[a]lthough the inferences that [plaintiff's] attorneys drew from these facts ultimately were unsubstantiated, they were not so thin, and the inquiry was not so unreasonable, as to warrant sanctions under Rule 11."  *Id*.

Counter-Defendants argue that courts apply a heightened standard when reviewing fraud allegations under Rule 11, but the case upon which they rely is factually distinguishable and does not support their contention.  *In re Ramada Inns Sec. Litig.*, 550 F. Supp. 1127 (D. Del. 1982) involved a class action suit under the Securities Exchange Act and stands for the unremarkable proposition that because of the nature of Rule 9(b), an attorney asserting fraud "must have more specific information reasonably believed to be trustworthy than would be required if she were commencing any other kind of action."  *Id*. at 1132.  It is not that the Rule 11 requirement is different for fraud claims, but that there are more elements to satisfy for fraud.  In that case, the court found no Rule 11 violation and explained that "the threshold [to satisfy] . . . Rule 11 is not a high one; a plaintiff cannot be required to establish the merits of the case at the time of its filing. . . . I am not prepared to say that counsel cannot marshal sufficient circumstantial evidence from the mass of material submitted to satisfy Rule 11 and justify discovery."  *Id*. at 1134.

### III.   The Foundation's Claim for Fraud Is Brought in Good Faith and Satisfies the Pleading Standard under Rule 9(b)

#### A.  Legal Standard

Although fraud claims are subject to a heightened pleading standard, the Eighth Circuit has cautioned that "court[s] cannot reasonably expect highly specific allegations before allowing at least a brief discovery period."  *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 921 (8th Cir.

5

2001).  If that were not the case, how could any claim for fraud ever survive a motion to dismiss when, as here, evidence of fraud is most often in the hands of the defendant and/or third parties?

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). That is, "a plaintiff must specifically allege the circumstances constituting fraud, including such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Abels*, 259 F.3d at 920 (citation omitted); *see also Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009).  The Eighth Circuit has explained the purpose of Rule 9(b):

> The special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct.

*Abels*, 259 F.3d at 920; *see also Star City Sch. Dist. v. ACI Bldg. Sys., LLC*, 844 F.3d 1011, 1016 (8th Cir. 2017).

"The level of particularity required depends on . . . the nature of the case and the relationship between the parties." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007).  The procedural posture also matters.  The Eighth Circuit has held that Rule 9(b) does not require a complaint to include highly specific allegations with respect to facts that would be known to the defendants but not to the plaintiffs before the plaintiffs have had some opportunity to conduct discovery.  *See Abels*, 259 F.3d at 921 (holding complaint pleaded fraud with particularity and reasoning "[plaintiffs] have not had the benefit of discovery.  We think it only fair to give them that benefit before requiring them to plead facts that remain within the defendants' private knowledge.").  Otherwise, claims for fraud would rarely reach discovery.  Courts in this district have applied this same reasoning.  *See Ash Grove Cement Co. v. MMR Constructors, Inc.*,

6

No. 10-CV-4069, 2011 WL 398860, at *1 (W.D. Ark. Feb. 3, 2011) (complaint satisfied Rule 9(b) even where plaintiff had not specifically identified persons who allegedly committed fraud because "this type of information cannot be determined by Plaintiffs without engaging in discovery").

Following this standard, other courts in this circuit have denied motions to dismiss and found complaints satisfied Rule 9(b) so long as the complaint identified the "who, what, where, when, and how" of the alleged fraud and put the opposing party on sufficient notice of the claims against it. *See, e.g., Duncan v. Harmon*, No. 4:16-CV-00910 BSM, 2017 WL 5071268, at *3 (E.D. Ark. Nov. 2, 2017); *Wallace v. XTO Energy, Inc.*, No. 4:13-CV-00608 KGB, 2014 WL 4202536, at *2 (E.D. Ark. Aug. 22, 2014); *Humphrey v. Electrolux Home Prod. Inc.*, No. 4:12-CV-157-DPM, 2012 WL 3257664, at *2 (E.D. Ark. Aug. 9, 2012). For example, a court in the District of Minnesota held: "Although the pleadings are somewhat skeletal, they sufficiently put [Defendant] on notice as to the time, place, and substance of the alleged fraud. Significantly, defendants here are not left to guess who was responsible for the alleged fraud." *Maher v. Sempris, LLC,* No. CIV. 13-2202 ADM/JJK, 2014 WL 4749186, at *3 (D. Minn. Sept. 24, 2014). There, the court explained that discovery was necessary to reveal other details of the fraud. *Id.*

Additionally, it is well established that "it is not necessary that fraud be shown by direct evidence or positive testimony. Circumstantial evidence can provide a basis for the jury to infer fraud where . . . the circumstances are inconsistent with honest intent." *Receivables Purchasing Co. v. Eng'g & Prof'l Servs., Inc.*, 510 F.3d 840, 844 (8th Cir. 2008) (reversing grant of summary judgment for defendant on fraud claim). There, the court held that genuine issues of material fact existed on the fraud claim where plaintiff had produced proof of a motive in discovery through deposition testimony of one of defendant's key witnesses. *Id.*; *see also Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.3d 857, 863 (8th Cir. 2015) ("Given the fact that direct evidence of fraud

is rare, a court in most instances can only infer fraud by considering circumstantial evidence."); *Moore Ford Co. v. Smith*, 270 Ark. 340, 345, 604 S.W.2d 943, 947 (1980) ("circumstantial evidence can serve as a basis for the jury to infer fraud just as to infer any other fact").

Recognizing that a high degree of specificity is not always possible at the pleading stage, the Eighth Circuit has explained that Rule 9(b), in some circumstances, may be satisfied by pleading upon information and belief.  *See Drobnak*, 561 F.3d at 783-84.  "When the facts constituting the fraud are peculiarly within the opposing party's knowledge, . . . such allegations may be pleaded on information and belief.  Rule 9(b) is deemed satisfied if the allegations are accompanied by a statement of facts on which the belief is founded."  *Id*. (citation omitted).  In short, the Eighth Circuit has articulated a practical approach to Rule 9(b) so as not to preclude potentially viable claims before discovery may be had, while also putting defendants on notice of such claims to be able to defend themselves against such claims.

### B.  The Foundation Adequately Pleads a Claim for Fraud

The factual contentions and claims asserted in the Counterclaim are based on a reasonable inquiry.  Indeed, the Foundation first sent notice of breach in January 2019, and it did not file its Counterclaim until September 2020. In the interim, the Foundation investigated the facts, interviewed witnesses, and collected and reviewed documents. The Foundation also requested evidence to disprove its claims from opposing counsel, but no such evidence was provided.  As such, the Foundation has conducted a thorough pre-complaint investigation, and the allegations in its Counterclaim are based upon a reasonable inquiry.  However, as the cases recognize, some of the information required to prove its fraud claim resides only in the hands of Counter-Defendants and/or third parties, and therefore, discovery is needed for the Foundation to prove its claim.  All

8

that is required at this stage is that the Foundation allege the "who, what, where, when, and how of the alleged fraud[,]" and the Foundation easily chins that bar.[1] *Drobnak*, 561 F.3d at 783.

As a threshold matter, the Foundation does not assert a stand-alone conspiracy claim. Indeed, it could not have pleaded such a claim. *See Colonia Ins. Co. v. City Nat. Bank*, 13 F. Supp. 2d 891, 899 (W.D. Ark. 1998) (explaining principals and agents generally cannot conspire).[2] Counter-Defendants admit that Cornrich acted as Bielema's agent in his negotiations with the Foundation and the Patriots (Doc. No. 42 ¶ 6 & Doc. No. 41 ¶ 6), so the fact that they conspired, or worked together, is not in dispute.

With respect to its fraud claim, the Foundation alleges that Counter-Defendants fraudulently induced the Foundation to enter into the Release Agreement knowing full well that Bielema would never live up to his mitigation obligations under that agreement. The Counterclaim adequately pleads the "who, what, where, when, and how" of the alleged fraud.

**1. Who?** The Foundation asserts a fraud claim against Counter-Defendants. Doc. No. 35 at 47-49, ¶¶ 65-78. Specifically, the Foundation alleges that Counter-Defendants made false representations to the Foundation. *Id.* at 47, ¶¶ 66-68. Cornrich served as Bielema's agent throughout all relevant time periods. *Id.* at 34, ¶ 8. He helped negotiate the Release Agreement on Bielema's behalf. *Id.* at 33, ¶ 10. As such, he had full knowledge of Bielema's obligations under that Agreement. *Id.* Cornrich also negotiated Bielema's Patriots agreements on Bielema's behalf. *Id.* at 48, ¶ 73. Contrary to Counter-Defendants' argument, Cornrich is not an innocent

---

[1] The Foundation has served written discovery on Counter-Defendants and eleven (11) third-party subpoenas. To date, the Foundation has not received any substantive responses. Notably, Counter-Defendants did not serve any documents with their initial disclosures.
[2] As a result, Counter-Defendants' argument that the Foundation named Cornrich as a Defendant solely to plead a conspiracy claim is legally and factually incorrect.

FEC\44844\0001\8059839.v1-10/30/20

bystander.  In fact, he was the ultimate puppet master, and he made misrepresentations to the Foundation regarding Bielema's duty to mitigate.[3]

The allegation that Cornrich worked with the Patriots to create a position for Bielema under the offset cap is pleaded upon information and belief (*Id.* at 33, ¶ 10) because the Foundation does not have access to the communications between Cornrich and the Patriots.  Nevertheless, the Foundation has reason to believe that Cornrich did in fact orchestrate this arrangement based on the known fact that Cornrich found higher paying positions for his other clients at the time, which the Foundation specifically alleges.  *Id.*  That is, the publicly available evidence shows that there were other higher paying positions available, and Cornrich secured those positions for his other clients, but not Bielema.  The Foundation is seeking more information on this issue through third-party subpoenas.

**2. What?**  Both Bielema, on his own and acting through Cornrich, and Cornrich made representations regarding Bielema's duty to mitigate to induce the Foundation to enter into the Release Agreement.  Doc. No. 35 at 33, ¶ 10.  They represented to the Foundation that Bielema would satisfy his mitigation obligations under the agreement by finding other employment, specifically another major college coaching position where he would maximize his earning potential.  *Id.* at 36, ¶¶ 19-21.  Specifically, Cornrich told the Executive Director of the Foundation that "Arkansas has been good to Bret" and the "Plan" was for Bielema to work with Belichick, another one of Cornrich's clients, in the short-term to rehabilitate Bielema, and then Bielema

---

[3]      Counter-Defendants cite to a reportedly "disinterested" news article in support of the contention that Cornrich played no role in the scheme.  Mot. at 10.  But the *Sportico* article can hardly be characterized as objective, as Bielema's lawyer has admitted to having conversations with the author before filing pleadings, which has resulted in an article being published in advance of the filing, talking to the author several times per week, and traveling and presenting at seminars with the author.

FEC\44844\0001\8059839.v1-10/30/20

would get a major college coaching position at the end of the 2018 season.  *Id.* at 36, ¶ 20.  Cornrich represented that as a result, the Foundation would owe little, or none, of the buyout amount.  *Id.*

**3. When?**  The Foundation alleges that the misrepresentations were made during the negotiation of the Release Agreement in December 2017 and January 2018.  *Id.* at 36, ¶¶ 19-21.  Specifically, the representation from Cornrich to the Executive Director of the Foundation that Bielema would get a major college coaching position at the end of the 2018 season was made at or near the completion of the negotations over the Release Agreement and again shortly after the publication of Dennis Dodd's article regarding Bielema's desire not to return to college coaching.

**4. Where?**  The negotiations related to the Release Agreement were primarily handled by email, and those emails have been produced by the Foundation with its initial disclosures.  Specifically, the representation from Cornrich to the Executive Director of the Foundation that Bielema would get a major college coaching position at the end of the 2018 season occurred at or near the completion of the negotiations over the Release Agreement and again shortly after the publication of Dennis Dodd's article regarding Bielema's desire not to return to college coaching.

**5. How?**  Counter-Defendants effected the fraud by assuring the Foundation that it would owe little or no part of the buyout amount, thereby inducing the Foundation to agree to the terms of the Release Agreement.  *Id.* at 47-49, ¶¶  66-78.  The Foundation pleaded that (i) Counter-Defendants made certain representations as described above in order to induce the Foundation to execute the Release Agreement, (ii) the representations were false and Counter-Defendants knew the statements were false at the time the statements were made because they knew Bielema did not intend to perform under the Release Agreement; (iii) Bielema's obligation to mitigate and the Foundation's corresponding right to offset were material terms; (iv) Counter-Defendants knew, and intended for, the Foundation to rely on these representations; (v) the Foundation did in fact

11

reasonably and justifiably rely on the representations; and (vi) the Foundation was damaged as a result. Thus, the Foundation has pleaded all the elements of fraud with specificity. *See Tyson Foods, Inc. v. Davis*, 347 Ark. 566, 580, 66 S.W.3d 568, 577 (2002).

**6. What was obtained or given up through the fraud?**[4] The Counterclaim clearly alleges that Bielema received a personal benefit by accepting a lower paying job with the Patriots. Doc. No. 35 at 48, ¶ 74. The Counter-Defendants fraudulently obtained, with Cornrich's assistance, buyout payments that Bielema used like "unemployment benefits" to support his affluent lifestyle for more than a year while he built an NFL resume so that he could obtain a high paying NFL position job once the Release Agreement (and his corresponding obligation to offset the Foundation's buyout payments) expired. Instead of pursuing more lucrative college coaching jobs like Chad Morris and many others, Bielema took a low-paying job with the Patriots to build his NFL credentials at the Foundation's expense. *Id.* at 30-31, ¶¶ 3-4. Thus, the Foundation pleaded the benefit to Bielema, as well as his motive. Additionally, it was publicly reported that Bielema enjoyed being an NFL consultant more than a college coach because it did not involve recruiting and fundraising.[5] The Foundation expressly pleaded that helping the Patriots hire Bielema for a low salary benefitted both of Cornrich's clients and therefore benefitted Cornrich. *Id.* at 48, ¶ 74. Bielema benefited as described above, and the Patriots (and by extension Belichick) benefited by

---

[4]     Counter-Defendants argue that the Counterclaim must assert a "concrete and personal benefit to the individual defendants that results from the fraud." Mot. at 9 (citing *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002)). But the case upon which they rely involved the scienter requirement for securities fraud under the Private Securities Litigation Reform Act (PSLRA). As this Court has previously noted, that requirement is separate and apart from Rule 9(b). *See Janes, Inc. v. Moates*, No. 2:13-CV-02049, 2014 WL 348588, at *8 (W.D. Ark. Jan. 31, 2014) (Holmes, J.).

[5]     Dennis Dodd, Kansas State coaching search: Seth Littrell, Bret Bielema among candidates to replace Bill Snyder (Dec. 3, 2018), *available at* https://www.cbssports.com/college-football/news/kansas-state-coaching-search-seth-littrell-bret-bielema-among-candidates-to-replace-bill-snyder/.

hiring a coach with years of college head coaching experience and three Rose Bowls for next to no pay. *Id.*

Although some allegations are made upon information and belief, the Foundation sets forth the facts supporting its belief. *See Drobnak*, 561 F.3d at 783-84. Specifically, in its Counterclaim, the Foundation sets forth at least eight (8) individual bases for its belief that Bielema, through Cornrich, entered into the Release Agreement knowing that Bielema would not perform his mitigation obligations and that conduct continued until the Foundation notified Bielema of his violations of the Release Agreement in January 2019. Doc. No. 35 at 37-39, ¶ 23. The Foundation expressly notes that this is a non-exhaustive list and reserves the right to amend its Counterclaim after discovery. *Id.* at 37-39, ¶ 23; 47-48, ¶ 72.

Specifically, the Foundation alleged the following facts to support its fraud claim:

1.     As set forth above, during negotiation of the Release Agreement, Cornrich represented to the Foundation that the Foundation would not have a large buyout payment, if any, because Bielema would get a high-paying college coaching job at the end of 2018. *Id.* at 36, ¶ 20.

2.     During negotiation of the Release Agreement, Counter-Defendants never objected to the offset provisions that allowed the Foundation to offset, dollar-for-dollar, the greater of (i) any amounts Bielema received from other employment or (ii) the average annual value of all amounts required to be paid to Bielema over the term of multi-year contracts (including bonus and incentive payments). *Id.* at 37, ¶ 23(b). Although Bielema negotiated many provisions of the Release Agreement, there was no pushback on the far-reaching offset provisions. The Foundation now realizes that Bielema was not concerned with the scope of the offset provisions because they were irrelevant given that he did not intend during the buy-out period to pursue a high-paying college coaching job contrary to Counter-Defendants' representations.

13

3.      Only 30 days after signing the Release Agreement, Bielema executed an agreement with the Patriots under which his compensation was suspiciously below or equal to the offset threshold set under the Release Agreement.  *Id.* at 38-39, ¶ 23(d).  The offset threshold for 2018 was $150,000.  On March 1, 2018, Bielema executed an agreement with the Patriots under which he received $25,000 through July 1, 2018.  In July 2018, Bielema executed another agreement with the Patriots under which he received $100,000 through January 2019.  As such, Bielema received $125,000 from the Patriots in 2018, just $25,000 shy of the offset threshold.  The offset threshold for 2019 was $125,000.  The July 2018 agreement provided the Patriots with the unilateral right to extend the contract for a one-year option period commencing on February 1, 2019.  Under the option, Bielema would have received $125,000, equaling exactly the offset threshold.

4.      Only months after signing the Release Agreement, Bielema executed an agreement with the Patriots that (i) prohibited him from seeking and accepting other employment during the term of the agreement, thereby legally binding himself to a prohibition from fulfilling his affirmative duty of mitigation and (ii) granted the Patriots the unilateral right to extend the agreement for an additional year.  *Id.* at 39, ¶ 23(e).  As a result, the Patriots' agreement had the potential of locking Bielema into a low dollar contract through January 2020 (*i.e.*, through all three coaching search cycles that would occur during the buyout period).

5.      Only months after signing the Release Agreement, Bielema was quoted in a news article as not wanting to return to a college coaching position.  *Id.* at 37-38, ¶ 23(c).  In a CBS Sports article, Bielema stated: "It's a whole different way to coach [in the NFL] . . . I understand once they go to that level, coaches don't ever go back [to college]."[6]  In response to this report, the

---

[6]      Dennis Dodd, *Bret Bielema Is Enjoying the NFL So Much, He May Never Go Back to College Football* (July 13, 2018), available at https://www.cbssports.com/college-football/news/bret-bielema-is-enjoying-the-nfl-so-much-he-may-never-go-back-to-college-football/.

Foundation's Executive Director contacted Cornrich to express concern that Bielema's quotes were very damaging to any prospects of obtaining another college coaching position.  Cornrich admitted to the Foundation's Executive Director that Bielema "should not have made those comments" and "Bret was too nice" to the reporter.  *Id.*  Cornrich further stated that he had "already chewed Bret out," and Bielema would not make similar remarks going forward.  *Id.*  Notably, Cornrich did not deny that Bielema had made the statements or their adverse impact on any effort to find another college coaching position.  *Id.*  Cornrich also reaffirmed at that time that getting Bielema a major college coaching job at the end of 2018 was still the "Plan" as expressed to the Foundation at the time the Release Agreement was negotiated and executed.  *Id.*

6.     Bielema utterly failed to engage in any activity to find other employment during the 2018 college coaching search period.  *Id.* at 39, ¶ 23(f); *see also id.* at 41, ¶¶ 33-34.  For the year-long period between the date Bielema signed the Release Agreement in January 2018 and the date the Foundation sent a notice of breach in January 2019, the Amended Complaint recites only *one* alleged instance in which Bielema's agent even spoke to a search firm.  Notably, the Amended Complaint makes *no* allegation that Bielema ever took a meeting or spoke to a search firm, an athletics director, or any possible employer during that year-long period.  Doc. No. 19 ¶ 88; *see generally id.* ¶¶ 85-92.  Indeed, the Amended Complaint expressly admits that Bielema expected employers to come to him rather than complying with his "affirmative duty" to mitigate.  *Id.* ¶ 92.

7.     A stark contrast exists between Bielema's efforts in 2018 (before he had notice of breach), and his efforts in 2019 (after the Foundation sent Bielema notice of breach), both with respect to his efforts to find a college coaching position and his attempt to create a false narrative that he had complied with the mitigation obligation in the Release Agreement. Specifically, Bielema's deficiencies in 2018 are sharply highlighted when compared to the efforts Bielema made

*after* notice of material breach and discharge of the Foundation—efforts which were insufficient and too late to satisfy the mitigation obligations under the parties' agreement.  *Compare id*. ¶¶ 62-64, 73-77 & 94, *with id*. ¶¶ 85-92; *see also id*. ¶ 71 (conceding that he was not contractually allowed to seek other employment until April 2019).  Bielema's post-notice-of-breach conduct is a tacit admission that his conduct in 2018 was a breach of the Release Agreement.

8.   Bielema did not report any job-search efforts during this time because *there were none* – as reflected in Bielema's own Amended Complaint.  Doc. No. 35 at 40, ¶ 28; 46, ¶¶ 60-64.

9.   All of the above was compounded by the lack of communication from Cornrich and his dismissive attitude about Bielema's job-search requirements.  *Id.* at 39, ¶ 23(g).

10.   In early December 2018, the Foundation's fears were confirmed when a person close to Bielema told the Foundation's Executive Director that Bielema had represented that Bielema was not interested in and "would not touch" the open head coaching job at Kansas State University ("KSU"), if offered.  In fact, Bielema did not apply for the KSU position, despite having significant ties with that school.  *Id.* at 39, ¶ 23(h).

11.   During the Foundation's pre-complaint investigation and to date in this litigation, neither Cornrich nor Bielema has provided any information that Bielema was actively on the job market seeking any available major college coaching positions in 2018.

As set forth herein and in its Counterclaim, the Foundation has sufficiently pleaded a fraud claim under Rule 9(b).  Further, the Foundation reserved the right to amend its Counterclaim as additional facts became known to it during discovery to support its fraud claim.  Doc. No. 35 at 47-48, ¶ 72.

### C. The Allegations in the Counterclaim Are Based Upon a Reasonable Inquiry and Have Sufficient Evidentiary Support

16

The fraud claim asserted in the Counterclaim is based on a reasonable inquiry and has evidentiary support.  Specifically, the Foundation's investigation revealed the following evidence.

**1.    Direct evidence** – With respect to its fraudulent misrepresentation claim, the Foundation must prove a negative—that Bielema never intended to fulfill his mitigation obligations and that Bielema did not search for or obtain a job that satisfied his duty to mitigate. As a result, absence of direct evidence may be the Foundation's best proof.  And there certainly is a dearth of information about Bielema's job search efforts, particularly in 2018, as set forth above.

But here, there is direct evidence of fraud—a signed agreement with the Patriots prohibiting Bielema from performing his affirmative duty of mitigation.  Bielema entered into an agreement with the Patriots within weeks of signing the Release Agreement.  The Foundation knows Bielema was working for the Patriots officially by March 1, 2018, and has reason to believe that he was working for them informally before that time, which would further support the fraud claim.  Doc. No. 35 at 39, ¶ 26.  The Foundation is currently seeking discovery on that issue.

Bielema's agreement with the Patriots would soon prohibit him from seeking or accepting other employment and provide the Patriots with the unilateral right to extend the agreement – legally prohibiting Bielema from complying with his obligations in breach of the Release Agreement. Doc. No. 35 at 31-32, ¶¶ 6-7. Consequently, Bielema put legal handcuffs on his ability to seek and to accept a college coaching position for three coaching cycles by signing the Patriots agreement.  *Id*. at 32, ¶ 7.  As a result, within months of signing the Release Agreement, Bielema had hitched his wagon to Belichick and the Patriots for the entire buyout period, completely abandoning his obligations under the Release Agreement. The temporal proximity between execution of the Release Agreement and his Patriots agreements supports an inference of fraud.[7]

---

[7]     Although the prohibition on other employment was not effective until July 2018, that was consistent with the "Plan" as represented by Cornrich.  Doc. No. 35 at 41, ¶¶ 35-36. Counter-

**2. Circumstantial evidence** – As set forth above, fraud is most often proven through circumstantial evidence.  The circumstantial evidence that the Foundation has at this point, even before discovery, more than tips the scales in the Foundation's favor.  The Counterclaim alleges a motive and opportunity for fraud.  Bielema's motive was to use the buyout payments from the Foundation to replace short-term earning capacity that he was deliberately foregoing in an effort to position himself to earn more money, when it mattered to him personally (*i.e*., after the buy-out payments from the Foundation ceased).[8]  There was an opportunity to put such a plan in place because Cornrich was agent for both Bielema and Patriots' head coach, Bill Belichick.  The fact that two of his clients would benefit from such a scheme is evidence of Cornrich's motive.  The Foundation also alleges facts to confirm the fraud after-the-fact and acts in furtherance of the fraudulent misrepresentations (*i.e*., that Bielema almost immediately locked himself into a low paying job with the Patriots for the entire buyout period and never looked for or obtained a comparable, higher paying job).

**3. Witness statements** – At this early stage, the Foundation has already identified several witness statements to support its fraud claim.  The Foundation identified in its initial disclosures that Barry Lunney Jr. had personal knowledge of Bielema's statement that he would not pursue the head coaching position at KSU.  This statement is particularly concerning because Bielema had strong ties to KSU, including that he had previously worked as co-defensive coordinator for Bill Snyder, who retired from KSU in 2018.  Instead, Chris Klieman got the job and signed a six-

---

Defendants represented that Bielema would work for the Patriots as a stopgap measure to rehabilitate Bielema and then would obtain a big college coaching position at the end of 2018.  *Id.* at 36, ¶ 20; 48, ¶ 74.

[8]    Such a strategy is logical when viewed only from the vantage point of Bielema's personal financial interests.  The problem is that Counter-Defendants lied to the Foundation about their strategy and then contractually promised in the Release Agreement that they would work to maximize Bielema's earnings during the buyout period which, of course, is the only time period in which the Foundation had any interest in the trajectory of Bielema's career.

18

year contract worth $16.8 million.  The Foundation also has disclosed the statement from Cornrich to the Foundation's Executive Director Scott Varady, in which Cornrich represented that the Foundation would not have much, if any, buyout obligation because the "Plan" was to get Bielema a big college coaching position in the 2018 coaching cycle.

**4.  Inferences drawn from the evidence** – To date, Counter-Defendants have utterly failed to show any attempt to comply with the Release Agreement until their wrongdoing was brought to light in the Foundation's January 2019 demand letter.  Indeed, all their efforts have been focused on Bielema's job-search effort from 2019 forward, *after* the notice of breach was sent.  In essence, they have admitted that Bielema breached the Release Agreement as soon as the ink was dry.  And the inference to be drawn from that immediate breach is that he never intended to comply with the agreement in the first place.

Additionally, Counter-Defendants have presented no evidence to support any defense to the fraud claim.  If the fraud claim is so ludicrous, surely they would have produced evidence by now to show that the Patriots position was just a stopgap measure until Bielema could find another job, he was actively seeking another, higher paying position throughout 2018, or communications with the Patriots to disprove any notion of collusion.  But so far, the Foundation has seen nothing of the sort despite requesting any and all such information and/or evidence *prior to filing its Counterclaim*.  Thus, the inference to be drawn from the Counter-Defendants' silence is that there is something to hide.

As clearly demonstrated in the Counterclaim, the Foundation has investigated and uncovered evidence of: (i) representations from Counter-Defendants and reliance by the Foundation about a "Plan" that was never realized to rehabilitate Bielema for a few months with the Patriots and then to get him a high-paying college coaching position at the end of 2018; (ii) a

FEC\44844\0001\8059839.v1-10/30/20

motive and an opportunity; (iii) an utter lack of job-search efforts at any time during 2018 in violation of the Release Agreement; (iv) an agreement with the Patriots within weeks of the ink drying on the Release Agreement; (v) a follow-on agreement with the Patriots in which Bielema contractually prohibited himself from performing his obligations under the Release Agreement; and (vi) a witness statement identifying that Bielema represented that he did not intend to perform his mitigation obligations under the Release Agreement. Together, that is more than enough to sufficiently plead a fraud claim, to justify discovery, and to deny the Motion. Any other evidence would be in the exclusive possession of the Counter-Defendants or third parties. In short, Counter-Defendants have "more than enough information to adequately respond and prepare a defense, which is the critical inquiry under Rule 9(b)." *Johnson v. Bobcat Co*., 175 F. Supp. 3d 1130, 1146 (D. Minn. 2016).

### D. The Foundation's Pre-Litigation Demands Evidence Its Long-Held Belief That It Was Defrauded

The evidence shows that the fraud claim was not imagined at the eleventh hour as Counter-Defendants argue. Rather, as early as March 28, 2019, counsel for the Foundation put Bielema's counsel on notice of such a claim. *See* **Exhibit A** (March 28, 2019 Letter) at 2 ("It is crystal clear that Coach Bielema and his team had no intent to comply with the terms of the agreement when the agreement was negotiated or since.").[9]   That letter identified that Cornrich assisted in the bad behavior. *Id*. ("Stated simply, the Foundation believes the evidence demonstrates, in numerous ways, a breach of the affirmative duty of mitigation, ***assisted by others***[.]") (emphasis added). That

---

[9]     This letter directly contradicts Counter-Defendants' position that the Foundation has refused to meet or discuss the issues in good faith. Ex. A at 2 ("You have indicated an interest in settlement dialogue, and we have offered a meeting. However, no offer has been made, and no meeting accepted.").

same correspondence demonstrates that the Foundation conducted a pre-complaint investigation and completely undermines Counter-Defendants' position that there was no inquiry of any kind.

### E.   The Foundation Did Not Ignore Exculpatory Evidence

Months before filing its Counterclaim in this action, the Foundation's counsel asked for "every piece of evidence that [Bielema] would introduce at a trial of this matter to try to show that Coach Bielema did not beach his agreement with the Foundation." Ex. A at 1. In response, Bielema's counsel provided zero evidence that Bielema had pursued any job between January 2018 and March 2019. Instead, Bielema's counsel provided: (i) ten emails, most of which were simply news articles forwarded from Cornrich to Bielema; (ii) third-party articles mentioning Bielema's name that he played no role in publishing and that only underscore that there were numerous jobs available that he was not pursuing; and (iii) one single communication suggesting Bielema might be interested in a job. The Foundation's counsel repeatedly requested evidence to support Bielema's position, and was provided nothing but emails and articles showing no effort on Bielema's part. The Foundation is continuing its quest for information through discovery. It has served discovery on Cornrich and his firm to determine the work he performed for his other clients and how Bielema's job-search efforts compare to Cornrich's other similarly situated clients.

### F.   The Allegations in the Counterclaim Are Not Made for an Improper Purpose

Not only are the allegations in the Counterclaim adequately pleaded, based on a reasonable inquiry, and supported by evidence, but they also are not made for an improper purpose. *See* Fed. R. Civ. P. 11(b). The Foundation has named only Bielema and Cornrich as Counter-Defendants. The Foundation has not named other third parties such as the Patriots or Bill Belichick in a conscious effort to go no further than necessary to defend the claim against it and to pursue its

claims.[10]  Moreover, the Foundation's discovery requests and subpoenas are designed to obtain more information to support its fraud claims, and importantly, the third-party subpoenas were intentionally narrowly tailored so as not to be overbroad or designed to harass.  In short, bringing a plausible claim that would survive a Rule 12(b)(6) motion against the two key players is not harassment; it is standard practice.

Additionally, the Foundation had an obligation to bring its fraud claim.  Bielema initiated this action against the Foundation.  As a result, the Foundation was required to assert any compulsory counterclaims.  *See* Fed. R. Civ. P. 13(a).  Moreover, the Foundation had an obligation to preserve such a claim before the statute of limitations ran in the coming months.  *See Chalmers v. Toyota Motor Sales, USA, Inc*., 326 Ark. 895, 901, 935 S.W.2d 258, 261 (1996) (describing three-year statute of limitations for fraud claims).

### IV. <u>The Rule 11 Motion is Nothing More Than Retaliation for the Foundation's Efforts To Protect Itself and Others from Harassment and Intimidation</u>

Counter-Defendants' Motion cannot be viewed in a vacuum.  Rather, it must be seen for what it is—another attempt to intimidate and to silence the Foundation's legal claims and/or to strong-arm the Foundation into settlement to avoid adverse publicity.  Counter-Defendants should not be allowed to weaponize the Rules of Civil Procedure, but instead should be forced to follow those rules just like the rest of us.

For the last year, Bielema's counsel has hurled threats at the Foundation and the University of Arkansas (the "**University**"), its Board of Trustees and, more recently, at the Foundation's counsel.  The following is a sampling of just some of the threats made by Bielema's counsel:

- He has promised that the University and the Foundation would be ruined in the press.
- He told the University that they will suffer "collateral damage."

---

[10]     Because the Patriots and Bill Belichick are not named parties, their motive, or the benefit to them, is of no consequence despite Counter-Defendants' argument otherwise.  *See* Mot. at 10.

- He repeatedly compared the University and the Board of Trustees to Ole Miss and has specifically stated that "They're gonna try to pull an Ole Miss."[11]

- He represented that he will dig until he finds personal improprieties to exploit and then he will "come after," "embarrass," and "ruin" people affiliated with the lawsuit.

- He stated that if this dispute becomes a lawsuit, "it's gonna be a knife fight."

- He claims an individual with influence over the Foundation "violated the law."

- He claims to have compromising videos of a non-party.

Once the lawsuit was filed, the bullying campaign only intensified. Bielema's counsel threatened that, without resolution, he would "dribble out new facts piece by piece over the next few months" in an effort to sabotage the University and the Foundation. He represented that he knows about "skeletons" related to people affiliated with the University and the Foundation and threatened to expose secrets that would embarrass these people. Notably, these people are not named defendants in this lawsuit and should not be dragged into this dispute. Bielema's counsel stated that Bielema is "seriously pissed" and "has authorized them to do what they need to do."

These intimidation tactics have only accelerated in recent weeks after the Foundation sought to end Bielema's bullying game with a proposed protective order. Since that time, Bielema's counsel escalated the campaign to attempt to silence and to harass the Foundation by filing its baseless Motion. As a professional courtesy and pursuant to Local Rule 7.3, the Foundation has not attached correspondence from Counter-Defendants' counsel due to its

---

[11]     Bielema's counsel previously represented Coach Houston Nutt in a lawsuit against the University of Mississippi. As part of that dispute, he obtained information about a salacious phone call involving a subsequently hired football coach. The information was not relevant to the lawsuit, but he used it to try to leverage a settlement for Coach Nutt and then leaked it to the press when Ole Miss did not submit to his demands. The coach subsequently resigned. *See* Pat Forde, *Why Houston Nutt, Lawyer Went Nuclear on Hugh Freeze and Ole Miss*, Yahoo Sports (July 24, 2017), *available at* https://sports.yahoo.com/houston-nutt-lawyer-went-nuclear-hugh-freeze-ole-miss-231430588.html; Dan Wolken, *Ole Miss Football Coach Hugh Freeze Made Call to Number Tied to Escort Service*, USA Today (July 20, 2017), *available at* https://www.usatoday.com/story/sports/ncaaf/sec/2017/07/20/ole-miss-coach-hugh-freeze-called-number-tied-escort-service/498056001/.

FEC\44844\0001\8059839.v1-10/30/20

sensational nature and its potential to embarrass Counter-Defendants' counsel.[12]  But suffice it to say that the emails and texts that the Foundation's counsel has received in recent weeks can only be characterized as unprofessional, offensive, and bordering on the disturbed.   In these communications, Counter-Defendants' counsel:

- Promises to humiliate the Foundation and its counsel.
- Admits (after denying) that they have been sharing information about the case with the media about court filings before those filings were filed, confirming the need for a protective order.
- Uses foul, unprofessional language directed at the Foundation, its counsel, and others completely unassociated with this matter and engages in childish name-calling and finger-pointing.
- Makes veiled references to acts of physical violence on their adversaries, referencing punching a lawyer in the face during a deposition.

In another email exchange between counsel regarding the proposed protective order and the Rule 26(f) report (which Bielema's counsel refused to agree to at the last minute), Bielema's counsel did not deny that he had made threats to the Foundation, its counsel, and the University and agreed that he had undertaken a FOIA attack against the University.  When those discussions faltered and each side filed its own Rule 26(f) report, a member of Bielema's team texted one of the Foundation's lawyers: "Katie, RKC.  Much love but, respectfully, stop writing sh** like this or I will be forced to ensure we humiliate you.  I do not wish to do that, and I expect there will be many opportunities where it isn't your head above the parapet."

Bielema's legal team has routinely copied the Foundation's lawyers on their purported internal emails, but that practice clearly is intentional.[13]   In one of the most notable of these "internal" email communications, on September 25, 2020, Bielema's counsel suggested they were

---

[12]   All referenced communications are available for the Court's *in camera* review upon request.
[13]   Counsel has engaged the Foundation's counsel directly in these faux "internal" emails (*e.g.*, stating in one email: "Robert, it's okay to laugh at the last line. You have to admit that was pretty funny.").

using (or threatening to use) Rule 11 to gain a strategic advantage.  Specifically, he wrote "**by referencing specific sections of their Counterclaim as Rule 11 violations in our Answer, we've put them in a position where if they file their 'litany of threats' Motion for a Protective Order, they're probably going to look like its "payback" for us raising Rule 11 violations that PK already took note of**."

Acrimony unfortunately arises with some regularity among opposing parties and their counsel in hotly contested cases.  Explicit efforts to intimidate coupled with threats to ruin or embarrass attorneys and non-parties are thankfully rare.  That, however, appears to be the primary "defense" strategy adopted by Counter-Defendants' counsel for this case, and the Motion is merely the most current adaptation of that tired, and unprofessional, tactic.

### V.     Conclusion

Rule 11 expressly provides that "the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion."  Fed. R. Civ. P. 11(c)(2).  The Advisory Committee Notes also explain that "the filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions."  *See* Fed. R. Civ. P. 11 (1993 Advisory Comm. Notes).

For the reasons set forth above, Counter-Defendants' Motion is baseless in fact and law. Thus, the Foundation respectfully requests that the Court deny the Motion, award the Foundation its costs and fees associated with defending the Motion, and grant the Foundation any and all other relief the Court deems just and proper.

25

Respectfully submitted,

Marshall S. Ney, AR91108
Robert W. George, AR98134
Katherine C. Campbell, AR2013241
Blake Z. Brizzolara, AR2017229
FRIDAY, ELDREDGE & CLARK, LLP
3350 S. Pinnacle Hills Parkway, Suite 301
Rogers, AR  72758
Office:        (479) 695-6049
Facsimile:     (501) 244-5389
mney@fridayfirm.com

By:    */s/ Marshall S. Ney*
      Marshall S. Ney, AR Bar 91108

## <u>CERTIFICATE OF SERVICE</u>

I, Marshall S. Ney, do hereby certify that the below listed persons will receive a copy of the foregoing via e-mail and U.S. Mail, postage prepaid, on or about this 3rd day of November, 2020:

Thomas A. Mars
MARS LAW FIRM
5500 Pinnacle Point Drive, Suite 202
Rogers, AR  72758
tom@mars-law.com

Richard N. Watts
WATTS, DONOVAN, TILLEY &
CARSON, P.A.
2120 Riverfront Drive, Suite 275
Little Rock, AR  72202-1436
Richard.watts@wdtc.law

Additionally, the following individuals will receive a copy of the foregoing via e-mail only, on or about this 3rd day of November, 2020:

R. Craig Wood
Benjamin P. Abel
McGUIRE WOODS LLP
Court Square Building
652 Peter Jefferson Parkway, Suite 350
Charlottesville, VA 22911
cwood@mcguirewoods.com
babel@mcguirewoods.com

John C. Everett
EVERETT LAW FIRM
P.O. Box 1460
12217 W. Hwy. 62
Farmington, AR 72730-1460
john@everettfirm.com

John E. Tull, III
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center St., Suite 1900
Little Rock, AR 72201
jtull@qgtlaw.com

Ryan K. Culpepper
CULPEPPER LAW FIRM, PLLC
P.O. Box 70
Hot Springs, AR 71902
ryan@theculpepperfirm.com

*/s/ Marshall S. Ney*
Marshall S. Ney