# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

BRET A. BIELEMA                                                    PLAINTIFF

v.                                  **5:20-cv-05104-PKH**

THE RAZORBACK FOUNDATION, INC.                               DEFENDANT

---

THE RAZORBACK FOUNDATION, INC.                        COUNTER-PLAINTIFF

V.

BRET A. BIELEMA and NEIL CORNRICH              COUNTER-DEFENDANTS

### [PROPOSED] AMENDED COUNTERCLAIM

Defendant / Counter-Plaintiff, The Razorback Foundation, Inc. (the "**Foundation**"), by and through its attorneys, Friday, Eldredge & Clark, LLP, for its Counterclaim against Plaintiff / Counter-Defendants, Bret A. Bielema ("**Bielema**") and Neil Cornrich ("**Cornrich**"), respectfully states as follows:

### NATURE OF DISPUTE

1.      After his separation from the University of Arkansas, Bielema had "an affirmative duty of mitigation to diligently seek and to obtain other employment." Release and Waiver Agreement ("Release Agreement"), attached hereto as **Exhibit A**, § 5(B)(i).   Further, Bielema agreed "to use his best efforts to maximize his earning potential with any new employer(s) consistent with compensation rates for similar positions in the given industry at the time such Other Employment is obtained" during the buy-out period (from November 2017- December 2020).  *Id*. § 5(B)(v).  The Foundation's guaranty payments to Bielema were entitled to be offset by amounts Bielema received from such other employment, subject to certain excluded threshold amounts.  *Id*.

1

§ 5(B)((iii), (iv).  In sum, Bielema had a contractual duty to mitigate the Foundation's liability to him.

2.      Bielema's affirmative duty to mitigate and to reduce the Foundation's liability to him carried the same weight and force as the Foundation's obligation to pay Bielema under the Release Agreement; the weight of those respective contractual commitments in the Release Agreement are equal and binding.  In exchange for the Foundation's contractual commitment to pay millions of dollars to him, Bielema contractually committed himself to work to diligently seek and to obtain other employment to meet his affirmative duty of mitigating the amount of money to be paid by the Foundation.  That is, Bielema was contractually obligated to reduce or to eliminate the amount of money to be paid by the Foundation.  Bielema, however, failed to do so on a wholesale basis in multiple ways.

3.      Bielema's duty to mitigate the Foundation's payments required more than simply finding another job.  He was required to seek and to obtain employment "of the same or similar character."  *See Runkle v. Fuess*, 226 Ark. 447, 449, 290 S.W.2d 433, 434 (1956).  Thus, he had an affirmative duty to seek and to obtain a job that maximized his earning potential during the buyout period, not just to take a job that built his resume while the Foundation footed the bill.  Despite years of college head coaching experience and three Rose Bowls, Bielema failed to use his best efforts to maximize his earning potential and to reduce the Foundation's payments to him, as required under the Release Agreement.  In contrast, and as just one of many examples, former Razorback Coach Chad Morris became the offensive coordinator for Auburn, making more than $700,000 per year following his termination.  Bielema, however, did not diligently seek and obtain other employment to meet the duty of mitigation as required by the Release Agreement.  Bielema likewise had a contractual duty once he had gotten a job to "use his best efforts to maximize his

2

earning potential with [the] new employer[s] consistent with compensation rates for similar positions in the given industry[.]" Ex. A. § 5(B)(v).  Bielema also failed to satisfy this requirement under the Release Agreement.  Bielema's duties to mitigate, as the word requires, must have reduced or eliminated the Foundation's liability to the greatest extent possible.  This requirement was not aspirational; it was a legally binding obligation that Bielema accepted but failed to meet.

4.     Instead, the facts demonstrate that Bielema saw the buyout period (November 2017 – December 2020) as an opportunity for him to move to the NFL while the Foundation subsidized his training with millions of dollars.  To accomplish this goal, Bielema and his agent, Neil Cornrich, conspired to place Bielema with the New England Patriots without regard to Bielema's legal obligation to diligently seek and to obtain other employment to meet his affirmative duty of mitigation to reduce the amount of money to be paid by the Foundation that was required by the Release Agreement.

5.     As part of their scheme, Bielema and Cornrich fraudulently induced the Foundation to enter into the Release Agreement knowing Bielema would not fulfill his legal commitments and then intentionally breached the Release Agreement as soon as it was signed by accepting a position that did not come close to maximizing his earning potential.  Bielema violated his promises to mitigate the Foundation's financial obligations by failing to use his best efforts to obtain, or even to look for, other employment.  Specifically, he agreed to a position with the New England Patriots that paid far below what Bielema could have earned given his experience and failed to even remotely fulfill his mitigation obligation.

6.     Perhaps most egregious and in *direct* breach of the Release Agreement, Bielema signed an employment agreement with the New England Patriots that legally prohibited Bielema from complying with his pre-existing affirmative duty of mitigation for which the Foundation was

3

paying $320,833.33 each month.  Specifically, the Patriots Employment Agreement provides: "The Employee [Bielema] shall not render services to another or others, either connected or not connected with football, during the Term of this Agreement, except with the express written permission of the Club[.]"  The Term of the Agreement was from July 2018 through January 2019 (or January 2020 if the Patriots elected, in its sole discretion, to exercise the one-year option). Thus, the express terms of the New England Patriots' employment agreement contain *no exceptions* for Bielema to diligently seek and to obtain other employment to comply with his affirmative duty of mitigation under the Release Agreement with the Foundation.  At no time did Bielema or Cornrich ever inform the Foundation that the unambiguous legal prohibition against seeking other employment did not apply to Bielema's contract with the Patriots.  Prior to and after signing the Patriots employment agreement, Bielema complied with the Patriots prohibition against seeking other employment because Bielema did nothing to meet his mitigation obligation to the Foundation in 2018 and early 2019 – all the while accepting millions of dollars from the Foundation without performing his contractual obligations.

7.     Equally as egregious and as another distinct breach of the Release Agreement, Bielema legally prohibited himself from complying with his affirmative duty of mitigation by granting the New England Patriots the *unilateral right* to extend his employment agreement for another year.  The Patriots Employment Agreement provided that the Patriots "in its sole discretion, may elect to extend the Term hereof for an additional one (1)-year period commencing February 1, 2019 and ending on January 31, 2020[.]" This provision resulted in Bielema's abandonment of his affirmative duty of mitigation to reduce or to eliminate the millions of dollars being paid by the Foundation – all in violation of the Release Agreement.  Once again, the Patriots employment agreement lacked any exceptions during its second year for Bielema to diligently seek

4

and to obtain other employment to meet his affirmative duty of mitigation in the Release Agreement. Thus, Bielema took himself off the job market – at a pay rate far below his actual earning potential – for *two* years (*i.e.*, more than half the buyout period) when he signed with the New England Patriots in violation of his legal obligations to the Foundation. In practical terms, the employment bar through January 2020 would have effectively taken Bielema out of the fall 2019 coaching hiring cycle, significantly restricting his ability to seek and to obtain employment for the final year of the buyout period.

8.     Bielema removed himself from the market for college coaching jobs (or any other position) by signing such a legally restrictive employment agreement with the New England Patriots. Bielema made no effort to affirmatively mitigate as required by the Release Agreement until well *after* the termination of the Release Agreement when the Foundation notified Bielema of a series of uncurable breaches of contract that legally excused any further performance by the Foundation. Consequently, Bielema is not entitled to further payment under the Release Agreement, and he is liable to the Foundation for the payments made to him.

9.     Given that he had contractually committed to the New England Patriots that he would not search for other positions, Bielema likewise failed to report his efforts to find other employment because he was not seeking other employment in 2018 and early 2019.

10.     Bielema's breach was made possible by the efforts of his agent, Neil Cornrich. Cornrich helped negotiate the Release Agreement, so he had full knowledge of Bielema's obligations under the Release Agreement. Further, Cornrich made representations regarding Bielema's duty to mitigate to induce the Foundation to enter into the Release Agreement, while knowing such representations were false. Cornrich represents a list of high-profile coaches, including Bill Belichick, among many others. Upon information and belief, Cornrich worked with

FEC/44844.0001/8254779.1-1/25/21

his other clients, including Bill Belichick, to orchestrate an arrangement under which Bielema could stay in a position where he received compensation just below the offset threshold under the Release Agreement, thereby allowing Bielema to maximize his payments under the Release Agreement and deprive the Foundation of the benefit of its bargain.  Cornrich did so while knowing that such terms were contrary to the agreement of the parties and in willful disregard of the Release Agreement's requirements.  Comparing Bielema to Cornrich's other clients who acquired much higher paying jobs around the same time clearly shows that Bielema and Cornrich plotted together to conspire against the Foundation.

11.    The fact that Bielema did not use his best efforts to maximize his earning potential and did not diligently seek and obtain other employment of the same or similar character is highlighted by the fact that he was able to obtain a multi-million-dollar head coaching position just two weeks before the Release Agreement expired.  On December 19, 2020, it was announced that Bielema had signed a contract with the University of Illinois for six years beginning with an annual salary of $4.2 million, and his duties were set to begin immediately on December 19.

## PARTIES, JURISDICTION, AND VENUE

12.    The Foundation is an Arkansas non-profit corporation with its principal place of business located in Fayetteville, Washington County, Arkansas.

13.    On information and belief, Bielema is a citizen and resident of Norfolk County, Massachusetts.

14.    On information and belief, Cornrich is a citizen of Cuyahoga County, Ohio. This Court has subject matter jurisdiction over this case pursuant to Ark. Code Ann. § 16-13-201 and Arkansas Constitution, Amendment 80, § 6.

15.    The Court may exercise personal jurisdiction over Bielema and Cornrich pursuant to Ark. Code Ann. § 16-4-101.

6

16.     Venue is appropriate pursuant to Ark. Code Ann. §§ 16-60-101(a)(1) and 16-60-101 (a)(3)(A) and pursuant to the forum selection clause in the governing contract, as set forth in the Court's Order dated August 21, 2020.

## FACTUAL ALLEGATIONS

17.     Bielema worked as the University of Arkansas's (the "University") head football coach from 2012 through 2017.

18.     During all relevant times, Bielema was represented by Cornrich as his agent.

19.     On November 24, 2017, the University terminated Bielema's employment for convenience.

### *Release and Waiver Agreement*

20.     After his termination, Bielema and the Foundation entered into the Release Agreement on January 30, 2018.  A true and correct copy of such Release Agreement is attached as **Exhibit A** and is incorporated herein by reference.

21.     The Release Agreement included a potential maximum guarantee payment to Bielema of $11,935,000, but the guarantee payment was expressly "subject to Bielema's duty of mitigation and the Foundation's right of offset." Ex. A § 5(A).

22.     The Foundation's payments were expressly conditioned upon, and carried the same weight as, Bielema's duty to mitigate.  *Id.*

23.     Pursuant to the Release Agreement, Bielema had an "affirmative duty of mitigation to diligently seek and to obtain other employment." *Id.* § 5(B)(i). Bielema further agreed to "use his best efforts to maximize his earning potential with any new employer(s) consistent with compensation rates for similar positions in the given industry at the time such Other Employment is obtained." *Id.* § 5(B)(v).

FEC/44844.0001/8254779.1-1/25/21

24.     Pursuant to the Release Agreement, Bielema also had a duty to "provide a written summary to the Foundation of his efforts to find other employment" every six months.  *Id.* § 5(B)(i).

25.     Pursuant to the Release Agreement, Bielema had a duty to inform the Foundation when he successfully gained new employment.  *Id.* § 5(B)(ii).

26.     Correspondingly, the Foundation had the right to offset and reduce its monthly payments dollar-for-dollar by the amount of compensation Bielema earned from other employment.  *Id.* § 5(B)(iii), (v).  The Release Agreement allowed the Foundation to offset the greater of either (i) Bielema's "Other Income" (*i.e.*, any amounts Bielema received from other employment) or (ii) Bielema's "Average Annual Compensation" (*i.e.*, the average annual value of all amounts required to be paid to Bielema over the term of multi-year contracts).  *Id.* § 5(B)(v).  Thus, the intent of the offset provision was to maximize the amount of offset available to the Foundation and to prevent Bielema from backloading any multi-year contracts in an attempt to evade the mitigation obligation.  *Id.*

27.     The Foundation's right to offset had certain exclusions, including that it did not apply to income falling below specified amounts.  *Id.* § 5(B)(iv).  Specifically, the offset right did not apply to amounts falling below $150,000 before December 31, 2018.  *Id.*

28.     The Foundation's right to offset specifically included the average annual compensation Bielema might be entitled to receive under multi-year contracts.  *Id.* §5(B)(v).

29.     Bielema's affirmative duty to mitigate and to reduce the Foundation's liability to him carried the same weight and force as the Foundation's obligation to pay Bielema under the Release Agreement; the weight of those respective contractual commitments in the Release Agreement are equal and binding.

*Bielema Fraudulently Enters Into the Release Agreement*

30.    During the negotiation of the Release Agreement, Bielema, acting through Cornrich, represented to the Foundation that Bielema would find other employment and maximize his earning potential when in fact Bielema never intended to maximize his earning potential.

31.    At the time of the signing of the Release Agreement, Cornrich advised the Executive Director of the Foundation that "Arkansas had been good to Bret" and sometimes things just "don't work out." Cornrich explained the "Plan" was to position Bielema to get a major head coaching position at the end of the 2018 season, and the Foundation would not owe any of the buyout amount, or at least not most of it.

32.    Upon information and belief, by the time the Release Agreement was executed, Bielema had already brokered a deal with the New England Patriots where he would be making less than the $150,000 threshold amount.

33.    Indeed, Bielema, working through his agent, Cornrich, entered into the Release Agreement knowing that Bielema would not perform his mitigation obligations that were material to the Foundation's willingness to enter into the Release Agreement.

34.    A non-exhaustive list of facts showing that Bielema, through Cornrich, entered into the Release Agreement knowing that Bielema would breach his mitigation obligations is as follows:

    a.    During negotiation of the Release Agreement, Cornrich represented to the Foundation that the Foundation would not have a large buyout payment because Bielema intended to get a high-paying position.

    b.    Bielema and Cornrich never objected to the offset provisions allowing the Foundation to offset, dollar-for-dollar, the greater of (i) Bielema's "Other Income"

(*i.e.*, any amounts Bielema received from other employment) or (ii) Bielema's "Average Annual Compensation" (*i.e.*, the average annual value of all amounts required to be paid to Bielema over the term of multi-year contracts). Indeed, they had no need to object to this provision, which would have benefited the Foundation, because Bielema and Cornrich knew – prior to execution of the Release Agreement – that they had negotiated a set-up where Bielema could stay with the Patriots throughout the term of the Release Agreement and receive an income below the offset threshold amount.

c.      Only months after signing the Release Agreement, Bielema was quoted in a news article as not wanting to return to a college coaching position. In a CBS Sports article, Bielema stated: "It's a whole different way to coach [in the NFL] . . . I understand once they go to that level, coaches don't ever go back [to college]." Dennis Dodd, *Bret Bielema Is Enjoying the NFL So Much, He May Never Go Back to College Football* (July 13, 2018), available at https://www.cbssports.com/college-football/news/bret-bielema-is-enjoying-the-nfl-so-much-he-may-never-go-back-to-college-football/. In response to this report, the Executive Director contacted Cornrich to express concern that Bielema's quotes were very damaging to any prospects of obtaining another college head coaching position. Cornrich admitted to the Executive Director that "Bret was too nice" to the reporter and "should not have made those comments." Cornrich further stated that he had "already chewed Bret out," and Bielema would not make similar remarks going forward. Cornrich then reaffirmed that getting Bielema a head coaching job was still the "Plan."

d.   Only months after signing the Release Agreement, Bielema executed agreements with the Patriots under which his compensation was suspiciously below or equal to the offset threshold set under the Release Agreement.

   i.   The offset threshold for 2018 was $150,000.  In March 2018, Bielema executed an agreement with the Patriots under which he received $25,000 through July 1, 2018.  In July 2018, Bielema executed another agreement with the Patriots under which he received $100,000 through January 2019. As such, Bielema received $125,000 from the Patriots in 2018, just $25,000 shy of the offset threshold.

   ii.   The offset threshold for 2019 was $125,000.  The July 2018 agreement with the Patriots provided for a one-year option period commencing on February 1, 2019.   Under the option, Bielema would have received $125,000, equaling exactly the offset threshold.

e.   Only months after signing the Release Agreement, Bielema executed an agreement with the Patriots that (i) legally bound himself to a prohibition from fulfilling his affirmative duty of mitigation and (ii) granted the Patriots the unilateral right to extend this scheme for an additional year.

f.   Bielema utterly failed to engage in any activity to find other employment during the 2018 college coaching search period as admitted in the Amended Complaint.

g.   All of the above was compounded by the lack of communication from Neil Cornrich and his dismissive attitude about Bielema's job-search requirements.

h.   In early December 2018, the Foundation's fears were confirmed when a person close to Bret Bielema told a representative of the Foundation that Bielema had

represented that Bielema was not interested in, and would not accept, the open head coaching job at Kansas State University, if offered.  Moreover, neither Cornrich nor Bielema provided any information that Bielema was actively on the job market seeking any available head coaching positions in 2018.

***Bielema's Efforts To Find Employment Fall Far Below What the Release Agreement Requires***

35.     In 2018, Bielema began working for the New England Patriots to assist the Patriots' coaching staff in assessing NFL draft prospects.

36.     Upon information and belief, Bielema provided services to the Patriots prior to March 2018 without compensation.

37.     Bielema's agreement with the Patriots was then memorialized in an independent contractor agreement dated March 1, 2018.  This agreement expired on July 1, 2018.

38.     Upon information and belief, the Patriots paid Bielema $25,000 for seven weeks of work under this arrangement.

39.     Having not heard from Bielema as to his plans when the March 1, 2018 agreement expired, the Foundation was forced to inquire with Cornrich instead of Bielema complying with the Release Agreement's requirement that he notify the Foundation.  After waiting two weeks to hear from Cornrich, on July 17, 2018, the Foundation asked: "I know his initial contract was set to expire at the end of June.  Can you please give us an update at this point?"  It was not until nearly one month later, on August 10 that Cornrich sent Bielema's new agreement to the Foundation.

40.     In July 2018, Bielema accepted a job as Special Assistant to the Patriots and accepted an annual salary of $100,000, notably just below the $150,000 offset limit.

41.     The Patriots agreement for the Special Assistant position prohibited Bielema from accepting any other employment during the term of the agreement. Specifically, the Patriots Employment Agreement provides: "The Employee shall not render services to another or others, either connected or not connected with football, during the Term of this Agreement, except with the express written permission of the Club[.]"

42.     At the time Bielema signed the Patriots Employment Agreement in July 2018, he had been warned and was aware that the position would prohibit him from seeking other jobs in violation of his mitigation obligations for the 2018 and 2019 "coaching carousels," but he executed the employment agreement nonetheless.

43.     By its express terms, Bielema legally forfeited the right to be available for head college coaching positions at the end of the 2018 college football season, and the New England Patriots were continuing to have a successful season in the play-offs and ultimately reached the Super Bowl.

44.     The Patriots agreement for the Special Assistant position gave the Patriots the *unilateral* right to extend the agreement (including the employment bar) for an additional year, including the unilateral right to exercise this extension within 48 hours after the Patriots' final game, which turned out to be the Super Bowl.

45.     Bielema failed to take any action whatsoever to diligently seek and to obtain other employment that would comply with his affirmative duty to mitigate in 2018.

46.     Indeed based on the allegations in Bielema's own Amended Complaint, during the year-long period between the date Bielema signed the Release Agreement in January 2018 and the date the Foundation sent a notice of breach in January 2019, Bielema did not meet with or speak to a search firm, Athletic Director, or anyone else about open positions.

13

47.    Thus, based on his July 2018 employment agreement with the New England Patriots, Bielema agreed – in violation of his Release Agreement and contrary to Cornrich's prior representations about the "Plan" for Bielema to obtain a high-paying collegiate head coaching position – not to seek employment during the 2018 college coaching cycle.

48.    Moreover, Bielema's July 2018 agreement granted the Patriots the unilateral right to extend Bielema's employment for an additional year at the same rate that was well below Bielema's true earning potential all the while still prohibiting Bielema from diligently seeking and obtaining another position to meet his affirmative duty of mitigation.  By early January 2019, this scheme to violate the Release Agreement was poised to continue within 48 hours following the conclusion of the 2019 Super Bowl.  Additionally, in January 2019, the Foundation was aware of reports that Bielema was telling people that he would be the next defensive coordinator of the Patriots.  The Patriots, however, already had Bielema contractually locked in at a low salary with the unilateral right to extend his employment for another year.  By the end of 2018 and early 2019, no steps were taken to carry out the "Plan" that Cornrich had touted at the time of executing the Release Agreement and again in July 2018 when Bielema expressed the intent not to return to college coaching.

***The New England Patriots Paid Bielema The Minimal Amount***

49.    Bill Belichick is the head coach and de facto general manager of Patriots.

50.    Neil Cornrich was Belichick's agent at all times relevant to the allegations herein.

51.    Robert Kraft is the owner of the Patriots.

52.    By at least the spring of 2018, Belichick and Kraft were aware that Bielema had entered into the Release Agreement with the Foundation and had knowledge of the terms of the Release Agreement.

53.     During the spring and summer of 2018, Belichick and Kraft exchanged emails regarding Bielema's position and compensation with the Patriots.



*Neil Cornrich Facilitates Bielema's Fraud and Breach*

59.     At all relevant times, Cornrich served as Bielema's agent.

60.     Cornrich represented Bielema as he negotiated the Release Agreement and was personally involved in negotiations with the Foundation about the Release Agreement's buyout and offset provisions.

61.     Cornrich also represented Bielema as he negotiated his agreements with the Patriots.

62.     Cornrich served as agent for the Patriots' Head Coach, Bill Belichick, during the time that Bielema's agreements with the Patriots were being negotiated.

15

63.     Because Cornrich was intimately involved in the negotiations of the Release Agreement, he had full knowledge of the salary limits that would trigger the Foundation's right to offset.  Indeed, Cornrich initially requested even higher salary exclusions than what the parties ultimately agreed to in the final Release Agreement.

64.     Upon information and belief, Cornrich used his connection with the Patriots to negotiate a salary with the Patriots for Bielema that was far below market price for a former Division I head football coach.  Cornrich purposefully negotiated a salary that was well below what Bielema could have received given his previous position and experience in order for Bielema to receive the maximum amount he could without invoking the Foundation's right of setoff.

65.     Comparing Bielema to Cornrich's other clients who acquired jobs with salaries well above the offset limit around the same timeframe confirms that Bielema and Cornrich intentionally negotiated compensation below the offset threshold.

66.     For example, Tom Arth, one of Cornrich's client, left the University of Tennessee – Chattanooga to become head coach at Akron in 2019 where he makes $500,000 per year.

67.     Additionally, comparing Bielema to other head coaches who were terminated for convenience around the same timeframe confirms that Bielema and Cornrich intentionally negotiated compensation below the offset threshold.

68.     For example, Will Muschamp was the head football coach at the University of Florida from 2011-2014.  One month after being terminated, he was hired as the Defensive Coordinator at Auburn, where his salary was more than $1.6 million.   After one year at Auburn, Muschamp was hired as the Head Coach at South Carolina, where he makes more than $4 million per year.

16

69.     As another example, Kevin Sumlin was the head football coach at Texas A&M from 2012-2017.  Within months of being terminated for convenience, he was hired as the head coach at the University of Arizona with a base salary of $2 million.

***Bielema's Post-Notice-of-Breach Efforts Underscore His Paltry Attempts To Seek Employment***

70.     On January 31, 2019, the Foundation sent written notice to Bielema that he failed to comply with the Release Agreement.  Specifically, the Foundation notified Bielema that he materially breached the Agreement by (i) failing to diligently seek and obtain other employment; (ii) failing to provide a written summary to the Foundation of his efforts to find other employment every six months; (ii) failing to notify the Foundation in writing of other employment he had obtained and the income he received from such employment; and (iv) failing to use his best efforts to maximize his earning potential with any new employer.

71.     Only after the Foundation's written notice of uncurable breach, the Patriots promoted Bielema to Assistant Coach with an annual salary of $250,000 in April 2019.

72.     After the Foundation notified Bielema of his breach in early 2019, Belichick suggested ███████████████████████████████████████████████████████
███████████████████████████████████████████████

73.     Notably, Bielema was first paid an income that was not below the threshold for the Foundation's right of offset after the Foundation's written notice of uncurable breach and the Foundation was legally excused from any further performance under the Release Agreement. However, Bielema's compensation was still well below his earning potential.

74.     Also after the Foundation's written notice of uncurable breach and in direct response to the specific violations of the Release Agreement identified in that notice, Bielema entered into a post-breach Assistant Coach Employment Agreement that—unlike his previous

17

Patriots' contract—permitted him to accept other employment.  This occurred only *after* the Foundation notified Coach Bielema of his breach.  If Bielema had not been bound by the employment bar in his previous Patriots agreement, then there would have been no need to make such a modification.

75.     In January 2020, Bielema accepted a position with the New York Giants as Outside Linebackers/Senior Assistant with an annual salary of $400,000.

76.     Also in January 2020, Bielema signed a revised agreement with the Giants that allowed Bielema to accept a Division 1 college head coaching position during the term of his agreement with the Giants.

***Bielema Obtained a High-Paying Position Only Two Weeks Before the Release Agreement Expired***

77.     On December 19, 2020, it was announced that Bielema had accepted the head coaching position at the University of Illinois.

78.     Upon information and belief, Bielema's initial contract with the University of Illinois is for six years beginning with an annual salary of $4.2 million.

79.     Upon information and belief, Bielema began his duties with the University of Illinois immediately on December 19, 2020.

<u>**COUNT I - BREACH OF DUTY TO MITIGATE**</u>
**(Counter-Defendant Bielema)**

80.     The Foundation restates and incorporates the preceding paragraphs of its Counterclaim as if stated herein again word for word.

81.     The Foundation and Bielema entered into the Release Agreement, which is a valid, binding contract.

82.     The Foundation has performed its obligations under the Release Agreement.

18

83.     Under the Release Agreement, Bielema had an affirmative duty to mitigate consistent with the terms of the Release Agreement and Arkansas law. Ex. A § 5(B)(i).  Further, Bielema agreed to "use his best efforts to maximize his earning potential with any new employer(s) consistent with compensation rates for similar positions in the given industry." *Id*. § 5(B)(v).  As such, Bielema had an affirmative duty of mitigation to reduce the amount of money to be paid by the Foundation that was required by the Release Agreement.

84.     Bielema breached the Release Agreement, by, among other things,

a.     Failing to seek and to obtain other employment;

b.     Failing to look for other employment that would maximize his earning potential;

c.     Failing to obtain employment "of the same or similar character."  *See Runkle v. Fuess*, 226 Ark. 447, 449, 290 S.W.2d 433, 434 (1956);

d.     Failing to obtain other employment that would maximize his earning potential and with a compensation rate that was consistent with compensation rates for similar positions;

e.     Accepting a position as a "Special Assistant" with an annual salary of $100,000, which is far below the salary a former Division I head football coach generally makes;

f.     Signing a contract that violated the Release Agreement by contractually prohibiting himself from meeting his affirmative duty of mitigation, including his duty to diligently seek and to obtain other employment;

g.     Accepting a position that allowed the Patriots to unilaterally extend the agreement (including the employment bar) for one year;

h.     Accepting these positions with the Patriots when he had other job offers; and

19

i.    Failing to reduce the amount of money to be paid by the Foundation that was required by the Release Agreement.

85.    Bielema's breach of the Release Agreement resulted in damages to the Foundation in an amount exceeding $ 4,555,833.29 (*i.e.*, the full amount of payments made by the Foundation to Bielema under the Release Agreement to date).

**COUNT II - BREACH OF DUTY TO REPORT**
**(Counter-Defendant Bielema)**

86.    The Foundation restates and incorporates the preceding paragraphs of its Counterclaim as if stated herein again word for word.

87.    The Foundation and Bielema entered into the Release Agreement, which is a valid, binding contract.

88.    The Foundation has performed its obligations under the Release Agreement.

89.    Under the Release Agreement, Bielema had an affirmative duty to provide the Foundation with regular reports related to his employment search.  Specifically, Bielema agreed to "provide a written summary to the Foundation of his efforts to find other employment" every six months.  Ex. A § 5(B)(i).

90.    Bielema breached his reporting obligations under the Release Agreement, by, among other things:

a.    Failing to provide written summaries of his job search efforts every six months;

b.    Failing to notify the Foundation of his other employment and other income; and

c.    Requiring the Foundation to inquire as to his other employment and other income.

91.    Bielema's breach of the Release Agreement resulted in damages to the Foundation in an amount to be proven at trial.

20

## COUNT III – FRAUDULENT MISREPRESENTATION
### (Counter-Defendants Bielema and Cornrich)

92.     The Foundation restates and incorporates the preceding paragraphs of its Counterclaim as if stated herein again word for word.

93.     To induce the Foundation to execute the Release Agreement, Bielema and Cornrich represented to the Foundation that Bielema would diligently seek and obtain other employment to fulfill his affirmative duty of mitigation and that he would use his best efforts to maximize his earning potential.

94.     To induce the Foundation to execute the Release Agreement, Bielema and Cornrich further represented and agreed that such income (above the offset threshold) would be used to offset the Foundation's payment obligations.

95.     To induce the Foundation to execute the Release Agreement, Cornrich represented that Bielema would obtain a significant coaching job in the next coaching hiring cycle in 2018 as part of the "Plan" that would eliminate or greatly reduce the Foundation's obligations under the Release Agreement.

96.     The parties and their representatives spent weeks negotiating the terms of the mitigation and offset provisions.

97.     As Bielema's agent, Cornrich had knowledge of the Release Agreement.  Cornrich worked with the Foundation to negotiate the Release Agreement and was personally involved in negotiating the mitigation and offset provisions.

98.     Bielema and Cornrich knew at the time of making such representations that such representations were false or that Bielema did not have a sufficient basis of information to make such representation.

99.     Specifically, upon information and belief, Bielema and Cornrich knew at the time

21

of making such representations that Bielema did not intend to carry out such promise, as evidenced by the facts alleged herein, specifically paragraphs 32-34. The Foundation reserves the right to amend its Counterclaim to assert additional facts as they may become known during discovery.

100.    Upon information and belief, Cornrich used his connection with Bill Belichick and the Patriots to negotiate a salary for Bielema from the Patriots that was below the level necessary to trigger the Foundation's right to offset so that Bielema could maximize his personal financial gain to the detriment of the Foundation. Additionally, Cornrich's actions benefitted the Patriots, and, by extension, his other client, Bill Belichick, to the detriment of the Foundation.

101.    Cornrich had a clear interest in helping the Patriots hire Bielema for a salary that was purposefully less than the trigger amount for the Foundation's right to offset, as a lower compensation amount would benefit both Bielema and the Patriots (and by extension Belichick). As a result, Cornrich had a motive to engage in the fraud because it financially benefited his clients on both ends of the deal and ultimately would benefit Cornrich to groom Bielema for a head coaching position in the NFL. To achieve this objective, however, Cornrich had to create a pathway for Bielema to position himself for an NFL head coaching position. Cornrich's scheme to place Bielema with the Patriots deprived the Foundation of Bielema's commitments in the Release Agreement to comply with his affirmative duty of mitigation to seek and to obtain other employment – all at the expense of the Foundation.

102.    Bielema's obligation to mitigate and the Foundation's corresponding right to offset were material terms, and Bielema and Cornrich knew that the Foundation would rely on such representations and intended for the Foundation to rely on these representations.

103.    The Foundation justifiably and reasonably relied on the representations set forth herein in executing the Release Agreement.

FEC/44844.0001/8254779.1-1/25/21

104.    The Foundation suffered damages as a result of such misrepresentations in an amount exceeding $4,555,833.29 (*i.e.*, the full amount of payments made by the Foundation to Bielema under the Release Agreement to date), but which the Foundation reserves the right to prove in greater amounts at trial, in addition to costs, pre-judgment and post-judgment interest, and attorneys' fees.

105.    In addition to the other damages to which the Foundation is entitled to recover from Plaintiff / Counter-Defendants, the Foundation is entitled to recover punitive damages from Bielema and Cornrich.

### COUNT IV - DECLARATORY RELIEF

106.    The Foundation restates and incorporates the preceding paragraphs of its Counterclaim as if stated herein again word for word.

107.    Pursuant to Arkansas Code Annotated § 16-111-102, parties whose rights, status, or legal relations are affected by a statute, contract, or other legal instrument are entitled to petition the court for a determination of any question of the construction or validity of such statute, contract, or other legal instrument and for a determination of their rights, status, or legal relations.

108.    There is a real and substantial judicial controversy between the parties to this action as to the Foundation's obligations under the Release Agreement.

109.    Because Bielema committed a material breach by failing to mitigate and breached the implied covenant of good faith and fair dealing by intentionally breaching the Release Agreement for his personal financial gain, the Foundation was relieved of its obligations under the Release Agreement.

110.    The Foundation therefore seeks a judicial declaration that it is not obligated to pay Bielema any additional amounts under the Release Agreement. In the alternative, the Foundation

23

seeks a judicial declaration that any amounts otherwise due to Bielema under the Release Agreement are reduced based upon the average annual compensation available to Bielema under his multi-year contract with the University of Illinois.

111.    As a result, a justiciable controversy exists between the parties, and the issues herein are ripe for determination.

## PUNITIVE DAMAGES & OTHER MATTERS

112.    Due to the egregious, fraudulent, and intentional misconduct of Plaintiff / Counter-Defendants described above, the Foundation is entitled to punitive damages in an amount to be determined by the jury.  In addition to being intentional, Plaintiff / Counter-Defendants knew or ought to have known, in the light of the surrounding circumstances, that their conduct would naturally and probably result in damage to the Foundation, and they nonetheless continued such conduct with malice and/or in reckless disregard of the consequences from which malice may be inferred.

113.    The Foundation requests a trial by jury.

WHEREFORE, Defendant / Counter-Plaintiff, the Razorback Foundation, Inc., prays as follows:

(a)    That the Foundation recover judgment against Plaintiff / Counter-Defendants, jointly and severally, for compensatory damages suffered as a result of their unlawful acts and omissions in an amount to be proven at trial but not less than $4,555,833.29 (*i.e.*, the full amount of payments made by the Foundation to Bielema under the Release Agreement to date), together with reasonable attorneys' fees, pre-judgment and post-judgment interest as allowed by law, costs, and additional costs of collection;

(b)      That the Foundation recover punitive damages from and against Plaintiff / Counter-Defendants sufficient in amount to punish and deter the egregious, intentional, and malicious conduct described in this Counterclaim;

(c)      That this Court judicially determine and declare the Foundation's rights and obligations under the Release Agreement and construe or interpret those rights in accordance with the law, the Release Agreement, and the allegations of this Counterclaim; and

(d)      That the Foundation be awarded such additional relief as may be proper under the allegations hereof.

Respectfully submitted,

Marshall S. Ney, AR91108
Robert W. George, AR98134
Katherine C. Campbell, AR2013241
Blake Z. Brizzolara, AR2017229
FRIDAY, ELDREDGE & CLARK, LLP
3350 S. Pinnacle Hills Parkway, Suite 301
Rogers, AR  72758
Office:          (479) 695-6049
Facsimile:     (501) 244-5389
mney@fridayfirm.com

By:     _____
            Marshall S. Ney, AR Bar 91108